1  Daniel T. Foley, Esq.
   Nevada Bar No. 1078
2  FOLEY & OAKES, PC
   1210 S. Valley View Blvd. #208
3  Las Vegas, Nevada 89102
   Tel.: (702) 384-2070
4  Fax: (702) 384-2128
   dan@foleyoakes.com
5  *Attorneys for Dan Montano and Jack Jacobs*

6

7                    UNITED STATES DISTRICT COURT

8                        DISTRICT OF NEVADA

9

10 VENTURIS THERAPEUTICS, INC.,          )   Case No:
   formerly known as CARDIOVASCULAR      )
11 BIOTHERAPEUTICS, INC.,                )
                                          )
12            Claimant,                   )
                                          )
13 v.                                     )   **APPLICATION FOR ORDER**
   DANIEL C. MONTANO and DR. JOHN W.      )   **CONFIRMING ARBITRATION**
14 JACOBS.                                )   **AWARD**
              Respondents.                )
15                                        )
                                          )
16 _____       )

17 _____       )
   DANIEL C. MONTANO and                  )
18 DR. JOHN W. JACOBS,                    )
                                          )
19            Counter Claimants,          )
                                          )
20 v.                                     )
                                          )
21 VENTURIS THERAPEUTICS, INC.,           )
   formerly known as CARDIOVASCULAR       )
22 BIOTHERAPEUTICS, INC.,                 )
                                          )
23            Counter Respondent.         )
                                          )
24

25

26         **APPLICATION FOR ORDER CONFIRMING ARBITRATION AWARD**

27

28

**FOLEY**
**&**
**OAKES**

1 of 8

COMES NOW, Daniel C. Montano and Dr. John W. Jacobs by and through their attorneys, Foley & Oakes, PC, and hereby Apply to this Court for an Order confirming the Arbitration Award in this matter.

This Application is made and based upon the Federal Arbitration Act, U.S. Code Title 9 and NRS §§ 38.239 and 38.243, the following points and authorities, and all attachments hereto.

DATED this 29th day of July, 2020.

FOLEY & OAKES, PC

**/s/ Daniel T. Foley**
Daniel T. Foley, Esq.
1210 S. Valley View Blvd. #208
Las Vegas, Nevada 89102
*Attorneys for Dan Montano and Jack Jacobs*

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF APPLICATION TO CONFIRM ARBITRATION AWARD**

**I.
INTRODUCTION**

Cardiovascular Biotherapeutics, Inc. is a Delaware corporation, with its original principal place of business in Las Vegas, Nevada. See the Affidavit of Daniel T. Foley, Esq. attached hereto as Exhibit "1". Cardiovascular Biotherapeutics, Inc. filed suit in this Court on November 26, 2014 against Dr. Jacobs in Case No. 2:14-cv-01965-JCM-PAL. A copy of Cardio's Complaint without exhibits filed with this Court is attached as Exhibit "A" to Mr. Foley's Affidavit. On February 19, 2015, Judge James C. Mahan Granted Dr. Jacobs' Motion to Dismiss Cardiovascular Biotherapeutics, Inc.'s Complaint and Compel Arbitration. A copy of Judge Mahan's February 19, 2015 Order Granting Dr. Jacobs' Motion to Dismiss and Compel Arbitration is attached as Exhibit "B" to Mr. Foley's Affidavit.

On July 19, 2018, three years and five months following Judge Mahan's Order Granting Dr. Jacobs' Motion to Dismiss, Cardiovascular Biotherapeutics, Inc. demanded Arbitration

**FOLEY
&
OAKES**

against Dr. Jacobs and Mr. Montano.  Exhibit "1".  Sometime between February 2015 and July 2019 Cardiovascular Biotherapeutics, Inc. relocated its principal place of business from Las Vegas to Dallas, TX.  Exhibit "1".

The Arbitration hearing took place August 26 - 28, 2019 in Las Vegas, NV. Exhibit "1". Sometime following the Arbitration Hearing, Cardiovascular Biotherapeutics, Inc. changed its name to Venturis Therapeutics, Inc. Exhibit "1".  The Arbitration Award was issued in the name of Cardiovascular Biotherapeutics, Inc. as the party in interest; however, counsel for Cardiovascular Biotherapeutics, Inc., Mr. Cannaday, has agreed that this Court's confirmation of the Arbitration Award should be issued in the name of Venturis Therapeutics, Inc.  Exhibit "1". Venturis Therapeutics, Inc., formerly known as Cardiovascular Biotherapeutics, Inc. shall at times hereinafter be referred to as "Cardio".

## II.
## THE AGREEMENTS TO ARBITRATE

Mr. Montano founded Cardio in 1998 and served as its President and CEO until 2013/2014.  Exhibit "1".  Dr. Jacobs served as Cardio's Chief Scientific Officer from 2000 through 2013/2014.  Exhibit "1".

Mr. Montano and Dr. Jacobs both executed written employment agreements with Cardio on January 1, 2007.  Those two employment agreements are attached hereto as Exhibits "C" and "D" to Mr. Foley's Affidavit.  The two employment agreements contain identical Arbitration provisions in paragraphs numbered 9.  In those Arbitration provisions, the parties agreed that the Arbitrator would be a retired judge, that the award would be a written reasoned opinion, the award would be final, and judgment upon the award could be entered in any court having jurisdiction.  Exhibits "C" and "D".

On March 1, 2010, Dr. Jacobs executed a written Consulting Agreement, which, for the most part, superseded his Employment Agreement.  Dr. Jacobs' Consulting Agreement is attached

FOLEY
&
OAKES

hereto as Exhibit "E" to Mr. Foley's Affidavit.   The Arbitration provision in Dr. Jacob's Consulting Agreement is paragraph 21.  This Arbitration provision is similar to the provision in the Employment Agreements, but also includes "if any judicial proceeding is required to enforce an arbitration ruling…, the parties hereby consent to the exclusive jurisdiction and venue of the U.S. District Court for the District of Nevada."   Exhibit "E" paragraph 21.

### III.
### SELECTION OF THE ARBITRATOR

Pursuant to the parties' agreements, the Arbitration was conducted through the American Arbitration Association ("AAA").  Exhibit "1".  The parties were provided Arbitrator Selection lists which they filled out and returned to AAA.  Exhibit "1".  Copies of the parties' Arbitration Selection Lists are attached hereto as Exhibits "F" and "G".  The Arbitrator selected by AAA was the Honorable Michael D. Zimmerman.  Judge Zimmerman's resume provided through AAA is attached as Exhibit "H" to Mr. Foley's Affidavit.  Judge Zimmerman served as a Utah Supreme Court Judge from 1984 to 2000, served as law clerk to United States Supreme Court Chief Judge Warren Burger, and is currently a partner in Zimmerman and Booher, a Utah law firm specializing in appellate work.  Exhibit "H".

### IV.
### THE ARBITRATION, BRIEFING, AND ISSUANCE OF TWO INTERIM AWARDS AND THE FINAL AWARD

Again, the Arbitration hearing took place August 26 - 28, 2019 in Las Vegas, NV.  Exhibit "1".

There were no requests for continuance of the Arbitration hearing sought by any party or the Arbitrator.  Exhibit "1".

Following three rounds of extensive Post Arbitration briefing agreed upon by the parties and the Arbitrator, two oral argument hearings via conference call, and two Interim Awards, and a Motion by Cardio to Modify the Arbitrator's Award, Judge Zimmerman issued his final Award on

FOLEY
&
OAKES

July 20, 2020.  Exhibit "1".  A copy of Judge Zimmerman's Final Arbitration Award is attached as Exhibit "I" to Mr. Foley's Affidavit.

## V.
## THE FINAL AWARD

Cardio asserted the following causes of action against Mr. Montano and Dr. Jacobs:

1.  Breach of Contract and Injunctive Relief,

2.  Violation of Copyright Law and Injunctive Relief,

3.  Actual Misappropriation of Trade Secrets and Injunctive Relief,

4.  Violation of Federal RICO Statutes,

5.  Violation of the Lanham Act (41 U.S.C. 1125(a),

6.  Misappropriation of Trade Secrets,

7.  Civil Conspiracy, and

8.  Breach of Fiduciary Duties.   A copy of Cardio's Second Amended (and final) Arbitration Demand is attached as Exhibit "J" to Mr. Foley's Affidavit.

The Arbitration Award denies all of Cardio's causes of action except for Violation of Copyright Law and Injunctive Relief.  With respect to that cause of action, the only damages awarded to Cardio were $10,000 for attorneys' fees incurred in presenting the claim to the Arbitrator as no actual damages were proffered by Cardio.  Exhibit "I".

Mr. Montano and Mr. Jacobs each alleged a single cause of action for breach of contract based on unpaid wages.  Exhibit "1".

The Arbitrator awarded Mr. Montano $900,000 in back wages, Dr. Jacobs $96,222 in back wages with a contingency, plus attorneys' fees of $171,375.17 and costs of $20,997.17 were awarded jointly to Mr. Montano and Dr. Jacobs.  Exhibit "I".

Judge Zimmerman ruled on and resolved all issues presented to him by all parties to the Arbitration.  Exhibit "1".

**FOLEY**
**&**
**OAKES**

1  Judge Zimmerman did not exclude any witnesses presented by the parties and did not

2  exclude any evidence proffered by the parties.   Exhibit "1".

3  Judge Zimmerman's Final Award has not been modified or corrected.  Exhibit "1".

**VI.**
**LAW**

The parties' agreements all provide that "the arbitrator's award shall be final" and the award may be entered in any court of competent jurisdiction.  Dr. Jacob's Consulting Agreement specifically designates this Court as having the exclusive jurisdiction where an arbitrator's award is to be confirmed.

This Court has jurisdiction over this matter as this Court previously exercised its jurisdiction when it dismissed Cardio's claim against Dr. Jacobs and compelled Cardio to bring its claim in arbitration.

Cardio set forth in its Complaint in this Court, Exhibit "A", the following:

17.   This Court has original jurisdiction over this action against Jacobs under 28 U.S.C. § 1332(a) because Plaintiff and Jacobs are citizens of different states and the matter of controversy exceeds the sum or value of $75,000 exclusive of interests and costs.

18.   This Court also has jurisdiction over this action against Jacobs pursuant to 28 U.S.C. §§ 1331 and 1338(a).

19.   This Court additionally has jurisdiction over this action pursuant to 28 U.S.C. §§ 1367(a).

9 U.S. Code § 9 of the Federal Arbitration Act provides,

if the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration**,** and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.

**FOLEY**
**&**
**OAKES**

6 of 8

1    NRS 38.239 follows the language of 9 U.S.C. § 9.  It states, "[a]fter a party to an arbitral

2    proceeding receives notice of an award, the party may make a motion to the court for an order

3    confirming the award at which time the court shall issue a confirming order unless the award is

4    modified or corrected pursuant to NRS 38.237 or 38.242 or is vacated pursuant to NRS 38.241."

5

6    This Court in *Wells Fargo Bank v. Hyflo Limited Partnership*, No. 2:19- cv-02054-GMN-

7    VCF (D. Nev., 2020), held

8            [t]he Federal Arbitration Act (FAA) permits any party to apply to
9            the court to confirm, vacate, modify, or correct an arbitration
             award. 9 U.S.C. § 9.  A court must confirm an arbitration award
10           "unless the award is vacated, modified, or corrected." 9 U.S.C. § 9;
             *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.,* 341 F.3d
11           987, 997 (9th Cir. 2003). "Under the statute, confirmation is
             required even in the face of erroneous findings of fact or
12           misinterpretations of law." *Kyocera,* 341 F.3d at 997 (internal
             quotation marks omitted)."

13           In *Geo-Logic Associates, Inc. v. Metal Recovery Solutions Inc.*,
14           No. 3:17-cv-00563-MMD-WGC, (D. Nev. 2020) this Court held
             that "[r]eview of an arbitration award is "both limited and highly
15           deferential". *Comedy Club, Inc. v. Improv W. Assocs.,* 553 F.3d
             1277, 1288 (9th Cir. 2009). Upon application for confirmation of
16           an arbitration award, "the court must grant such an order unless the
             award is vacated, modified, or corrected. . . ." 9 U.S.C. § 9. "The
17           Federal Arbitration Act enumerates limited grounds on which a
             federal court may vacate, modify, or correct an arbitral award.
18           Neither erroneous legal conclusions nor unsubstantiated factual
             findings justify federal court review of an arbitral award." *Kyocera*
19           *Corp. v. Prudential-Bache Trade Serv. Inc.,* 341 F.3d 987, 994 (9th
20           Cir. 2003) (internal citations omitted)."

21    Judge Mahan, in his Order dismissing Cardio's complaint against Dr. Jacobs and

22    compelling arbitration, Exhibit "B" held:

23           Because the consulting agreement at issue (Dr. Jacobs') is a
             "contract evidencing a transaction involving commerce," it is
24           subject to the Federal Arbitration Act. *See* 9 U.S.C. § 2; *Chiron*
             *Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir.
25           2000).
26           The Federal Arbitration Act ("FAA") reflects Congress' intent to
             provide for the enforcement of arbitration agreements within the
27           full reach of the commerce clause. *See Republic of Nicaragua,* 937
             F.2d at 475 (citing *Perry v. Thomas,* 482 U.S. 483, 490 (1987)).
28           The FAA embodies a clear federal policy in favor of arbitration.

FOLEY
&
OAKES

"[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Simula*, 175 F.3d at 719 (quoting *Moses H. Cone*, 460 U.S. at 24–25).

9 U.S. Code §13 of the Federal Arbitration Act provides,

> The party moving for an order confirming, modifying, or correcting an award shall, at the time such order is filed with the clerk for the entry of judgment thereon, also file the following papers with the clerk:
> (a) The agreement; the selection or appointment, if any, of an additional arbitrator or umpire; and each written extension of the time, if any, within which to make the award.
> (b) The award.
> (c) Each notice, affidavit, or other paper used upon an application to confirm, modify, or correct the award, and a copy of each order of the court upon such an application.
> The judgment shall be docketed as if it was rendered in an action.
> The judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered.

Mr. Montano and Dr. Jacobs respectfully request that this Court reduce to judgment the Arbitrator's Award attached hereto as Exhibit "I".

## VII.
## CONCLUSION

For the reasons indicated above, the Court should reduce to judgment the Arbitrator's Award.

DATED this 29th day of July, 2020.

FOLEY & OAKES, PC

**/s/ Daniel T. Foley**
Daniel T. Foley, Esq.
Nevada Bar No. 1078
1210 S. Valley View Blvd. #208
Las Vegas, Nevada 89102
*Attorneys for Mr. Montano and Dr. Jacobs*

FOLEY
&
OAKES

# EXHIBIT "1"

# EXHIBIT "1"

1      **AFFIDAVIT OF DANIEL T. FOLEY, ESQ.**

2

3      STATE OF NEVADA          )
                                 ) ss.
4      COUNTY OF CLARK          )

5

6          Daniel T. Foley, Esq., being first duly sworn, deposes and states the following:

7          1.      I have personal knowledge of the facts and statements set forth herein.

8

9          2.      I am counsel of record for Mr. Daniel Montano and Dr. Jack Jacobs.

10         3.      I was counsel for Mr. Montano and Dr. Jacobs in the Arbitration with Venturis

11     Therapeutics, Inc., formerly known as Cardiovascular Biotherapeutics, Inc., conducted through the

12     American Arbitration Association, the Honorable Michael D. Zimmerman presiding.

13         4.      Cardiovascular Biotherapeutics, Inc. filed suit in this Court on November 26, 2014

14     against Dr. Jacobs in Case No. 2:14-cv-01965-JCM-PAL.  A true and correct copy of Cardio's

15     Complaint filed with this Court is attached hereto as Exhibit "A".

16         5.      A true and correct copy of Judge Mahan's February 19, 2015 Order Granting Dr.

17     Jacobs' Motion to Dismiss and Compel Arbitration is attached as Exhibit "B".

18

19         6.      On July 19, 2018, three years and five months following Judge Mahan's Order

20     Granting Dr. Jacobs' Motion to Dismiss, Cardiovascular Biotherapeutics, Inc. demanded

21     Arbitration against Dr. Jacobs and Mr. Montano.

22         7.      Based on my research of Cardiovascular Biotherapeutics, Inc.'s corporate records,

23     my conversations with Mr. Barry Cannaday, and my review of Cardio's pleadings filed in the

24     Arbitration, Cardiovascular Biotherapeutics, Inc. is a Delaware corporation, with its original

25     principal place of business in Las Vegas, Nevada.  Sometime between February 2015 and July

26

**FOLEY** 27
  **&**
**OAKES** 28

2019 Cardiovascular Biotherapeutics, Inc. relocated its principal place of business from Las Vegas to Dallas, TX.

8.     Based on my conversations with Mr. Barry Cannaday, sometime following the Arbitration Hearing, Cardiovascular Biotherapeutics, Inc. changed its name to Venturis Therapeutics, Inc.

9.     True and correct copies of Mr. Montano's and Dr. Jacobs' employment agreements are attached hereto as Exhibits "C" and "D".

10.    A true and correct copy of Dr. Jacobs' Consulting Agreement is attached hereto as Exhibit "E".

11.    Pursuant to the parties' agreements, the Arbitration was conducted through the American Arbitration Association ("AAA").  The parties were provided Arbitrator Selection lists which they filled out and returned to AAA.  True and correct copies of the parties' Arbitration Selection Lists are attached hereto as Exhibits "F" and "G".

12.    A true and correct copy of Judge Zimmerman's resume provided through AAA is attached as Exhibit "H".

13.    A true and correct copy of Judge Zimmerman's Final Arbitration Award is attached as Exhibit "I".

14.    A true and correct copy of Cardio's Second Amended (and final) Arbitration Demand is attached as Exhibit "J".

15.    In their Counter Claim in Arbitration, Mr. Montano and Dr. Jacobs each alleged a single cause of action for breach of contract based on unpaid wages.

16.    The Arbitration hearing took place August 26 - 28, 2019 in Las Vegas, NV.

FOLEY
&
OAKES

17.     Based on its Complaint filed in this Court in 2014, Cardiovascular Biotherapeutics, Inc. is a Delaware corporation, with its original principal place of business in Las Vegas, Nevada.

18.     The Arbitration Award was issued in the name of Cardiovascular Biotherapeutics, Inc. as the party in interest; however, counsel for Cardiovascular Biotherapeutics, Inc., Mr. Cannaday, has agreed that this Court's confirmation of the Arbitration Award should be issued in the name of Venturis Therapeutics, Inc.

19.     Mr. Montano founded Cardio in 1998 and served as its President and CEO until 2013/2014.

20.     Dr. Jacobs served as Cardio's Chief Scientific Officer from 2000 through 2013/2014.

21.     Judge Zimmerman ruled on and resolved all issues presented to him by all parties to the Arbitration.

22.     Judge Zimmerman did not exclude any witnesses presented by the parties and did not exclude any evidence proffered by the parties.

23.     Three rounds of extensive Post Arbitration briefing were agreed upon by the parties and Judge Zimmerman.

24.     Two separate oral argument hearings were held via conference call.

25.     Two Interim Awards were issued by Judge Zimmerman.

26.     Cardio filed a Motion to Modify the Arbitrator's Award which was denied by Judge Zimmerman.

27.     Judge Zimmerman issued his final Award on July 20, 2020.

28.     There were no requests for continuance of the Arbitration hearing sought by any party or Judge Zimmerman.

FOLEY
&
OAKES

1       29.    Judge Zimmerman's Final Award has not been modified or corrected.

2       Dated this 29th day of July 2020.

3

4                                        Daniel T. Foley, Esq.

5

6

7    SUBSCRIBED and SWORN to before me

8    this 29th day of July 2020.

9

10    NOTARY PUBLIC in and for said
       County and State

NOTARY PUBLIC
ELIZABETH LEE GOULD
STATE OF NEVADA · COUNTY OF CLARK
MY APPOINTMENT EXP. NOV. 22, 2022
No: 00-62039-1

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**FOLEY** 27
**&**
**OAKES** 28

EXHIBIT "A"

EXHIBIT "A"

1   Barry F. Cannaday
    Texas Bar No. 03743500
2   DENTONS US LLP
    2000 McKinney Avenue, Suite 1900
3   Dallas, Texas 75201-1858
    Telephone: (214-259-1855)
4   Email: barry.cannaday@dentons.com
    *Will comply with LR IA 10-2 within 45 days*
5
    Timothy S. Cory
6   Nevada Bar No. 001972
    TIMOTHY S. CORY & ASSOCIATES
7   8831 West Sahara Avenue
    Las Vegas, Nevada 89117
8   Telephone: (702) 388-1996
    Email: tim.cory@corylaw.us
9
    Attorneys for Plaintiff
10  CARDIOVASCULAR BIOTHERAPEUTICS, INC.

11              **IN THE UNITED STATES DISTRICT COURT**
                    **DISTRICT OF NEVADA**
12

13  **CARDIOVASCULAR
    BIOTHERAPEUTICS, INC.,**
            a Delaware corporation;     Case No.  2:14-CV-01965
14
                            **COMPLAINT FOR BREACH OF
                            CONTRACT, COPYRIGHT**
15           Plaintiff,             **INFRINGEMENT, INJUNCTIVE
                            AND OTHER RELIEF**
16     v.

17  **JOHN W. JACOBS,** an individual;

18           Defendant.

19  **TO THE HONORABLE UNITED STATES DISTRICT COURT:**

20       Plaintiff CARDIOVASCULAR BIOTHERAPEUTICS, INC. ("*Cardio*"), for its Complaint

21  for Breach of Contract, Copyright Infringement, Injunctive and Other Relief against JOHN W.

22  JACOBS ("*Jacobs*"), states as follows:

23                      **INTRODUCTION**

24       Cardio requests this Court's intervention to prevent Jacobs from executing a plan calculated

25  to cause severe irreparable damage to Cardio through the breach of express contractual provisions

26  relating to his post-employment activities and the actual, threatened and inevitable dissemination of

27  highly confidential intellectual property rights, trade secrets, and copyright protected information

28  owned by Cardio ("*Cardio Proprietary Information*").

1    Cardio is a biopharmaceutical company focused on developing recombinant human fibroblast
2    growth factors in various drug candidates for cardiovascular diseases, treatment of chronic wounds
3    and diabetic conditions.

4    Jacobs was employed by Cardio as its Chief Scientific Officer, until his employment was
5    terminated on September 18, 2014 after a lengthy shareholder fight.  At the time of termination of
6    his employment with Cardio, Jacobs was in possession of a significant amount of Cardio Proprietary
7    Information which he was required to return to Cardio under his Employee Agreements (as defined
8    below).   Further, under Jacobs' Employee Agreements, Jacobs was required to preserve the
9    confidentiality of the Cardio Proprietary Information following the termination of his employment
10   and he was prohibited from using Cardio Proprietary Information for personal gain or in competition
11   with Cardio.  Despite lawful demands from Cardio for the return by Jacobs of the Cardio Proprietary
12   Information, Jacobs has failed and refused to return such Confidential Proprietary Information to
13   Cardio.

14   Jacobs has, accordingly, breached his contractual obligations under the Employee
15   Agreements which require Jacobs upon termination of his employment to (i) return all Cardio
16   property and Cardio Proprietary Information to Cardio, (ii) preserve the confidentiality of the Cardio
17   Proprietary Information and (iii) refrain from using Cardio Proprietary Information to compete with
18   Cardio or for personal gain (collectively, the "***Post-Employment Obligations***").  Furthermore,
19   instead of returning all such Cardio Proprietary Information to Cardio as required by his Employee
20   Agreements, Jacobs is now engaging in a course of conduct, in concert with others, in breach of his
21   Employee Agreements, to misappropriate (steal) Cardio Proprietary Information so that such
22   proprietary information can be used in a newly started company to compete with Cardio for Jacobs
23   personal benefit.

24   As part of Jacobs' unlawful scheme to take, misappropriate and disseminate Cardio
25   Proprietary Information, Jacobs and others formed Defendant Zhittya in Delaware on June 30, 2014
26   and registered Zhittya to do business in Nevada on July 15, 2014.  Zhittya was formed by Jacobs
27   and others for the purpose of unlawfully competing with Cardio. Following its registration to do

28

R3451906\V-1

1   business in Nevada, Zhittya published a "white paper" authored by Jacobs on the internet to promote

2   Zhittya's "new business" in direct competition with Cardio relating to the treatment of diabetic foot

3   ulcers which included copyright protected material exclusively owned by Cardio (the "***Infringed***

4   ***Materials***"), as well as additional Cardio Proprietary Information which had been taken, converted

5   and/or misappropriated by Jacobs from Cardio.

6         This action has additionally been instituted for the purpose of, *inter alia*, seeking a

7   preliminary injunction against Jacobs requiring Jacobs and all others acting in concert with him to

8   immediately cease using and publishing Cardio Proprietary Information for any purpose and to

9   immediately return to Cardio all Cardio proprietary information and property in Jacobs' possession,

10   custody or control and for a permanent injunction requiring Jacobs and all others acting in concert

11   with him to permanently cease using Cardio Proprietary Information for any purpose. Cardio

12   additionally seeks damages against Jacobs for breach of contract and theft of trade secrets.

13   **NATURE OF THE ACTION**

14         8.    This is an action for breach of contract, copyright infringement and theft of trade

15   secrets.  Cardio seeks temporary, preliminary, and permanent injunctive relief in addition to other

16   damages.

17         9.    Until recently, Jacobs was employed as Chief Scientific Officer of Cardio.  In his

18   position, Jacobs gained access to all Cardio Proprietary Information, including access to information

19   relating to patent applications, drug development processes, clinical trials, marketing strategies and

20   potential marketing and financial partners.

21         10.    During Jacobs' employment with Cardio, he acquired copies of substantially all of

22   such Cardio Proprietary Information and, following his termination of employment with Cardio,

23   Jacobs, in breach of his Employee Agreements, has retained, and still possess, copies of all, or

24   substantially all, of such Cardio Proprietary Information, including a copy of the Merck Data (as

25   defined below).

26         11.    Based upon website postings by Zhittya and others, it has become clear that Jacobs,

27   in violation of his Post-Employment Obligations, now seeks to utilize Cardio Proprietary

28

b3451906\V-1

- 3 -

1   Information for his own personal gain through his newly formed company, Zhittya, to develop and

2   market FGF-1 human protein applications in direct competition with Cardio.

3          12.     Upon information and belief, Jacobs is acting in concert with others who are

4   knowingly aiding and abetting Jacobs in violating his Post-Employment Obligations and his theft

5   of trade secrets from Cardio.

6          13.     Accordingly, Cardio seeks to temporarily, preliminarily, and permanently enjoin

7   Jacobs and all parties acting in concert with Jacobs from using or threatening to use Cardio's

8   confidential and/or trade secret information in any business or undertaking in competition with

9   Cardio.  In addition, Cardio seeks to obtain an temporary, preliminary, and permanent mandatory

10  injunction ordering Jacobs and all parties acting in concert with him to immediately return to Cardio

11  all tangible expressions of Cardio Proprietary Information in their possession, custody or control.

12         14.     Absent such injunctive relief, Cardio faces irreparable injury, including the loss of

13  markets for its biopharmaceutical business, its exclusive competitive advantage and its trade secrets

14  and goodwill in amounts which likely will be impossible to determine unless Jacobs and all others

15  acting in concert with him are enjoined and restrained by order of this Court at once.

16                                       **PARTIES**

17         15.     CardioVascular BioTherapeutics, Inc. is a corporation organized and existing under

18  the laws of the State of Delaware, with its principal place of business in Las Vegas, Nevada.

19         16.     John W. Jacobs is an individual who is domiciled in and a resident of Berkeley,

20  California who has regularly conducted business in Las Vegas, Nevada.

21                              **JURISDICTION AND VENUE**

22         17.     This Court has original jurisdiction over this action against Jacobs under 28 U.S.C.

23  § 1332(a) because Plaintiff and Jacobs are citizens of different states and the matter of controversy

24  exceeds the sum or value of $75,000 exclusive of interests and costs.

25         18.     This Court also has jurisdiction over this action against Jacobs pursuant to 28 U.S.C.

26  §§ 1331 and 1338(a).

27

28
    83451906/V-1

                                          - 4 -

1      19.     This Court additionally has jurisdiction over this action pursuant to 28 U.S.C. §§

2   1367(a).

3      20.     This Court has personal jurisdiction over Jacobs and venue is proper in this District

4   under 28 U.S.C. §§ 1391(b)(2).

5                                   **FACTUAL ALLEGATIONS**

6      21.     Cardio is a biopharmaceutical company developing protein drug candidates to

7   address diseases that result from lack of blood flow to a tissue or organ such as diabetic foot ulcers,

8   severe coronary microvascular disease and peripheral artery diseases ("***Cardio's Biopharmaceutical***

9   ***Business***"). The active pharmaceutical ingredient in Cardio's drug candidates is FGF-1, a human

10  protein that stimulates the growth of new blood vessels, thereby increasing the blood supply to

11  ischemic organs and tissues.

12     22.     Jacobs was Chief Scientific Officer and Chief Operating Officer of Cardio until

13  September 18, 2014 when Cardio terminated Jacobs' role with Cardio as Chief Scientific Officer

14  and Chief Operating Officer. Prior to his termination on September 18, 2014, Jacobs had entered

15  into an Employment Agreement with Cardio dated January 1, 2007 (the "***Employment Agreement***"),

16  a true and correct copy of which is attached hereto as Exhibit "A". Jacobs' Employment Agreement

17  imposed obligations upon Jacobs to maintain the confidentiality of all Cardio Proprietary

18  Information and to refrain from utilizing any Cardio Proprietary Information to directly or indirectly

19  compete with Cardio. Although Jacobs' Employment Agreement was replaced by a Consulting

20  Agreement between Jacobs and Cardio dated March 1, 2010 (the "***Consulting Agreement***"), a true

21  and correct copy of which is attached hereto as Exhibit "B", Jacobs continued to remain subject to

22  the confidentiality and non-compete obligations under his Employment Agreement. Further, during

23  Jacobs' employment with Cardio, Jacobs was subject to a Code of Business Conduct which Jacobs

24  agreed to comply with on October 25, 2010 (the "***Code of Conduct***"). A true and correct copy of

25  the Code of Conduct and Jacobs agreement to comply are attached hereto as Exhibit "C". The

26  Employment Agreement, the Consulting Agreement and the Code of Conduct are collectively

27  referred to herein as the "***Employee Agreements***.")

28

83451906\V-1

- 5 -

1    23.    Jacobs' Employee Agreements, which were in effect when he was terminated on

2    September 18, 2014, contained reasonable post-employment obligations relating to (1) the

3    confidentiality of Cardio Proprietary Information, (2) the return of all tangible expressions of Cardio

4    Proprietary Information and all other Cardio property and (3) Jacobs' obligations to refrain from

5    using Cardio Proprietary Information for personal financial gain or to compete with Cardio

6    (collectively, the "***Post-Employment Obligation***").

7    24.    During the period of time Jacobs was employed by Cardio and was subject to the

8    terms of his Employee Agreements, Jacobs had access to and came into possession of valuable

9    Cardio Proprietary Information, including confidential and proprietary information relating to

10   Cardio's intellectual property rights, trade secrets, clinical drug trials, important strategic

11   information about Cardio's business and marketing plans and strategies and copyright protected

12   original works of authorship published in writing by Cardio.  Jacobs' access to Cardio Proprietary

13   Information included access to confidential FDA clinical trials exclusively licensed to Cardio by

14   Merck Sharp and Dome dated November 22, 2010 (the "***Merck Data***").  A true and correct copy of

15   Cardio's License Agreement with Merck Sharp & Dome Corp. (the "***Merck License***") is attached

16   hereto as <u>Exhibit "D"</u>.

17   25.    Following a lengthy shareholder fight for control of Cardio, Jacobs was terminated from all

18   positions he held as an employee and officer of Cardio on September 18, 2014.  Immediately following his

19   termination, demands were made upon Jacobs to comply with his Post-Employment Obligations to

20   immediately (1) return to Cardio all tangible expressions of Cardio Proprietary Information and all other

21   Cardio property and (2) refrain from disclosing or utilizing any Cardio Proprietary Information, either

22   individually or in conjunction with others, to directly or indirectly compete with Cardio.  A true and correct

23   copy of Cardio's demand to Jacobs is attached hereto as <u>Exhibit "E"</u>.

24   26.    Despite Cardio's demands to Jacobs for a return of all tangible expressions of Cardio

25   Proprietary Information following his termination of employment with Cardio, Jacobs has failed and refused

26   to return any Cardio Proprietary Information to Cardio.

27

28

N3451906\V-1

27. Instead, following Jacobs' termination of employment, Jacobs began to actively pursue a course of action in which he utilized Cardio Proprietary Information, in violation of his Post-Employment Obligations under the Employee Agreements, to form and participate in Zhittya for the purpose of competing with Cardio utilizing Cardio Proprietary Information.

28. Following Jacobs' formation of Zhittya, Zhittya published a "white paper" on the internet authored by Jacobs promoting Zhittya's activities in direct competition with Cardio (the "*White Paper*"). A true and correct copy of this "white paper" is attached hereto as Exhibit "F".

29. Further, Daniel M. Montano, a co-founder of Zhittya along with Jacobs, has published statements on the internet that Zhittya will disseminate the White Paper to anyone who requests a copy. See Exhibit "G" attached hereto.

30. Zhittya's White Paper includes wholesale reproductions of the original works of authorship by Cardio subject to protection under U.S. copyright laws. Attached hereto as Exhibit "H" and Exhibit "I" are true and correct copies of the original works of authorship of Cardio which are subject to protection under U.S. copyright laws. Attached hereto as Exhibit "J" is a copy of Cardio's application for copyright protection for these original works.

31. Those provisions of Exhibit "H" and Exhibit "I" which have been reproduced in violation of copyright laws and reprinted in the White Paper are highlighted with handwritten references on those Exhibits, with the first character being a I (for Exhibit "H") or a II (for Exhibit "I") and the second character being a reference to the page number of the Exhibit in question. For example a handwritten reference to "II-6" would be a reference to Exhibit "I", page 6.

32. Attached hereto as Exhibit "K" is the White Paper with those portions which have been illegally reproduced being highlighted with a reference to the highlighted portions of Exhibit "H" and Exhibit "I".

33. If Jacobs is not immediately enjoined from violating his Post Employment Obligations, the knowledge and information that Jacobs possesses and is disclosing to third parties will enable investors in the newly formed Zhittya to save millions of dollars in start-up costs and erode Cardio's trade secrets, confidential and proprietary business information, and prospective investor relationships and goodwill.

34.   Absent immediate intervention by the Court, Cardio expects Jacobs' activities in violation of his Post-Employment Obligations to result in an irreparable damage to Cardio as a result of Jacobs' misappropriation Cardio's years of extensive research, clinical trials and invaluable FDA trial data exclusively licensed to Cardio.

35.   Cardio's confidential and proprietary information is not generally available to the public, is of great value to Cardio and would give any of its competitors who acquired such information, including Jacobs and those acting in concert with him, an unfair competitive advantage.

36.   Cardio rigorously maintains the confidentiality of the Cardio Proprietary Information because such information provides Cardio a competitive advantage in the marketplace from which Cardio derives substantial economic value.

37.   Jacobs's post-employment breach of contract, misappropriation of trade secrets and improper use of Cardio Proprietary Information in competition with Cardio is irreparably harming Cardio and poses an immediate and ongoing threat to Cardio's biopharmaceutical business, its intellectual property rights and trade secrets that must be enjoined because Cardio has no adequate remedy at law.

38.   Cardio's trade secrets and confidential and proprietary information are of great value to Cardio and would give any competitor of Cardio—including Jacobs and those acting in concert with him—an unfair competitive advantage.   Specifically, Cardio's trade secrets and other proprietary information are of great value to Cardio and such information would give any competitor, who improperly acquired such information, an unfair competitive advantage by:  not expending the time and resources to develop the trade secret and confidential and proprietary information as Cardio has done; quickly developing products and technologies to unfairly compete with Cardio in order to diminish Cardio's head start; alerting a competitor as to initiatives that should not be pursued; and other improper advantages.

39.   All told, Jacobs and those acting in concert with him are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Cardio, including the loss of value of confidential and/or proprietary information, the loss of long-standing prospective investor

1    relationships, loss of goodwill, as well as damage to Cardio's reputation as an industry leader and

2    its ability to successfully market its drug applications.  Money alone cannot make Cardio whole.

3                                        **COUNT I**

4                                **BREACH OF CONTRACT**

5         40.    Cardio hereby repeats, realleges, and incorporates by reference the allegations

6    which are contained in Paragraphs 1 through 32.

7         41.    The Employee Agreements that Jacobs entered into with Cardio constitute valid and

8    enforceable contracts.

9         42.    Cardio performed all of the duties and obligations it agreed to and owed to Jacobs

10   under the Employee Agreements.

11        43.    The Post Employment Obligations and activity restrictions contained in the

12   Employee Agreements are reasonable in both scope and duration, and are necessary to protect

13   Cardio's legitimate protectable interests in its confidential business information, as well as its

14   business relationships, goodwill and other legitimate business interests.

15        44.    Jacobs breached, and continues to breach, his Post Employment Obligations to

16   Cardio by failing and refusing to return all tangible expressions of Cardio Proprietary Information

17   in his possession following his termination and by using, in concert with others, such Cardio

18   Proprietary Information to form Zhittya and possibly other companies to compete with Cardio.

19        45.    As a result of Jacobs's breaches of his Employee Agreements, Cardio has been

20   irreparably injured, and it continues to face irreparable injury.  Cardio is threatened with losing the

21   value of its confidential and proprietary information and valuable business opportunities, along

22   with income and goodwill, for which a remedy at law is inadequate.

23        46.    Accordingly, Jacobs, and others acting in concert with him, must be enjoined and

24   restrained by Order of this Court.  To the extent a remedy at equity is inadequate, Cardio seeks

25   actual, incidental, compensatory, punitive and consequential damages, along with its reasonable

26   attorneys' fees and interest.

27

28
     83451906\V-1

47.     Cardio is also entitled to Jacobs' profits attributable to his use of Cardio Confidential Proprietary Information in competition with Cardio in violation of his Employee Agreements.

### COUNT II

### VIOLATION OF COPYRIGHT LAWS

48.     Cardio hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 40.

49.     Through his conduct as set forth herein, Jacobs has infringed upon Cardio's copyrights in the Infringed Materials in violation of Sections 106 and 501 of the Copyright, 17 U.S.C. §§ 106 and 501.

50.     Jacobs' acts of infringement are willful, purposeful, in reckless disregard and with knowledge Cardio's rights.

51.     As a direct and proximate result of said infringement by Jacobs, Cardio is entitled to damages in an amount to be proven at trial.

52.     Cardio is also entitled to Jacobs' profits attributable to the infringement, pursuant to 17 U.S.C. § 504(b), including an accounting of and a constructive trust with respect to such profits.

53.     Cardio further is entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and otherwise according to law.

54.     As a direct and proximate result of the foregoing acts and conduct, Cardio has sustained and will continue to sustain substantial, immediate and irreparable injury, for which there is no adequate remedy at law. Cardio is informed and believes and on that basis avers that unless enjoined and restrained by this Court, Jacobs will continue to infringe Cardio's rights in the Infringed Material. Cardio is entitled to preliminary and permanent injunctive relief to restrain and enjoin Jacobs' continuing infringing conduct.

/ / /

/ / /

/ / /

/ / /

N3451906\V-1

- 10 -

**COUNT III**

**ACTUAL AND/OR THREATENED MISAPPROPRIATION OF TRADE SECRETS**

**(NEVADA UNIFORM TRADE SECRET ACT, NRS §600A.010, ET SEQ.)**

55.     Cardio hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 47.

56.     Cardio's confidential and proprietary information includes, *inter alia,* information relating to Cardio's to patent applications, drug development processes, clinical trials, marketing strategies, potential marketing and financial partners and access to the Merck Data.

57.     This information constitutes trade secrets, pursuant to the Nevada Uniform Trade Secret Act, NRS 600A.10, *et seq.,* because Cardio derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

58.     Jacobs has actually misappropriated and/or threatens to inevitably misappropriate Cardio's trade secrets without Cardio's consent, in violation of Nevada law. Jacobs cannot participate in the formation of companies in competition with Cardio without utilizing and disclosing Cardio's confidential information.

59.     Jacobs and those acting in concert with him will be or are being unjustly enriched by the misappropriation of Cardio's trade secrets and/or confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Cardio's trade secrets and confidential information.

60.     Upon information and belief, Jacobs' actual and/or threatened misappropriation has been willful and malicious.

61.     As a result of the threatened and/or actual misappropriation of Cardio's trade secrets, Cardio has been injured and faces irreparable injury. Cardio is threatened with losing financial partners, its trade secrets and goodwill in amounts which will be impossible to determine, unless

83451906W-1

1   Jacobs and those acting in concert with him are permanently enjoined and restrained by order of this

2   Court.

3                                    **PRAYER FOR RELIEF**

4           WHEREFORE, Cardio seeks judgment in its favor and an Order against Jacobs that grants

5   the following relief:

6           A.      Temporarily, preliminarily, and permanently enjoining Defendant John W.
      Jacobs, and all parties in active concert or participation with him, from using or
7     disclosing any of Cardio's confidential, proprietary and/or trade secret information;

8           B.      Temporarily, preliminarily, and permanently enjoining Defendant John W.
      Jacobs, and all parties in active concert or participation with him, from directly or
9     indirectly engaging in any business in competition with Cardio which utilizes any
      of Cardio's confidential, proprietary and/or trade secret information.
10

11          C.      Orders Defendant Jacobs and all parties in active concert or participation
      with him to return to Cardio all originals and copies of all files, devices and/or
12    documents that contain or relate to Cardio's confidential and proprietary
      information, including without limitation, all computers, electronic media, PDA's
13    and electronic storage devices;

14          D.      Awards Cardio actual, incidental, compensatory, and consequential damages
      to be proven at trial;
15

16          E.      Awards Cardio exemplary or punitive damages in an amount to be proven at
      trial due to Jacobs' willful and malicious activities;
17

18          F.      Awards Cardio its costs and expenses incurred herein, including reasonable
      attorneys' fees and interest, pursuant to NRS 600A.060;

19          G.      Awards Cardio damages in the amount of any and all unjust enrichment
20    realized by Jacobs as a result of his unlawful use of Cardio's confidential,
      proprietary and/or trade secret information; and
21

22          H.      Awards Cardio such further relief as the Court deems necessary and just.

      **Dated: November 25, 2014**                **Respectfully submitted.**

23                                                **CARDIOVASCULAR BIOTHERAPEUTICS,**
24                                                **INC.**

25                                                By: /s/ Timothy S. Cory
26                                                Timothy S. Cory
                                                  TIMOTHY S. CORY & ASSOCIATES
27                                                8831 West Sahara Avenue
                                                  Las Vegas, Nevada 89117

28

93451906\V-1

                                    - 12 -

# EXHIBIT "B"

# EXHIBIT "B"

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| CARDIOVASCULAR   BIOTHERAPEUTICS, INC., | Case No. 2:14-CV-1965 JCM (PAL) |
| Plaintiff(s), | ORDER |
| v. | |
| JOHN W. JACOBS, | |
| Defendant(s). | |

Presently before the court is defendant John W. Jacobs's motion to dismiss and compel arbitration.  (Doc. # 24).  Plaintiff Cardiovascular Biotherapeutics, Inc.'s ("Cardio") filed a response (doc. # 41), and defendant filed a reply (doc. # 45).

Also before the court is plaintiff's application for preliminary injunction and memorandum in support.  (Doc. # 2).  Defendant filed a response (doc. # 32), and plaintiff filed a reply (doc. # 42).[1]

I.    **Background**

This case involves an alleged breach of contract and dissemination of confidential proprietary information.  Plaintiff Cardio is a biopharmaceutical company developing protein drug candidates to address diseases that result from lack of blood flow to a tissue or organ such as diabetic foot ulcers, severe coronary microvascular disease and peripheral artery diseases.  (*See*

---

[1] The court notes that plaintiff has also filed a supplemental motion for preliminary injunction (doc. # 49) and motion for leave to file supplemental motion for preliminary injunction and supporting memorandum (doc. # 55), which are not yet ripe for this court's consideration. Defendant filed a motion to strike plaintiff's supplemental motion for preliminary injunction arguing that plaintiff's supplemental motion was improperly filed and should not be considered by the court. (Doc. # 53).  Plaintiff filed a response (doc. # 54), and the date for defendant to file a reply has not yet passed.  Because the court will grant defendant's motion to dismiss and compel arbitration, the court will dismiss each of these motions as moot.

James C. Mahan
U.S. District Judge

1  doc. # 2). Defendant John W. Jacobs was a Chief Scientific Officer, Chief Operating Officer, and
2  consultant for Cardio. (*See id.*).

3      During the course of his employment with Cardio, Jacobs had access to and possession of
4  valuable and confidential proprietary information belonging to Cardio. (*See* doc. # 2). Jacobs
5  signed a number of employee agreements imposing obligations on him to maintain the
6  confidentiality of all information he gained during the time of his employment. (*See id.*). Jacobs
7  also agreed to not use Cardio's proprietary information for any purpose unconnected to his
8  employment with Cardio and that all gain or profit from the proprietary information would belong
9  to Cardio. (*See id.*).

10     On September 18, 2014, following a lengthy shareholder fight for control of the Cardio's
11  board of directors, Cardio terminated Jacobs from all of his positions held as an employee,
12  consultant, and officer of Cardio. (*See id.*). Immediately following his termination, Cardio made
13  a demand on Jacobs to comply with his post-employment obligations as outlined in the employee
14  agreements. (*See id.*). Cardio's demand on Jacobs included that Jacobs immediately disclose in
15  writing to Cardio the details of any confidential information Jacob's had devised while employed
16  with Cardio, return all confidential information and copies belonging to Cardio, provide a list of
17  names and addresses of people with whom Jacobs had shared any confidential information, and
18  stop any use of confidential information that violates his employee agreements. (*See id.*).

19     On November 25, 2014, Cardio filed a complaint alleging breach of contract, violation of
20  copyright laws, and actual and/or threatened misappropriation of trade secrets by defendant Jacobs.
21  (Doc. # 10). Cardio alleges that Jacobs has not returned their confidential information and has
22  failed to comply with his post-employment obligations. Additionally, Cardio alleges that Jacobs
23  has used Cardio proprietary information to start a new, competing company, Zhittya Regeneragive
24  Medicine ("Zhittya"), and that Zhittya has published a "white paper" on the internet promoting
25  Zhittya's biopharmaceutical business in direct competition with Cardio.

26     Cardio requests the instant preliminary injunction to prevent Jacobs from continuing to
27  violate his post-employment obligations under the employee agreements, and also to prevent
28  Jacobs' continuing breach of Cardio's copyright protected works. Jacobs contends, however, that

James C. Mahan
U.S. District Judge
                                    - 2 -

1    Cardio's motion for preliminary injunction is improperly before this court. According to Jacobs,

2    the relevant employee agreement – a March 1, 2010 consulting agreement between Cardio and

3    Jacobs – contains a broad form mandatory arbitration provision. Accordingly, Jacobs has filed the

4    instant motion to dismiss the complaint and compel arbitration.

5    **II.    Legal Standards**

6         *A.  Arbitrability*

7         Federal substantive law governs the question of arbitrability. *See Simula, Inc. v. Autoliv.,*

8    *Inc.,* 175 F.3d 716, 719 (9th Cir. 1999) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

9    *Corp.,* 460 U.S. 1, 24 (1983); *Republic of Nicaragua v. Standard Fruit Co.,* 937 F.2d 469, 474-75

10   (9th Cir. 1991). Because the consulting agreement at issue is a "contract evidencing a transaction

11   involving commerce," it is subject to the Federal Arbitration Act. *See* 9 U.S.C. § 2; *Chiron Corp.*

12   *v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

13        The Federal Arbitration Act ("FAA") reflects Congress' intent to provide for the

14   enforcement of arbitration agreements within the full reach of the commerce clause. *See Republic*

15   *of Nicaragua,* 937 F.2d at 475 (citing *Perry v. Thomas,* 482 U.S. 483, 490 (1987)). The FAA

16   embodies a clear federal policy in favor of arbitration. "[A]ny doubts concerning the scope of

17   arbitrable issues should be resolved in favor of arbitration." *Simula,* 175 F.3d at 719 (quoting

18   *Moses H. Cone,* 460 U.S. at 24–25).

19        The standard for demonstrating arbitrability is not high. *Simula,* 175 F.3d at 719. The

20   Supreme Court has held that the FAA leaves no place for the exercise of discretion by a district

21   court, but instead mandates that district courts direct the parties to proceed to arbitration on issues

22   as to which an arbitration agreement has been signed. *See Dean Witter Reynolds v. Byrd,* 470 U.S.

23   213, 218 (1985); *Simila,* 175 F.3d at 719. Such agreements are to be rigorously enforced. *Simula,*

24   175 F.3d at 719; *see also Dean Witter*, 470 U.S. at 221.

25        Despite the federal policy favoring arbitration, arbitration is a "matter of contract" and no

26   party may be required to arbitrate "any dispute which he has not agreed so to submit." *Howsam*

27   *v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002) (quoting *United Steelworkers,* 363 U.S. at 582).

28   When determining whether a party should be compelled to arbitrate claims: the court must engage

James C. Mahan
U.S. District Judge
                                          - 3 -

1   in a two-step process. *Chiron*, 207 F.3d at 1130 (9th Cir. 2000). The court must determine: (1)

2   whether a valid agreement to arbitrate exists, and if it does; (2) whether the agreement encompasses

3   the dispute at issue. *Id.*

        B.  *Preliminary Injunction*

6       Under Federal Rule of Civil Procedure 65, a court may issue a preliminary injunction when

7   the moving party provides specific facts showing that immediate and irreparable injury, loss, or

8   damage will result before the adverse party's opposition to a motion for preliminary injunction can

9   be heard.  Fed. R. Civ. P. 65.

10      The Supreme Court has stated that courts must consider the following elements in

11  determining whether to issue a preliminary injunction: (1) a likelihood of success on the merits;

12  (2) likelihood of irreparable injury if preliminary relief is not granted; (3) balance of hardships;

13  and (4) advancement of the public interest. *Winter v. N.R.D.C.*, 555 U.S. 7, 20 (2008). The test is

14  conjunctive, meaning the party seeking the injunction must satisfy each element.

15      Additionally, post-*Winter*, the Ninth Circuit has maintained its serious question and sliding

16  scale test. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). "Under

17  this approach, the elements of the preliminary injunction test are balanced, so that a stronger

18  showing of one element may offset a weaker showing of another." *Id.* at 1131. "Serious questions

19  going to the merits and a balance of hardships that tips sharply towards the plaintiff can support

20  issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood

21  of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (quotations

22  omitted).

23  **III.   Discussion**

24      Before reviewing the merits of plaintiff's motion for preliminary injunction, the court must

25  determine whether it has jurisdiction over the dispute. Therefore, the court will first consider

26  defendant Jacobs' motion to dismiss and compel arbitration.

27

28

James C. Mahan
U.S. District Judge

1    The parties do not challenge the validity of the agreement. Therefore, the FAA restricts

2    the court's review to deciding only whether the dispute is arbitrable, that is, whether it falls within

3    the scope of the parties' agreement to arbitrate. *Chiron*, 207 F.3d at 1131.

4    The parties' application of the arbitration clause to "any dispute arising out of this

5    Agreement" is broad and far reaching. *See Chiron*, 207 F.3d at 1131. This statement, alone, would

6    leave little doubt that the instant dispute is subject to arbitration. *See id.* The question here,

7    however, centers on whether additional language in the dispute resolution paragraph of the parties'

8    consulting agreement allows either party to bypass arbitration and proceed directly to this court to

9    obtain equitable or injunctive relief.

10    Paragraph 21 of the parties' consulting agreement reads:

11

12    The parties shall attempt in good faith to resolve any dispute arising out of this
       Agreement through good faith negotiation. Any dispute which has not been
13    resolved by negotiation within a 30 day period shall be settled by binding arbitration
       in Clark County, Nevada . . . . The arbitrator shall render an award and a written,
14    reasoned opinion in support thereof. The arbitrator's award shall by final and
       judgment upon the award may be entered in any court having jurisdiction thereof.
15    The arbitrator may, subject to any limitations placed on remedies by the terms of
       this Agreement, grant any relief authorized by law, including but not limited to,
16    equitable relief, declaratory relief, and damages including punitive damages. . . . If
       any judicial proceeding is required to enforce an arbitration ruling or to obtain
17    equitable or injunctive relief, the parties hereby consent to the exclusive jurisdiction
       and venue of the U.S. District Court for the District of Nevada for any such
18    proceeding.

19
      (Doc. #10-1).
20
      Jacobs asserts that, given that the arbitration clause is broad and far reaching, all of Cardio's
21
      causes of action and prayers for relief should be resolved in arbitration. Jacobs cites non-
22
      controlling authority from this district, *Hillgen-Ruiz v. TLC Casino Enterprises, Inc.*, case no. 2:14-
23
      cv-437-APG-VCF, 2014 WL 5341676 (D. Nev. 2014). *Hillgen-Ruiz*, however, is not helpful for
24
      this court's determination of whether a carve-out exists for parties to pursue injunctive or equitable
25
      relief before the court.
26
      The court in *Hillgen-Ruiz* found that an arbitration agreement encompassed an employee's
27
      employment discrimination action because the arbitration agreement expressly stated that it
28
      applied to "all disputes that may arise out of the employment context." *Hillgen-Ruiz*, 2014 WL

James C. Mahan
U.S. District Judge
                                                 - 5 -

1   5341676 at *8.  In *Hillgen-Ruiz*, however, the parties did not dispute that the employment

2   discrimination action was subject to arbitration; the issue was whether the arbitration agreement

3   was valid.  *See id.*  Additionally, the arbitration agreement in *Hillgen-Ruiz* did not mention any

4   opportunity for parties to appear before a court for any purpose, even to enforce the arbitrator's

5   award.  Therefore, the court does not find *Hillgen-Ruiz*'s findings instructive.

6       Cardio asserts that the parties have "expressly agreed" that this court has exclusive

7   jurisdiction to hear and decide Cardio's application for temporary and permanent injunction in this

8   case.  Cardio also cites *Hillgen-Ruiz*.  *See Hillgen-Ruiz*, 2014 WL 5341676 at *8 (". . . in the

9   absence of an express provision excluding a particular grievance from arbitration, we think only

10  the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.").

11  Counter to Cardio's assertions, however, it is not clear by the language of the consulting agreement

12  that the parties have expressly agreed that this court has exclusive jurisdiction to hear and decide

13  Cardio's application for temporary and permanent injunction.

14      To support its position further, Cardio references a 2007 employment agreement between

15  Jacobs and Cardio, which it believes is still applicable.  (*See* doc. # 3-1).  Paragraphs 9 through 9.2

16  govern arbitration.  Under paragraph 9.2 of the employment agreement the "Employee and

17  Company agree that the Company may seek and obtain otherwise available injunctive relief in

18  Court for any violation of obligations concerning confidential information, trade secrets,

19  solicitation, or other Company policies that cannot adequately be remedied at law or in

20  arbitration."  Cardio argues that Jacobs' subsequent change of status from employee to consultant

21  did not nullify or erase his continuing obligations to Cardio under the employment agreement,

22  which stated that Jacobs' obligations would survive and last in perpetuity.

23      Cardio is correct that Jacobs' obligations survive in perpetuity.  Cardio is incorrect,

24  however, that the specific provisions of the 2007 employment agreement, such as its arbitration

25  provision, still apply.  The arbitration provision of the March 1, 2010, consulting agreement clearly

26  supersedes the arbitration provision in the 2007 employment agreement.[2]  The terms of 2007

27

28      [2] Paragraph 19 of the consulting agreement states, "This Agreement and all attached
    exhibits set forth the entire understanding and agreement of the Parties and supersedes all prior

James C. Mahan
U.S. District Judge                                          - 6 -

1   employment agreement, however, are helpful in interpreting the intent of the parties' 2010
2   consulting agreement. For reasons discussed below, the court finds that the 2010 consulting
3   agreement is a separate, freestanding document meant to impose different procedures on the parties
4   than the 2007 employment agreement. Based on the clear differences between the two documents,
5   the court finds that the 2010 consulting agreement does not exempt causes of action seeking
6   injunctive and equitable relief from proceeding to arbitration. The court will grant defendant
7   Jacobs' motion to dismiss and compel arbitration.

8          First, the 2007 employment agreement, unlike the 2010 consulting agreement, contains
9   language that clearly and unequivocally exempts injunctive relief from being sought through
10  arbitration. For example, the employment agreement contains an entirely separate paragraph titled
11  "Injunctive Relief" that outlines Cardio's right to proceed to court and forego arbitration if seeking
12  injunctive relief.[3] Further, paragraph 9.2 of the employment agreement, which governs arbitration,
13  repeats that "the Company may seek and obtain otherwise available injunctive relief in Court for
14  any violation concerning confidential information, trade secrets, solicitation, or other Company
15  policies that cannot adequately be remedied at law or in arbitration." (Doc. # 3-1). Finally, the
16  opening sentence of the arbitration provision in the 2007 employment agreement exempts "rights
17  the parties may have to seek injunctive relief or specific performance . . . ." (Doc. # 3-1).

18         Second, though the arbitration provisions from the 2007 employment agreement and the
19  2010 consulting agreement share the *exact same language* regarding the qualifications and
20  appointment of an arbitrator, the applicable rules of arbitration, and what costs and fees a
21  prevailing party is entitled to receive, there is not language instructing that injunctive relief is
22  unequivocally exempted from arbitration. While the 2007 employment agreement is silent with
23  respect to the particular powers of the arbitrator (and arguably removes injunctive relief from the
24  arbitrator's authority), the 2010 consulting agreement instructs that the arbitrator is vested with the
25  power to grant "any relief authorized by law, including but not limited to, equitable relief,

26  and contemporaneous agreements and understandings, both oral and written, related thereto."
27  (Doc. # 10-1).

28         [3] Paragraph 8 titled "Injunctive Relief" directs that Cardio is entitled to "seek and receive specific performance and temporary, preliminary and permanent injunctive relief . . . from any court of competent jurisdiction [for violations of the agreement]. . . ." (Doc. # 3-1).

James C. Mahan
U.S. District Judge

1    declaratory relief, and damages including punitive damages." (*Compare* doc. # 3-1: ¶¶ 8, 9-9.2

2    *with* doc. # 10-1: ¶ 21).[4]

3        Third, though the 2010 consulting agreement does state that "[i]f any judicial proceeding

4    is required to enforce an arbitration ruling or to obtain equitable or injunctive relief, the parties

5    hereby consent to the exclusive jurisdiction and venue of the U.S. District Court for the District of

6    Nevada . . ." this is the one and only reference to court proceedings in the entire consulting

7    agreement.   The parties' 2007 employment agreement titled an entire paragraph "Injunctive

8    Relief" and outlined specifically that Cardio had an unequivocal right to proceed directly to the

9    courts not only in that paragraph, but also in a subsection of the arbitration provision (doc. # 3-1:

10   ¶ 9.2). The court does not find that this one mention at the end of the arbitration paragraph allows

11   the parties to skip arbitration and proceed directly to the court on matters of equitable or injunctive

12   relief. At most, this provision may grant the parties the ability to enforce a claim for injunctive or

13   equitable relief *after* the conclusion of arbitration.

14       Comparing the language of the 2007 employment agreement with the language of the 2010

15   consulting agreement, construing the consulting agreement's ambiguity against the drafting party,

16   *see In re Kim*, 182 F.3d 926 at *2 (9th Cir. 1999), and keeping in mind the FAA's policy supporting

17   resolution in favor of arbitration, the court finds that the arbitration agreement encompasses the

18   dispute at issue.   Accordingly, the court will grant Jacobs' motion to dismiss and compel

19   arbitration.

20   **IV.   Conclusion**

21       Accordingly,

22       IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendant John W.

23   Jacobs's motion to dismiss and compel arbitration (doc. # 24) be, and the same hereby is,

24   GRANTED.

25

26   _____

27   [4] Additional drafting differences to demonstrate that the two agreements are meant to outline different terms include that the 2007 employment agreement provides that "the Company

28   shall pay all fees and costs of arbitration" (doc. # 3-1: ¶ 9.1), while the 2010 consulting agreement instructs that "both parties shall equally share the costs of each arbitration proceeding." (Doc. # 10-1: ¶ 21).

James C. Mahan
U.S. District Judge

1    IT IS FURTHER ORDERED that plaintiff's application for preliminary injunction and

2 memorandum in support (doc. # 2), supplemental motion for preliminary injunction (doc. # 49),

3 and motion for leave to file supplemental motion for preliminary injunction and supporting

4 memorandum (doc. # 55) be, and the same hereby are, DENIED as moot.

5    IT IS FURTHER ORDERED that defendant's motion to strike plaintiff's supplemental

6 motion for preliminary injunction (doc. # 53) be, and the same hereby is, DENIED as moot. The

7 clerk is instructed to close the case.

8    DATED February 19, 2015.

9

10                                          UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

James C. Mahan
U.S. District Judge                              - 9 -

# EXHIBIT "C"

# EXHIBIT "C"



**CardioVascular BioTherapeutics, Inc.**

1635 Village Center Circle, Suite 250
Las Vegas, Nevada 89134  USA
702-839-7200 TEL, 1866-323-1051 FAX
WWW.CVBT.COM

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into as of the 1st day of January 2007 (the "Effective Date") by and between CardioVascular BioTherapeutics, Inc., a Delaware corporation (the "Company"), and Daniel C. Montano, an individual (the "Employee").

### RECITALS

A.      The Company has offered to Employee the position of <u>President and Chief Executive Officer</u> and Employee accepts such offer.

B.      Company and Employee desire to enter into a formal arrangement as set forth herein.

C.      In connection with Employee's employment, Employee has been and/or will be exposed to Confidential Information (as defined in Section 6 below) and may participate in the development, sales and/or marketing activities of the Company, in addition to many other confidential aspects of the Company's business.

D.      Employee has received and, in the course of Employee's employment with the Company, will continue to receive, training with respect to and acquire personal knowledge of the Company's products, plans and business relationships with customers and potential customers.

### AGREEMENT

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements set forth herein, and consideration received, the sufficiency of which is acknowledged, Company and Employee, intending to be legally bound, hereby agree as follows:

1.      **Employment**. Company hereby employs Employee and the Employee accepts such employment and agrees to devote all of his/her efforts and skills diligently in performing his/her assigned duties for the benefit of the Company.

2.      **Compensation**.

2.1      Base Salary. As compensation for all services to be rendered by the Employee under this Employment Agreement, the Company shall pay to the Employee a base annual salary of Four Hundred Eighty Thousand Dollars ($480,000) (the "Base Salary"), which shall be paid biweekly. The Company shall review the amount of the Base Salary periodically and the Company shall determine, in its sole discretion, whether the Employee's Base Salary shall be adjusted. Such determination is to be made on the basis of an evaluation of the Employee's performance, the performance of the Company and such other factors as the Company deems appropriate.

2.2      Participation in Benefit Plans. The Employee shall be entitled to participate in all employee benefit plans or programs) generally available to all on a basis no less favorable than those available to other Employees of the Company, to the extent that Employee's position, title, tenure, salary, age, health and other qualifications make Employee eligible to participate therein. The Employee's

participation in any such plan or program shall be subject to the provisions, rules and regulations thereof that are generally applicable to all participants.

**2.3     Expenses.** In accordance with the Company's policies established from time to time, the Company will pay or reimburse the Employee for all reasonable and necessary out-of-pocket expenses incurred by him/her in the performance of his/her duties, subject to the authorization of appropriate vouchers or receipts.

**2.4     Confidentiality of Compensation.** Employee is to keep all components of all compensation packages confidential with management.

**3.     Company Policies.** It is Employee's affirmative duty to familiarize him/herself with all current and future Company policies applicable to Employee. Should Employee have any doubt or question as to the application or existence of a Company policy, Employee shall inquire with Human Resources or the Legal Department. Employee recognizes that he/she is bound by and must comply with all applicable current and future Company policies, which are made part of this Agreement and incorporated herein by this reference, as a material requirement of satisfying Employee's obligations under this Agreement. Such policies included, but are not limited to: Code of Business Conduct, Employment at Will , Employee (Contract) Confidential Information and Non-Solicitation Agreement, Policy Statement on Sexual Harassment.

**4.     Term.** This Employment Agreement shall commence on the Effective Date. Then this Agreement shall automatically renew each year on the same month and day (the "Anniversary Date") for additional one-year terms, unless either party delivers written notice to the other party prior to the Anniversary Date that the term of Executive's employment hereunder will not be renewed or unless Employee's employment is terminated pursuant to the provisions of this Agreement.

**5.     Termination.** The employment of Employee by the Company may be terminated either by the Company or Employee at any time for any reason or for no reason at all, with or without notice. If this Agreement is terminated, Company shall have no further obligation or liability to Employee, except that Employee shall be entitled to receive only (i) Employee's salary as set forth in Section 3.1 which has been earned up to the date employment is terminated or the last day worked ("Date of Termination"), (ii) compensation for any accrued and unused Paid Time Off (PTO) up to the Date of Termination, (iii) reimbursement, pursuant to Section 3.5 for approved business expenses incurred up to the Date of Termination, (iv) any commissions or incentive payments that, by the Date of Termination, have satisfied all criteria set forth by the Company to earn such commissions or incentive payments for payment up to, but not beyond, the Date of Termination, and (v) any other payments or benefits required by law.

**6.     Confidentiality, Assignment of Rights and Non-Solicitation.**

**6.1     Definitions.** For the purpose of this Section 6, the following terms have the following definitions:

**(a)     "Confidential Information"** means all information of any kind, type or nature (written, stored on magnetic or other media or oral) which at any time during the employment of Employee by the Company is, has been or will be compiled, prepared, devised, developed, designed, discovered or otherwise learned of by Employee to the extent that such information relates to the Company or any of its affiliated entities including, without limitation, all of the Company's price lists, pricing information, customer lists, customer information, financial information, trade secrets, know how, formulas, patterns, plans, compilations, research, devices, methods, techniques, processes, confidential trade knowledge and computer programs and information; provided, however, that any such information

2

which is generally known to the public or which may be obtained by a reasonably diligent person without material cost or effort from trade publications or other readily available and public sources of information shall not be deemed to be Confidential Information, unless such information was first published in breach or in violation of a confidentiality or similar agreement, including this Agreement.

(b)     "**Person**" means any individual, corporation, partnership, trust, government or regulatory authority, or other entity.

**6.2     Confidentiality.**

(a)     Employee shall not, at any time from and after the date hereof and throughout perpetuity, directly or indirectly, disclose, reveal or permit access to all or any portion of the Confidential Information, or any tangible expressions or embodiments thereof (including any facilities, apparatus or equipment which embody or employ all or any portion of the Confidential Information), to any Person without the written consent of the Company, except to Persons designated or employed by the Company.

(b)     Without the prior written consent of the Company, Employee shall not, directly or indirectly, use or exploit the Confidential Information at any time from and after the date hereof and throughout perpetuity for any purpose other than in connection with his or her employment duties and obligations to the Company, and any gain or profit of any kind or nature obtained or derived by Employee or to which Employee may become entitled, directly or indirectly, at any time as a result of the disclosure of use of all or any part of the Confidential Information in violation of the provisions of this Agreement shall be held in trust by Employee for the express benefit of the Company and shall be remitted thereby to the Company on demand.

(c)     Employee acknowledges and agrees that the uses of Confidential Information specifically prohibited hereunder include, without limitation, the following:

(i)     Using any Confidential Information to induce or attempt to induce any Person, who is either a customer of the Company or who was being actively solicited by the Company at any time during which Employee is or was employed by the Company, to cease doing business or not to commence doing business in whole or in part with the Company; or

(ii)     Using any Confidential Information to solicit or assist in the solicitation of the business of any customer for any products or services competing with those products and services offered and sold by the Company at any time during which Employee is employed by the Company.

**6.3     Disclosure and Assignment of Rights.**

(a)     Employee shall disclose in writing to the Company full and complete details respecting any Confidential Information devised, developed, designed or discovered by Employee while in the employ of the Company.  Such disclosure shall be made promptly upon such development, design or discovery, and shall be disclosed in writing pursuant to the form attached as Exhibit "A" to this Agreement, or such other form as the Company may from time to time provide.

(b)     Employee agrees to assign and does hereby irrevocably assign to the Company all of his or her right, title and interest in and to any Confidential Information devised, developed, designed or discovered by him or her or in which he or she may otherwise obtain, or has

3

fb.uk.30501359.01

otherwise obtained, any rights, while in the employ of the Company.  Employee agrees to take any actions, including the execution of documents or instruments, which the Company may reasonably require to effect the Employee's assignment of rights pursuant to this Section 6(b), and Employee hereby constitutes and appoints, with full power of substitution and resubstitution, the President of the Company as his or her attorney-in-fact to execute and deliver any documents or instruments which Employee is obligated to execute and deliver pursuant to this Section 6(b).

      (c)    Employee shall promptly notify the Company of any patent or patent application relating to any portion of the Confidential Information which identifies the Employee as an inventor or which is applied for by, or issued to, Employee or in which the Employee has an ownership interest ("Patent").  Such notice shall be in writing on the form attached as Exhibit "B" to this Agreement, or on such other form as the Company may from time to time provide. On the written request of the Company, Employee shall sell to the Company, and the Company shall purchase from Employee, all right, title and interest of Employee in and to any Patent, whether or not Employee is employed by the Company at the time the Patent issues. The purchase price for any Patent shall be $1, and shall be paid by the Company at the time it makes the written request to purchase the Patent. Employee agrees to execute any and all documents and instruments necessary to evidence and effect the transfer to the Company of all right, title and interest of Employee in and to the Patent.

      (d)    At the request of the Company, Employee shall assist the Company in applying for and obtaining both domestic and foreign patents, or copyrights, as the case may be, on all Confidential Information that the Company deems to be patentable or copyrightable devised, developed, designed or discovered by Employee or in which he or she may otherwise obtain, or has otherwise obtained, any rights, while in the employ of the Company, and Employee shall execute at any time or times any and all documents and perform all acts reasonably requested by the Company which the Company deems to be necessary or desirable in order to obtain such patents or copyrights or otherwise to vest in the Company full and exclusive title and interest in and to all such Confidential Information, to protect the same against infringement by others and otherwise to aid the Company in connection with any continuations, renewals or reissues of any patents or copyrights, or in the conduct of any proceedings or litigation in regard thereto.  All expenses of procuring any patent or copyright shall be born by the Company.

  **6.4**    **Tangible Expressions of Confidential Information.**

      (a)    Without limiting the generality of any other provision of this Agreement, Employee specifically acknowledges and agrees that all tangible expressions of the Confidential Information, including, without limitation, all documents, instruments, sketches, drawings, notes, records, plans, specifications, research, scientific experiments, manuals and tapes, and all reproductions, copies or facsimiles thereof, have been developed, made or invented exclusively for the benefit of and are the sole and exclusive property of the Company, it successors and assigns and constitute "work for hire" under Section 201 of Title 17 of the United States Code.

      (b)    Employee shall not remove any tangible expressions of the Confidential Information from the premises of the Company without authorization.

      (c)    Upon either the written request of the Company, or upon termination of the Employee's employment with the Company, Employee shall deliver to the Company all tangible expressions of the Confidential Information which are in the possession or under the control of Employee.

  **6.5**    **Covenant Not to Solicit or Hire.**  Employee covenants and agrees that for so long as he or she is employed by the Company and for three years thereafter, Employee shall not hire,

fb.uk:30501359.01

solicit or cause to be solicited for employment by Employee or by any third party any person who is as of the date of such solicitation or who was within the 12-month period prior to the date of such solicitation an employee of the Company or any subsidiary or affiliate of the Company.

**6.6    Business Opportunities.**

(a)    Employee covenants and agrees that for so long as he or she is employed with the Company, to the maximum extent permitted by applicable law, he or she will not, without the prior written consent of the Company (which consent may be withheld by the Company in the exercise of its absolute discretion), engage, directly or indirectly, in any business, venture or activity that Employee is aware or reasonably should be aware that the Company or any affiliate of the Company is engaged in, intends at any time to become engaged in, or might become engaged in if offered the opportunity, or in any other business, venture or activity if the Company reasonably determines that such activity would adversely affect the business of the Company or any affiliate thereof or the performance by Employee of any of Employee's duties or obligations to the Company. Employee further covenants and agrees that if he or she ever engages in any such business, venture or activity in contravention of this Section 6.7 any and all gross profits, compensation, rents and other income or gain (computed without reduction for the value of the services performed by the Company, if any) derived by Employee in connection therewith shall be held by Employee for the benefit of the Company and the affiliates thereof, and shall be remitted to the Company upon demand.

(b)    Employee further covenants and agrees that for the period commencing on the effective date hereof and continuing up to and including the period of two years from the date of termination of this Agreement, Employee will not directly or indirectly, as an individual proprietor, partner, stockholder, officer, employee, director, joint venturer, investor, lender, or in any other capacity whatsoever (other than ownership of not more than 1% of the issued and outstanding stock of a publicly-held corporation), engage in the business of developing, producing, marketing or selling products or services which would compete with the products or services of the kind or type developed or being developed, produced, marketed or sold by the Company, or planned to be produced, marketed or sold as described in any business plan of the Company or as set forth in any notes or minutes of internal Company meetings, while Employee's contractual relationship with the Company was in effect.

**7.    Miscellaneous.**

**7.1    Governing Law.** This Employment Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Nevada.

**7.2    Withholding Taxes.** The Company may withhold from any salary and benefits payable under this Employment Agreement all federal, state, city or other taxes or amounts as shall be required to be withheld pursuant to any law or governmental regulation or ruling.

**7.3    Entire Agreement/Amendments.** This Agreement sets forth the entire understanding between the parties and supersedes all prior agreements and understandings, both oral and written, related thereto. No amendment or modification of this Agreement shall be deemed effective unless made in writing signed by the parties hereto specifying the date on which it is to be effective.

**7.4    No Waiver.** No term or condition of this Employment Agreement shall be deemed to have been waived nor shall there be any estoppel to enforce any provisions of this Employment Agreement, except by a statement in writing signed by the party against whom enforcement of the waiver or estoppel is sought. Any written waiver shall not be deemed a continuing waiver unless

fh.uk.30501359.01

5

specifically stated, shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically stated.

**7.5    Severability.** To the extent any provision of this Employment Agreement or Company policy shall be invalid or unenforceable, it shall be revised to conform with applicable law and the remaining provisions shall maintain their full force and effect. The Employee acknowledges the uncertainty of the law in this respect and expressly stipulates that this Employment Agreement and the Company policies shall be given the construction that renders the provisions valid and enforceable to the maximum extent (not exceeding their express terms) possible under applicable law.

**7.6    Counterpart Execution.** This Employment Agreement may be executed by facsimile and in counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same instrument.

**8.    Injunctive Relief.** Employee agrees that in the event of any breach by Employee of any of the covenants and agreements set forth in this Agreement, including, without limitation, the covenants and agreements set forth in Section 6 hereof, the Company would encounter extreme difficulty in attempting to prove the actual amount of damages suffered by it as a result of such breach and would not have adequate remedy at law in such event. Employee therefore agrees that, in addition to any other remedy available at law or in equity, in the event of such breach, the Company shall be entitled to seek and receive specific performance and temporary, preliminary and permanent injunctive relief from violation of any of said covenants and agreements from any court of competent jurisdiction without necessity of proving the amount of any actual damage to the Company resulting from such breach.

**9.    Arbitration.** In the event any dispute between the parties concerning the validity, interpretation, enforcement or breach of this Agreement or in any way related to Employee's employment or any termination of such employment except only any rights the parties may have to seek injunctive relief or specific performance, if after open discussion the dispute remains unresolved, the dispute shall then be resolved by final and binding arbitration in Clark County, Nevada in accordance with the then existing American Arbitration Association Rules and Procedures and its National Rules for the Resolution of Employment Disputes before one (1) independent, impartial arbitrator, who shall be a retired judge mutually designated by both parties. If the parties cannot agree upon such arbitrator, then the American Arbitration Association shall be empowered to designate such arbitrator. All applicable state and federal laws will apply to such proceedings. The arbitrator shall render an award and a written, reasoned opinion in support thereof. The arbitrator's award shall be final and judgment upon the award may be entered in any court having jurisdiction thereof. The parties intend this arbitration provision to be valid, enforceable, irrevocable and construed as broadly as possible. Pending the resolution of any dispute between the parties, the Company shall continue prompt payment of all amounts due to Employee under this Agreement and prompt provision of all benefits to which Employee is otherwise entitled.

**9.1**    The Company shall pay the fees and costs of arbitration. The prevailing party shall be entitled to recover all of its out-of-pocket costs and reasonable attorney's fees incurred in each and every such proceeding.

**9.2**    Notwithstanding the foregoing provisions of this Section, Employee and Company agree that the Company may seek and obtain otherwise available injunctive relief in Court for any violation of obligations concerning confidential information, trade secrets, solicitation, or other Company policies that cannot adequately be remedied at law or in arbitration.

**10.    Successors and Assigns.** This Agreement shall be binding on the parties hereto and their respective successors and assigns. Employee's duties, obligations, rights and privileges hereunder may

fb:uk.305013559.01

not be delegated or assigned by him or her in any manner.  The benefits hereunder with respect to the rights of the Company may be assigned by the Company to any other corporation or other business entity which succeeds to all or substantially all of the business of the Company through merger, consolidation, corporate reorganization or by acquisition of all or substantially all of the assets of the Company.

      **11.**    **Survival of Employee's Obligations.**  The obligations of Employee hereunder shall survive the termination of Employee's employment with the Company regardless of the reason or cause for such termination.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

Daniel C. Montano

Signature: _____

Print Name: DANIEL C. MONTANO

CARDIOVASCULAR BIOTHERAPEUTICS, INC.

By: _____

Title: VP & CFO

fb.us.1816584.02

# EXHIBIT "D"

# EXHIBIT "D"


**CardioVascular**
BioTherapeutics, Inc.

## CONSULTING AGREEMENT

This agreement to become a Consultant to CardioVascular BioTherapeutics, Inc. (the "Agreement") is entered into as of March 1, 2010 by and between CardioVascular BioTherapeutics, Inc. ("CVBT") and John Jacobs. Each hereinafter is referred to individually as a "Party" and both are referred to collectively as the "Parties."

## RECITALS

A.  CVBT is a biopharmaceutical company focused on developing recombinant human fibroblast growth factor in various drug candidates for cardiovascular diseases.

B.  CONSULTANT desires to be a consultant to CVBT regarding its business activities.

C.  CVBT and CONSULTANT desire to establish in this Agreement certain terms and conditions regarding the relationship between the parties and duties to be performed.

## AGREEMENT

1.  Term. Contracted services shall commence on the Effective Date and shall continue on a monthly basis or until either party terminates this agreement as set forth herein.

2.  Duties. CONSULTANT shall perform, on a non-exclusive basis, all the duties and responsibilities necessary to the Chief Scientific Officer and Chief Operating Officer. CONSULTANT shall perform any additional tasks necessary to carry out the intent and purpose of this Agreement or as CVBT otherwise reasonably requests pursuant to this Agreement ("CONSULTING SERVICES").

3.  Fees. CVBT agrees to pay CONSULTANT $20,619.03 per month for services to be rendered. Such fee may be prorated should services be rendered for only a portion of such period. CVBT shall pay the monthly fee in two installments: 1) one half on or about the 15th of each month and 2) the other half on or about the last day of each month.

4.  Expenses. Ordinary business expenses shall be reimbursed pursuant to CVBT's expense reimbursement policy and upon CVBT's receipt of appropriate receipts or vouchers.

5.  Continuity of Service. Any stock or rights to acquired stock issued to CONSULTANT while employed with CVBT immediately prior to the Effective Date of this Agreement that were contingent on CONSULTANT's employment with CVBT shall continue in full force and effect under the terms of those agreements, and continue to vest or reverse vest as the case may be, and be, become or remain exercisable as the case may be, on those same such terms so long as CONSULTANT continues as a service provider to CVBT under this Agreement or resumes employment subsequent to this Agreement, and for purposes of the stock or rights to acquired stock such service period shall be viewed as continuous with no break in employment.

6.  Confidentiality. Subject to the exclusions and limitations set forth below, all information given to the CONSULTANT by CVBT and/or developed by CONSULTANT in the course of performing the CONSULTING SERVICES under this Agreement or during the negotiations

any activities contemplated by this Agreement is confidential ("CONFIDENTIAL INFORMATION"). The CONSULTANT shall not publish or otherwise disclose to any third party (other than affiliates, subsidiaries, successors, assigns, employees, consultants or advisors to the extent reasonably necessary to carry out the Duties or provide or utilize the services hereunder) any CONFIDENTIAL INFORMATION; unless required by law, government agency, court order, interrogatories, requests for information or documents, subpoenas or civil investigative demands, or needed by CONSULTANT to assert claims under this Agreement or defend against claims made against CONSULTANT of such disclosure in a reasonable time after the disclosure. In addition, CONSULTANT may disclose any such information that becomes generally available to the public, provided it is not the result of disclosure in violation of this Section. Upon termination of this Agreement and/or request by CVBT, the CONSULTANT shall return all CONFIDENTIAL INFORMATION to CVBT.

7. Intellectual Property Rights. CONSULTANT agrees to assign, and hereby does assign, to CVBT, any and all intellectual property rights for any products and processes, including without limitation, any innovations and inventions, whether patentable or not, any trademarks, trade secrets, copyrightable expressions, "works for hire" and any other forms of proprietary information ("INTELLECTUAL PROPERTY") that may be developed as a result of the CONSULTANT'S performance of the CONSULTING SERVICES. CONSULTANT also agrees that he will cooperate with CVBT in prosecution of any of such INTELLECTUAL PROPERTY, including signing all necessary documents required to perfect such INTELLECTUAL PROPERTY rights. CONSULTANT agrees that no license under any patent or other intellectual property rights of CVBT is granted, by implication or otherwise, to CONSULTANT under this Agreement.

8. Relationship of the Parties. In performance hereunder, CONSULTANT shall be acting solely as an independent contractor, and nothing contained herein shall be construed to create a partnership, joint venture or other agency relationship between the Parties. CONSULTANT shall not make any communication to any person indicating that CONSULTANT has the right to act on behalf of, bind or make promises or representations for CVBT for any reason.

9. Indemnity. Both Parties agree to mutually indemnify each other of any and all liability for their own wrong-doing and negligence in any way related to, or arising out of this Agreement.

10. Notice. Any notice or communication required, permitted or contemplated hereunder shall be in writing and shall be delivered by hand, deposited with an overnight courier, sent by confirmed email, facsimile with a sheet demonstrating successful transmission, or mailed by registered or certified mail, return receipt requested, postage prepaid, in each case to the address or number listed below. Such notice shall be deemed given as of the date it is delivered, mailed, emailed, faxed or sent.

11. Termination. Either party may terminate this Agreement with a 30-day advance written notice to the other party. All monies, earned shares, any vested warrants/options, and any other compensation due at that time shall be prorated for the period of actual work performed and services rendered.

12. Survival. Any section of the Agreement and the obligations contained therein that by their nature should continue beyond the term of this Agreement shall survive termination of this Agreement, including but not limited to Confidentiality and Intellectual Property.

13. Governing Law. The laws of the State of Nevada shall govern this Agreement, without application of the principals of conflicts of laws.

14. Assignment. This Agreement shall be binding on CONSULTANT, CVBT and their respective successors and assigns. Neither party may assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld.

15. Modifications. Only a written instrument signed by both parties may modify this Agreement.

16. Force Majure. CONSULTANT will not be liable for any delay or failure to perform resulting from act's beyond the CONSULTANT's control, such as acts of God, catastrophic whether, fire, explosions, accidents, riots or civil disturbances, dangerous conditions threatening the safety of the CONSULTANT, and acts of government.

17. Waiver. No delay or omission by either party to exercise any right or power, under this Agreement shall impair or be construed as a waiver of such right or power. All waivers must be in writing and signed by the party waiving its right(s). A waiver by either party of any breach or covenant shall not be construed to be a waiver of any other breach or covenant.

18. Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, then such provision shall be disregarded and the remaining provisions of this Agreement shall remain in full force and effect.

19. Entire Agreement. This Agreement and all attached exhibits set forth the entire understanding and agreement of the Parties and supersedes all prior and contemporaneous agreements and understandings, both oral and written, related thereto.

20. Counterparts/Facsimile. This Agreement may be executed by facsimile and in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

21. Dispute Resolution. The parties shall attempt in good faith to resolve any dispute arising out of this Agreement through good faith negotiation. Any dispute which has not been resolved by negotiation within a 30 day period shall be settled by binding arbitration in Clark County, Nevada, in accordance with the then current rules of the American Arbitration Association, before one (1) independent and impartial arbitrator, who shall be a retired judge mutually designated by both parties. If the parties cannot agree upon such arbitrator, then the American Arbitration Association shall be empowered to designate such arbitrator. The arbitrator shall render an award and a written, reasoned opinion in support thereof. The arbitrator's award shall be final and judgment upon the award may be entered in any court having jurisdiction thereof. The arbitrator may, subject to any limitations placed on remedies by the terms of this Agreement, grant any relief authorized by law, including but not limited to, equitable relief, declaratory relief, and damages including punitive damages. In the event that any arbitration proceeding or other action is instituted concerning or arising out of this Agreement, both parties shall equally share the costs of each arbitration proceeding and the prevailing party shall recover all of its out-of-pocket costs and reasonable attorney's fees incurred in each and every such proceeding. If any judicial proceeding is required to enforce an arbitration ruling or to obtain equitable or injunctive relief, the parties hereby consent to the exclusive jurisdiction and venue of the U.S. District Court for the District of Nevada for any such proceeding.

Mar. 23  10  06:29a     JACK JACOBS                          7149202200              p.3

IN WITNESS WHEROF, the authorized representatives of both parties have read the foregoing
document and agree and accept these terms as of the Effective Date.

CardioVascular BioTherapeutics, Inc.          CONSULTANT
A Delaware Corporation

By: _____                By: _____

Print Name: _Mickael Flaa_                   Print Name: _John Jacobs_

Title: _Chief Financial Officer_             Title: _Chief Science Officer_

Date: ___3/23/10___                          Date: ___3-23-  2010___

Address for notices:                         Address for notices: AUBURN AVE
1930 Village Center Circle, #3-625           ___1230  AUBURN  AVE___
Las Vegas, NV 89134                          ___HUMMELSTOWN, PA 17036___
Telephone: (702) 839-7200                    Attn: _____
Facsimile:  (702) 304-2120                   Facsimile: _____

                                             Tax ID # _203- 38- 7455_

# EXHIBIT "E"

# EXHIBIT "E"



**CardioVascular BioTherapeutics, Inc.**

1635 Village Center Circle, Suite 250
Las Vegas, Nevada 89134 USA
702-839-7200 TEL, 1866-323-1051 FAX
WWW.CVBT.COM

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made and entered into as of the 1st day of January 2007 (the "Effective Date") by and between CardioVascular BioTherapeutics, Inc., a Delaware corporation (the "Company"), and John W. Jacobs, Ph.D., an individual (the "Employee").

### RECITALS

A.   The Company has offered to Employee the position of Chief Scientific Officer and Chief Operating Officer and Employee accepts such offer.

B.   Company and Employee desire to enter into a formal arrangement as set forth herein.

C.   In connection with Employee's employment, Employee has been and/or will be exposed to Confidential Information (as defined in Section 6 below) and may participate in the development, sales and/or marketing activities of the Company, in addition to many other confidential aspects of the Company's business.

D.   Employee has received and, in the course of Employee's employment with the Company, will continue to receive, training with respect to and acquire personal knowledge of the Company's products, plans and business relationships with customers and potential customers.

### AGREEMENT

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements set forth herein, and consideration received, the sufficiency of which is acknowledged, Company and Employee, intending to be legally bound, hereby agree as follows:

1.   **Employment.** Company hereby employs Employee and the Employee accepts such employment and agrees to devote all of his/her efforts and skills diligently in performing his/her assigned duties for the benefit of the Company.

2.   **Compensation.**

2.1   **Base Salary.** As compensation for all services to be rendered by the Employee under this Employment Agreement, the Company shall pay to the Employee a base annual salary of Two Hundred Forty Thousand Dollars ($240,000) (the "Base Salary"), which shall be paid biweekly. The Company shall review the amount of the Base Salary periodically and the Company shall determine, in its sole discretion, whether the Employee's Base Salary shall be adjusted. Such determination is to be made on the basis of an evaluation of the Employee's performance, the performance of the Company and such other factors as the Company deems appropriate.

2.2   **Participation in Benefit Plans.** The Employee shall be entitled to participate in all employee benefit plans or programs generally available to all on a basis no less favorable than those available to other Employees of the Company, to the extent that Employee's position, title, tenure, salary, age, health and other qualifications make Employee eligible to participate therein. The Employee's

participation in any such plan or program shall be subject to the provisions, rules and regulations thereof that are generally applicable to all participants.

      2.3    **Expenses.**  In accordance with the Company's policies established from time to time, the Company will pay or reimburse the Employee for all reasonable and necessary out-of-pocket expenses incurred by him/her in the performance of his/her duties, subject to the authorization of appropriate vouchers or receipts.

      2.4    **Confidentiality of Compensation.**  Employee is to keep all components of all compensation packages confidential with management.

      3.    **Company Policies.**  It is Employee's affirmative duty to familiarize him/herself with all current and future Company policies applicable to Employee.  Should Employee have any doubt or question as to the application or existence of a Company policy, Employee shall inquire with Human Resources or the Legal Department.  Employee recognizes that he/she is bound by and must comply with all applicable current and future Company policies, which are made part of this Agreement and incorporated herein by this reference, as a material requirement of satisfying Employee's obligations under this Agreement.  Such policies included, but are not limited to:  Code of Business Conduct, Employment at Will , Employee (Contract) Confidential Information and Non-Solicitation Agreement, Policy Statement on  Sexual Harassment.

      4.    **Term.**  This Employment Agreement shall commence on the Effective Date.  Then this Agreement shall automatically renew each year on the same month and day (the "Anniversary Date") for additional one-year terms, unless either party delivers written notice to the other party prior to the Anniversary Date that the term of Executive's employment hereunder will not be renewed or unless Employee's employment is terminated pursuant to the provisions of this Agreement.

      5.    **Termination.**  The employment of Employee by the Company may be terminated either by the Company or Employee at any time for any reason or for no reason at all, with or without notice.  If this Agreement is terminated, Company shall have no further obligation or liability to Employee, except that Employee shall be entitled to receive only (i) Employee's salary as set forth in Section 3.1 which has been earned up to the date employment is terminated or the last day worked ("Date of Termination"), (ii) compensation for any accrued and unused Paid Time Off (PTO) up to the Date of Termination, (iii) reimbursement, pursuant to Section 3.5 for approved business expenses incurred up to the Date of Termination, (iv) any commissions or incentive payments that, by the Date of Termination, have satisfied all criteria set forth by the Company to earn such commissions or incentive payments for payment up to, but not beyond, the Date of Termination, and (v) any other payments or benefits required by law.

      6.    **Confidentiality, Assignment of Rights and Non-Solicitation**.

      6.1    **Definitions.**  For the purpose of this Section 6, the following terms have the following definitions:

      (a)    "**Confidential Information**" means all information of any kind, type or nature (written, stored on magnetic or other media or oral) which at any time during the employment of Employee by the Company is,  has been or will be compiled, prepared, devised, developed, designed, discovered or otherwise learned by Employee to the extent that such information relates to the Company or any of its affiliated entities including, without limitation, all of the Company's price lists, pricing information, customer lists, customer information, financial information, trade secrets, know how, formulas, patterns, plans, compilations, research, devices, methods, techniques, processes, confidential trade knowledge and computer programs and information; provided, however, that any such information

2

fb.uk.50501539.01

CVBT00251

which is generally known to the public or which may be obtained by a reasonably diligent person without material cost or effort from trade publications or other readily available and public sources of Information shall not be deemed to be Confidential Information, unless such information was first published in breach or in violation of a confidentiality or similar agreement, including this Agreement.

(b)     "**Person**" means any individual, corporation, partnership, trust, government or regulatory authority, or other entity.

6.2     **Confidentiality.**

(a)     Employee shall not, at any time from and after the date hereof and throughout perpetuity, directly or indirectly, disclose, reveal or permit access to all or any portion of the Confidential Information, or any tangible expressions or embodiments thereof (including any facilities, apparatus or equipment which embody or employ all or any portion of the Confidential Information), to any Person without the written consent of the Company, except to Persons designated or employed by the Company.

(b)     Without the prior written consent of the Company, Employee shall not, directly or indirectly, use or exploit the Confidential Information at any time from and after the date hereof and throughout perpetuity for any purpose other than in connection with his or her employment duties and obligations to the Company, and any gain or profit of any kind or nature obtained or derived by Employee or to which Employee may become entitled, directly or indirectly, at any time as a result of the disclosure of use of all or any part of the Confidential Information in violation of the provisions of this Agreement shall be held in trust by Employee for the express benefit of the Company and shall be remitted thereby to the Company on demand.

(c)     Employee acknowledges and agrees that the uses of Confidential Information specifically prohibited hereunder include, without limitation, the following:

(i)     Using any Confidential Information to induce or attempt to induce any Person, who is either a customer of the Company or who was being actively solicited by the Company at any time during which Employee is or was employed by the Company, to cease doing business or not to commence doing business in whole or in part with the Company; or

(ii)     Using any Confidential Information to solicit or assist in the solicitation of the business of any customer for any products or services competing with those products and services offered and sold by the Company at any time during which Employee is employed by the Company.

6.3     **Disclosure and Assignment of Rights.**

(a)     Employee shall disclose in writing to the Company full and complete details respecting any Confidential Information devised, developed, designed or discovered by Employee while in the employ of the Company.  Such disclosure shall be made promptly upon such development, design or discovery, and shall be disclosed in writing pursuant to the form attached as Exhibit "A" to this Agreement, or such other form as the Company may from time to time provide.

(b)     Employee agrees to assign and does hereby irrevocably assign to the Company all of his or her right, title and interest in and to any Confidential Information devised, developed, designed or discovered by him or her or in which he or she may otherwise obtain, or has

fb.uk.30501339.01

3

CVBT00252

otherwise obtained, any rights, while in the employ of the Company. Employee agrees to take any actions, including the execution of documents or instruments, which the Company may reasonably require to effect the Employee's assignment of rights pursuant to this Section 6(b), and Employee hereby constitutes and appoints, with full power of substitution and resubstitution, the President of the Company as his or her attorney-in-fact to execute and deliver any documents or instruments which Employee is obligated to execute and deliver pursuant to this Section 6(b).

(c)     Employee shall promptly notify the Company of any patent or patent application relating to any portion of the Confidential Information which identifies the Employee as an inventor or which is applied for by, or issued to, Employee or in which the Employee has an ownership interest ("Patent"). Such notice shall be in writing on the form attached as Exhibit "B" to this Agreement, or on such other form as the Company may from time to time provide. On the written request of the Company, Employee shall sell to the Company, and the Company shall purchase from Employee, all right, title and interest of Employee in and to any Patent, whether or not Employee is employed by the Company at the time the Patent issues. The purchase price for any Patent shall be $1, and shall be paid by the Company at the time it makes the written request to purchase the Patent. Employee agrees to execute any and all documents and instruments necessary to evidence and effect the transfer to the Company of all right, title and interest of Employee in and to the Patent.

(d)     At the request of the Company, Employee shall assist the Company in applying for and obtaining both domestic and foreign patents, or copyrights, as the case may be, on all Confidential Information that the Company deems to be patentable or copyrightable devised, developed, designed or discovered by Employee or in which he or she may otherwise obtain, or has otherwise obtained, any rights, while in the employ of the Company, and Employee shall execute at any time or times any and all documents and perform all acts reasonably requested by the Company which the Company deems to be necessary or desirable in order to obtain such patents or copyrights or otherwise to vest in the Company full and exclusive title and interest in and to all such Confidential Information, to protect the same against infringement by others and otherwise to aid the Company in connection with any continuations, renewals or reissues of any patents or copyrights, or in the conduct of any proceedings or litigation in regard thereto. All expenses of procuring any patent or copyright shall be born by the Company.

6.4     **Tangible Expressions of Confidential Information.**

(a)     Without limiting the generality of any other provision of this Agreement, Employee specifically acknowledges and agrees that all tangible expressions of the Confidential Information, including, without limitation, all documents, instruments, sketches, drawings, notes, records, plans, specifications, research, scientific experiments, manuals and tapes, and all reproductions, copies or facsimiles thereof, have been developed, made or invented exclusively for the benefit of and are the sole and exclusive property of the Company, it successors and assigns and constitute **"work for hire"** under Section 201 of Title 17 of the United States Code.

(b)     Employee shall not remove any tangible expressions of the Confidential Information from the premises of the Company without authorization.

(c)     Upon either the written request of the Company, or upon termination of the Employee's employment with the Company, Employee shall deliver to the Company all tangible expressions of the Confidential Information which are in the possession or under the control of Employee.

6.5     **Covenant Not to Solicit or Hire.** Employee covenants and agrees that for so long as he or she is employed by the Company and for three years thereafter, Employee shall not hire,

4

fb.uk.30591359.01

solicit or cause to be solicited for employment by Employee or by any third-party any person who is as of the date of such solicitation or who was within the 12-month period prior to the date of such solicitation an employee of the Company or any subsidiary or affiliate of the Company.

### 6.6    Business Opportunities.

(a)    Employee covenants and agrees that for so long as he or she is employed with the Company, to the maximum extent permitted by applicable law, he or she will not, without the prior written consent of the Company (which consent may be withheld by the Company in the exercise of its absolute discretion), engage, directly or indirectly, in any business, venture or activity that Employee is aware or reasonably should be aware that the Company or any affiliate of the Company is engaged in, intends at any time to become engaged in, or might become engaged in if offered the opportunity, or in any other business, venture or activity if the Company reasonably determines that such activity would adversely affect the business of the Company or any affiliate thereof or the performance by Employee of any of Employee's duties or obligations to the Company. Employee further covenants and agrees that if he or she ever engages in any such business, venture or activity in contravention of this Section 6.7 any and all gross profits, compensation, rents and other income or gain (computed without reduction for the value of the services performed by the Company, if any) derived by Employee in connection therewith shall be held by Employee for the benefit of the Company and the affiliates thereof, and shall be remitted to the Company upon demand.

(b)    Employee further covenants and agrees that for the period commencing on the effective date hereof and continuing up to and including the period of two years from the date of termination of this Agreement, Employee will not directly or indirectly, as an individual proprietor, partner, stockholder, officer, employee, director, joint venturer, investor, lender, or in any other capacity whatsoever (other than ownership of not more than 1% of the issued and outstanding stock of a publicly-held corporation), engage in the business of developing, producing, marketing or selling products or services which would compete with the products or services of the kind or type developed or being developed, produced, marketed and sold by the Company, or planned to be produced, marketed or sold as described in any business plan of the Company or as set forth in any notes or minutes of internal Company meetings, while Employee's contractual relationship with the Company was in effect.

### 7.    Miscellaneous.

7.1    Governing Law.  This Employment Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Nevada.

7.2    Withholding Taxes.  The Company may withhold from any salary and benefits payable under this Employment Agreement all federal, state, city or other taxes or amounts as shall be required to be withheld pursuant to any law or governmental regulation or ruling.

7.3    Entire Agreement/Amendments.  This Agreement sets forth the entire understanding between the parties and supersedes all prior agreements and understandings, both oral and written, related thereto.  No amendment or modification of this Agreement shall be deemed effective unless made in writing signed by the parties hereto specifying the date on which it is to be effective.

7.4    No Waiver.  No term or condition of this Employment Agreement shall be deemed to have been waived nor shall there be any estoppel to enforce any provisions of this Employment Agreement, except by a statement in writing signed by the party against whom enforcement of the waiver or estoppel is sought.  Any written waiver shall not be deemed a continuing waiver unless

5

Clark 30501359.01

CVBT00254

specifically stated, shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically stated.

**7.5 Severability.** To the extent any provision of this Employment Agreement or Company policy shall be invalid or unenforceable, it shall be revised to conform with applicable law and the remaining provisions shall maintain their full force and effect. The Employee acknowledges the uncertainty of the law in this respect and expressly stipulates that this Employment Agreement and the Company policies shall be given the construction that renders the provisions valid and enforceable to the maximum extent (not exceeding their express terms) possible under applicable law.

**7.6 Counterpart Execution.** This Employment Agreement may be executed by facsimile and in counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same instrument.

**8. Injunctive Relief.** Employee agrees that in the event of any breach by Employee of any of the covenants and agreements set forth in this Agreement, including, without limitation, the covenants and agreements set forth in Section 6 hereof, the Company would encounter extreme difficulty in attempting to prove the actual amount of damages suffered by it as a result of such breach and would not have adequate remedy at law in such event. Employee therefore agrees that, in addition to any other remedy available at law or in equity, in the event of such breach, the Company shall be entitled to seek and receive specific performance and temporary, preliminary and permanent injunctive relief from violation of any of said covenants and agreements from any court of competent jurisdiction without necessity of proving the amount of any actual damage to the Company resulting from such breach.

**9. Arbitration.** In the event any dispute between the parties concerning the validity, interpretation, enforcement or breach of this Agreement or in any way related to Employee's employment or any termination of such employment except only any rights the parties may have to seek injunctive relief or specific performance, if after open discussion the dispute remains unresolved, the dispute shall then be resolved by final and binding arbitration in Clark County, Nevada in accordance with the then existing American Arbitration Association Rules and Procedures and its National Rules for the Resolution of Employment Disputes before one (1) independent, impartial arbitrator, who shall be a retired judge mutually designated by both parties. If the parties cannot agree upon such arbitrator, then the American Arbitration Association shall be empowered to designate such arbitrator. All applicable state and federal laws will apply to such proceedings. The arbitrator shall render an award and a written, reasoned opinion in support thereof. The arbitrator's award shall be final and judgment upon the award may be entered in any court having jurisdiction thereof. The parties intend this arbitration provision to be valid, enforceable, irrevocable and construed as broadly as possible. Pending the resolution of any dispute between the parties, the Company shall continue prompt payment of all amounts due to Employee under this Agreement and prompt provision of all benefits to which Employee is otherwise entitled.

**9.1** The Company shall pay the fees and costs of arbitration. The prevailing party shall be entitled to recover all of its out-of-pocket costs and reasonable attorney's fees incurred in each and every such proceeding.

**9.2** Notwithstanding the foregoing provisions of this Section, Employee and Company agree that the Company may seek and obtain otherwise available injunctive relief in Court for any violation of obligations concerning confidential information, trade secrets, solicitation, or other Company policies that cannot adequately be remedied at law or in arbitration.

**10. Successors and Assigns.** This Agreement shall be binding on the parties hereto and their respective successors and assigns. Employee's duties, obligations, rights and privileges hereunder may

Ruxk_30501359.01

CVBT00255

not be delegated or assigned by him or her in any manner. The benefits hereunder with respect to the rights of the Company may be assigned by the Company to any other corporation or other business entity which succeeds to all or substantially all of the business of the Company through merger, consolidation, corporate reorganization or by acquisition of all or substantially all of the assets of the Company.

**11.    Survival of Employee's Obligations.** The obligations of Employee hereunder shall survive the termination of Employee's employment with the Company regardless of the reason or cause for such termination.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

John W. Jacobs, Ph.D.                                CARDIOVASCULAR BIOTHERAPEUTICS, INC.

Signature: _____    By: _____

Print Name: _____    Title: _____

fb.us.7816884.02

fb.uk.30501359.01

7

CVBT00256

# EXHIBIT "F"

# EXHIBIT "F"

## AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between:

Case Number: 01-18-0002-7794

CardioVascular BioTherapeutics, Inc.
-vs-
Daniel C. Montano
-vs-
John W. Jacobs and
Zhittya Regenerative Medicine, Inc.

CASE MANAGER: Terri Martinez
DATE LIST SUBMITTED: October 3, 2018

### DATE LIST DUE: October 17, 2018
### LIST FOR SELECTION OF ARBITRATOR
*****************************************************************************************

In accordance with the Rules we are providing you a list of arbitrators who are members of our Employment Dispute Resolution Roster. Along with this list are the attached Biographical Information Sheets on each arbitrator listed. We encourage parties to review the following list of arbitrators and if possible, agree to a single arbitrator from this list.

Should parties not be able to agree to an arbitrator please review and independently submit the attached list to me by **October 17, 2018**. In accordance with the Rules:

> Strike any names that you have an objection on
> Number the remaining names in order of preference
> Return list to AAA upon completion

Should you not return your list by the above date all names will be deemed acceptable.

Note: If appointment cannot be made from this list the AAA may appoint without the submission of an additional list, in accordance with the rules. For your convenience, this form may be completed online through AAA's WebFile at www.adr.org.

~~Hon. Rebecca A. Albrecht~~

~~Hon. Nickolas J. Dibiaso (Ret.)~~

~~Hon. Ruben M. Hernandez~~

~~Hon. Patrick Irvine~~

3  Hon. Bruce E. Meyerson

2  Hon. Connie Peterson

~~Hon. Philip M. Saeta~~

1  Hon. Alice D. Sullivan (Ret.)

4  Hon. Michael A. Yarnell

Hon. Michael D. Zimmerman

*****************************************************************************************

Arbitrators are compensated at the rate stated on their biographical data. The compensation is an independent obligation of the parties and it is understood that the American Arbitration Association has no liability, direct or indirect, for such payments. Deposits shall be made promptly with the AAA as required by the case manager, pursuant to the Rules, subject to final appointment by the arbitrator in the award. If you have any questions please call or email me.

Party: _Cardio Vascular Bio Therapeutics, Inc_

By: _Barry Cannaday_

Title: _Attorney for Cardio Bio Therapeutics, Inc_

# EXHIBIT "G"

# EXHIBIT "G"

# AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration between:

Case Number: 01-18-0002-7794

CardioVascular BioTherapeutics, Inc.
-vs-
Daniel C. Montano
-vs-
John W. Jacobs and
Zhittya Regenerative Medicine, Inc.

CASE MANAGER: Terri Martinez
DATE LIST SUBMITTED: October 3, 2018

DATE LIST DUE: **October 17, 2018**
LIST FOR SELECTION OF ARBITRATOR
**************************************************************************************

In accordance with the Rules we are providing you a list of arbitrators who are members of our Employment Dispute Resolution Roster. Along with this list are the attached Biographical Information Sheets on each arbitrator listed. We encourage parties to review the following list of arbitrators and if possible, agree to a single arbitrator from this list.

Should parties not be able to agree to an arbitrator please review and independently submit the attached list to me by **October 17, 2018**. In accordance with the Rules:

      Strike any names that you have an objection on
      Number the remaining names in order of preference
      Return list to AAA upon completion

Should you not return your list by the above date all names will be deemed acceptable.

Note: If appointment cannot be made from this list the AAA may appoint without the submission of an additional list, in accordance with the rules. For your convenience, this form may be completed online through AAA's WebFile at www.adr.org.

~~Hon. Rebecca A. Albrecht~~

#4 — Hon. Nickolas J. Dibiaso (Ret.)

~~Hon. Ruben M. Hernandez~~

~~Hon. Patrick Irvine~~

~~Hon. Bruce E. Meyerson~~

~~Hon. Connie Peterson~~

#3 — Hon. Philip M. Saeta

#1 — Hon. Alice D. Sullivan (Ret.)

~~Hon. Michael A. Yarnell~~

#2  Hon. Michael D. Zimmerman

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Arbitrators are compensated at the rate stated on their biographical data. The compensation is an independent obligation of the parties and it is understood that the American Arbitration Association has no liability, direct or indirect, for such payments. Deposits shall be made promptly with the AAA as required by the case manager, pursuant to the Rules, subject to final appointment by the arbitrator in the award. If you have any questions please call or email me.

Party: DANIEL C. MONTANO

By: Dan l C. Montano          Oct 17, 2018

Title: _____

EXHIBIT "H"

EXHIBIT "H"

AMERICAN
ARBITRATION
ASSOCIATION®   INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

# Hon. Michael D. Zimmerman
Zimmerman Booher PLLC

**Current Employer-Title**   Zimmerman Booher

**Profession**   Attorney

**Work History**   Zimmerman Booher, 2011-present; Partner, Snell & Wilmer, 2000-11; Chair of Judicial Council/Member of Judicial Council/Chief Justice/Justice, Utah Supreme Court, 1984-00; Adjunct Professor/Associate Professor, University of Utah College of Law, 1989-93, 1976-84; Shareholder, Watkiss & Campbell, 1980-84; Attorney, Kruse, Landa, Zimmerman & Maycock, 1978-80; Special Counsel to Governor of Utah, State of Utah, 1978-84; Associate, O'Melveny & Myers, 1970-76; Law Clerk, Chief Justice Warren E. Burger of the U.S. Supreme Court, 1969-70.

**Experience**   Appointed to the Utah Supreme Court in 1984 by Governor Scott M. Matheson. Served as chief justice from 1994 through early 1998, leaving the Utah Supreme Court in January 2000. As a justice of a common law supreme court, has had broad exposure to numerous areas of law. Taught antitrust and securities regulation as an associate professor of law at the University of Utah College of Law. Heavily involved in class actions, securities fraud suits, and appellate work as a practitioner in Los Angeles for six years. Current practice concentrates on complex commercial litigation, major motions, and appellate practice.

**Alternative Dispute Resolution Experience**   Has served as an arbitrator on more than 85 cases and as a mediator on over 150 cases. Handled disputes involving constitutional takings; contract breaches, both domestic and international; wrongful franchise termination; intentional infliction of emotional distress; business torts; landlord-tenant disputes; arbitral division of $1.5 billion in assets of school district; interpretation of commercial insurance policy; claims of unfair trade practices and consumer fraud; and class action determinations.

**Alternative Dispute Resolution Training**   Arbitrator Performance and Demeanor ~ Meeting Participant Expectations, 2018; The Arbitration "Need to Knows": Trends and Lessons for 2017 and Beyond, 2018; AAA Confronting Arbitrability and Jurisdiction Issues in Arbitration, 2016; AAA The "How To" of Presenting Damages in Arbitration, 2015; AAA "Exceeded Powers" - Recent Trends in Cases Challenging Arbitrator Authority 2015; AAA Webinar, Does AT&T Mobility v. Concepcion L.L.C. Spell an End to Class Actions?, 2013; AAA Maximizing Efficiency & Economy in Arbitration: Challenges at the Preliminary Hearing, 2011; AAA Webinar, New AAA Healthcare Payor Provider Judicial Orientation, 2011; AAA Webinar, How to Prevent Arbitrations from Transforming into Litigations, 2009; AAA Webinar, Get Smart: Issues Surrounding Surveillance in the Workplace, 2009; AAA Webinar, Why Construction Mediations Fail: Avoiding Common Mistakes, 2009; AAA Chairing an Arbitration Panel: Managing Procedures, Process & Dynamics (ACE005), 2009; AAA Arbitrator Ethics & Disclosure (ACE003), 2006; AAA

*Hon. Michael D. Zimmerman*
*Neutral ID : 150397*

The AAA provides arbitrators to parties on cases administered by the AAA under its various Rules, which delegate authority to the AAA on various issues, including arbitrator appointment and challenges, general oversight, and billing. Arbitrations that proceed without AAA administration are not considered "AAA arbitrations," even if the parties were to select an arbitrator who is on the AAA's Roster.

Chairing an Arbitration Panel: Managing Procedures, Process & Dynamics (ACE005), 2005; Utah Council on Conflict Resolution, Annual ADR Symposium, 1999-2005; AAA Arbitration Awards: Safeguarding, Deciding & Writing Awards (ACE001), 2004; AAA Commercial Arbitrator II Training: Advanced Case Management Issues, 2003; AAA Arbitrator I Training-Fundamentals of the Arbitration Process, 2002; Utah Council on Conflict Resolution, Mediation Advocacy Workshop, 2000; Utah Dispute Resolution, Basic Mediation Training, 2000; Harvard Law School, P.I.L. Negotiation Workshop, 1999; various other ADR training.

**Professional Licenses**  Admitted to the Bar: California, 1971; Utah, 1978.

**Professional Associations**  American Academy of Appellate Lawyers; American Bar Association; American Judicature Society (Board of Directors, Past Member); American Law Institute; Salt Lake County Bar Association; Conference of Chief Justices (Board of Directors, Past Member); Utah Council on Conflict Resolution (Board of Directors, Past Chair).

**Education**  University of Utah (BS, Political Science, cum laude-1966); University of Utah (JD-1969).

**Publications and Speaking Engagements**  Invited panelist, "Trial Skills Academy," Utah State Bar Litigation Section, 2015; presenter, "How to Build a Firm Culture that Handles Conflict Constructively," Utah State Bar Convention, 2014; book review, "Business and Commercial Litigation in Federal Court, Third Edition," Utah Bar Journal, Vol. 26, No. 6, 2013; keynote address, "It Is Time to Burn the Boats: 'Twin Crises in the Law,'" University of Utah, Twin Crises in the Law CLE, 2013; presenter, "Preservation and Post-Trial Motions," Aldon J. Anderson American Inn of Court, 2012; book chapter (with Troy Booher and Katherine Carreau), Utah Appellate Practice, APPELLATE PRACTICE COMPENDIUM, ABA Book Publishing, 2012; book review, "Business and Commercial Litigation in Federal Court, Second Edition," Utah Bar Journal, Vol. 21, No. 2, 2008; "A New Approach to Court Reform," JUDICATURE, vol. 82, no. 3, November-December 1998; speaker, annual "State of the Judiciary" speech to Utah Legislature, published in 11 UTAH BAR JOURNAL 49 (1998), 10 UTAH BAR JOURNAL 35 (1997), 9 UTAH BAR JOURNAL 27 (1996), 8 UTAH BAR JOURNAL 32 (1995), 7 UTAH BAR JOURNAL 25 (1994); "Where We Have Been and Where We May Be Headed: Some Thoughts on the Progress of the Utah Judiciary," 11 UTAH BAR JOURNAL 18, 1998; "Remarks Before First 100 Dinner of Utah State Bar," 11 UTAH BAR JOURNAL 75, 1998; "Point/Counterpoint: Mandatory Reporting of Pro Bono Service: Why It Is an Issue," 10 UTAH BAR JOURNAL 13, 1997; "Alternative Dispute Resolution and the Utah Courts," 9 UTAH BAR JOURNAL 11, 1996; "Legal Ethics: The Chief Justice Explains Complications," THE THINKER, Utah Valley State College, Center for the Study of Ethics, February 1996; "The Law School Publication Experience--What Is It Worth?," THE NEO-ANALYST, September 1990; "Professional Standards Versus Personal Ethics: The Lawyer's Dilemma," UTAH LAW REVIEW, vol. 1, 1989; "Some Common Problems of Appellate Advocacy," THE BARRISTER 1, September-October 1986; "An Inside View of the Utah Supreme Court," THE BARRISTER 1, January-February 1986;

The AAA provides arbitrators to parties on cases administered by the AAA under its various Rules, which delegate authority to the AAA on various issues, including arbitrator appointment and challenges, general oversight, and billing. Arbitrations that proceed without AAA administration are not considered "AAA arbitrations," even if the parties were to select an arbitrator who is on the AAA's Roster.

note, "Attempt to Monopolize:  The Offense Redefined," UTAH LAW REVIEW 704, 1969; case note, "Lack of Statewide Equality in Court Delay Held Not a Denial of Equal Protection," UTAH LAW REVIEW 556, 1967.

**Citizenship**     United States of America
**Languages**     English
**Locale**     Salt Lake City, Utah, United States of America

**Compensation**

| | |
|---|---|
| Hearing: | $425.00/Hr |
| Study: | $425.00/Hr |
| Travel: | $215.00/Hr |
| Cancellation: | $0.00/Hr |
| Cancellation Period: | 0 Days |
| Comment: | Research assistance as needed from Zimmerman Booher associate attorney at $225 per hour. |

*Hon. Michael D. Zimmerman*
*Neutral ID : 150397*

The AAA provides arbitrators to parties on cases administered by the AAA under its various Rules, which delegate authority to the AAA on various issues, including arbitrator appointment and challenges, general oversight, and billing.  Arbitrations that proceed without AAA administration are not considered "AAA arbitrations," even if the parties were to select an arbitrator who is on the AAA's Roster.

# EXHIBIT "I"

# EXHIBIT "I"

## AMERICAN ARBITRATION ASSOCIATION
## EMPLOYMENT TRIBUNAL

|  |  |
|---|---|
| CARDIOVASCULAR BIOTHERAPEUTICS, INC., <br><br> Claimant, <br><br> v. <br><br> DANIEL C. MONTANO, JOHN W. JACOBS, AND ZHITTYA REGENERATIVE MEDICINE, INC. <br><br> Respondents. | **Final Memorandum of Award** <br><br> No. 01-18-0002-7794 <br><br> Michael D. Zimmerman, Arbitrator |

**I, Michael D. Zimmerman, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and having previously issued an Interim Memorandum of Award dated February 25, 2020, and a Partial Final Memorandum of Award dated May 22, 2020, do hereby issue this Final Memorandum of Award, as follows:**

### Appearances

Claimant is represented by Barry F. Cannaday of Dentons US, LLP, Michele Ratcliffe of Lamberth, Ratcliffe, Covington, PLLC, Matthew L. Johnson and Timothy S. Cory of Johnson & Gubler, PC. Respondents are represented by Daniel T. Foley of Foley & Oakes, PC. By agreement of the parties, this matter came on for hearing before Arbitrator Michael D. Zimmerman.

This Partial Final Memorandum of Award constitutes the findings of fact and rulings of law of the arbitrator.

### Background

This is an action brought by Cardiovascular Biotherapeutics, Inc. (Cardio) against Respondents and Cross-Claimants Daniel Montano and Dr. John Jacobs claiming breach of contract, breach of various duties to Cardio, and violations of various state and federal law. Cardio seeks damages and injunctive relief to prevent Montano and Jacobs from continuing

their allegedly wrongful conduct in the course of their employment by a company Montano founded in 2014, Zhittya Regenerative Medicine, Inc., to pursue the development of the same type of drug that Cardio has been working on prior to 2014. Cardio sees Zhittya as a competitive threat and a potential spoiler in Cardio's efforts to raise money.

Cardio is a biopharmaceutical company founded in 1998 dedicated to the development of a commercially viable drug based on a naturally occurring molecule of human growth factor known as "fibroblast growth factor," or FGF-1. FGF-1 has been shown to promote the growth of blood vessels. A drug based on FGF-1 is thought to have the potential to treat a wide range of conditions caused by or resulting in insufficient vascularization.

Respondent Montano founded Cardio in 1998. He was CEO, President, and Chair of the Board of Cardio until mid-2013 when he was replaced by Mickael Flaa as President and an alternative interim Board of Directors was put in place under a stipulated *status quo* order entered by the Delaware Chancery Court. Following a shareholder vote a year later, he was terminated by Cardio in September 2014. He also founded an affiliate, Phage Biotechnologies, Inc. in 1998. Phage used a Ukrainian developed process to create an FGF-1 molecule that was to be the basis for an FGF-1 drug.

Respondent Jacobs has a Ph.D. in Molecular Biology. He was hired by Cardio in 2000. He served as Cardio's Chief Science Officer and COO until 2013, when he was suspended by the stipulated *status quo* order. He was terminated along with Montano in September of 2014. Jacobs also served as a Director of Cardio from February of 2005 until the *status quo* order.

Because Cardio was a start-up venture that had no salable product and could not expect to have one for years, it required large sums of money to support the development of the product. Witnesses from both sides described its primary function from the beginning as money raising. The intention was and appears to remain today to raise money by lauding the potential for FGF-1 to uniquely address a number of medical conditions, to raise awareness of the large volume of scientific literature describing the tantalizing success of existing FGF studies, and to highlight the possibility of an FGF-1 drug being a financial bonanza for any company that developed it. Montano described his job as selling the "sizzle" surrounding FGF-1. Until recently, President of Cardio, Mickael Flaa, characterized the target audience for materials Cardio prepared for distribution as investors, not scientists.

I. Post-2007

Cardio had what could be characterized as a significant "burn rate." Between 1998 and 2007, Cardio raised and spent approximately $100,000,000 to develop and manufacture an FGF-1 molecule suitable to serve as the basis of an FGF-1 drug and to begin animal and FDA approved human testing. However, by the close of 2007, with the advent of the Great Recession, venture capital dried up and Cardio wound down its development efforts. By the fall of that year, Cardio had cut its workforce and by October of 2007, it ceased paying any of its

2

employees, including officers and board members. On June 17, 2009 it adopted a board resolution, which recognized that it owed its employees some $3.5 million in back wages. In recognition of their willingness to continue to work on the hope of payment, the board resolution provided that these employees would be offered warrants for Cardio stock and that Cardio would book interest at the rate of 12% per annum on all unpaid wages accrued to date and going forward. The resolution provides that employees, including officers and board members, were to release their claims for unpaid wages in exchange for the sums specified in the resolution. Resp. Ex. 5, Minutes of Board 6/17/2009 at p. 5.

The testimony indicates that from this point on, Cardio did no drug-development work. Its continued existence amounted to a holding action and minimizing expenditures, while the company attempted to find ways to raise money. Cardio lost its FGF-1 molecule manufacturing affiliate, Phage, to bankruptcy in 2008, then lost access to the stock of the FGF-1 molecule Phage had developed as the key element of a future drug when Phage failed to pay a facility that maintained the material in deep refrigerated storage. In 2009, Cardio wound down its FDA approved heart trials when it could not afford to pay arrearages to contractors conducting the trials. In 2010 Phage was liquidated and its assets sold off.

Cardio quickly slid into negative financial territory as early as 2008. It accumulated debts for unpaid bills and increasing obligations to unpaid employees. It raised only scattered sums from investors. By June 2009, Cardio had liabilities in excess of assets of $12,000,000. It owed its employees $3,500,000 plus interest at 12% per annum and had only $4,000 in cash. By 2012, liabilities were in excess of $25,000,000, employee debt was $10,300,000 plus interest, and it had $3,500 in cash.

With fundraising efforts stalled, Cardio made an effort to broaden its IP base and thereby bolster its fundraising potential. In 2008, it had disclosed in SEC filings that it had no IP protection for its FGF-1 molecule, other than that which pertained to the manufacturing process developed by Phage. It also disclosed that there were other ways of manufacturing an FGF-1 molecule besides the Phage method. Jacobs and several others associated with Cardio, including Ken Thomas, had trained at Washington University where they worked on FGF molecules. They had also moved on to work at the pharmaceutical company Merck, which had spent considerable money over several decades developing FGF-1 materials, before abandoning the effort. Thomas was on the team that first purified FGF-1 and obtained a patent for Merck on the molecule, a patent that later expired when Merck abandoned its work on FGF-1. Thomas and Jacobs thought that Merck's now-mothballed FGF-1 files might contain protected information that would be useful to Cardio's fundraising effort; specifically, information suggesting broader applications for FGF-1 than Merck had pursued, and that could give Cardio something new to use in its effort to raise funds.

Jacobs approached Michael Rosenberg, who was at Merck and who had hired Jacobs to work there. He asked about obtaining a license to the Merck files. Merck agreed. On November

3

22, 2010, the two entered into a licensing agreement. Merck would copy all the warehoused FGF-1 research material and license it to Cardio for $100,000 and a royalty if anything came of it. Cardio did not have the $100,000 but entered the agreement in late 2009. (Merck was not paid for this material until 2012. These materials were mined for possible additional conditions treatable with FGF-1, other than those pursued by Cardio to that point, such as foot ulcers, and for information that could be disseminated to potential investors and partners. Jacobs had hoped that the Merck data might provide some useful information about how it manufactured the FGF-1. However, Merck ultimately was not able to produce usable information on that score. Decl. of J. Jacobs ¶ 33, Ex. B to Mot. For Determination, filed 4/29/19.

During the years following the start of the Great Recession, Montano, supported by Jacobs and others, did not day-to-day act as CEO, since there was little to do. Most of his Cardio time was spent trying to raise new money to revive the company and its research efforts, all without significant success. Going to market with securities was not feasible. Cardio was not current in its SEC filings because it could not pay for audits. Montano's efforts included approaches to all possible sources of equity investment and loans. It also included efforts to find buyers for rights to share in future profits from distribution of yet to be developed drugs, or even to find companies to partner with or even acquire an interest in Cardio. He traveled around the world, soliciting companies and investors. Jacobs prepared materials to be distributed, some in print and some as PowerPoint presentations. Jacobs stated that during the three years following the obtaining of the Merck material, he supported Cardio's efforts to disseminate information about the Merck clinical trial outcomes to the public via the Cardio website, press releases, and investor solicitations in an effort to promote Cardio and raise funds. Id. ¶37. He testified that he accompanied Montano at times to make these presentations. Flaa also accompanied Montano on one such promotional trip.

As things became worse, and as creditors pressed Cardio more closely, Montano cast his net wider in seeking money. In sending materials to potential funders, Montano requested and received non-disclosure agreements in connection with some of these presentations, but in many others he did not require them. And there was no showing that the information provided in the latter situations was less sensitive than in the former. The number of solicitations he sent out ran to over one hundred.

As noted, none of these companies could be enticed to invest in Cardio or partner with it. Jacobs and Montano testified, largely without contradiction, that these companies did not see that Cardio had IP protections for its work sufficient to justify a significant investment when potential competitors could not be blocked from the market if they developed a parallel drug more quickly. Jacobs testified that the fact that Merck had let its patent expire meant that there was lots of information on FGF molecules and their potential medical uses in the public domain, and this discouraged companies from investing. Jacobs testified that there were some 180,000 articles on the FGF family of 22 different molecules in the scientific literature and 70,000 NIH grants. There are some 2000 articles on the FGF-1 molecule alone.

4

In an effort to protect its intellectual property, early on Cardio had instituted a company policy that "confidential" information should be disclosed only to someone who had signed a nondisclosure agreement ("NDA"). This policy further expressed in agreements signed by Cardio officers and employees with the corporation. Some of the materials sent out by Montano and included in presentations by Jacobs clearly fall within the broadly worded definition of "confidential" in Cardio's policy. However, as noted above, it seems plain that after 2009 this confidentiality policy was not followed consistently, and ultimately was for all intents and purposes abandoned. A large volume of materials Cardio now contends contain "confidential" information was disseminated broadly without NDAs.

Jacobs testified that the policy expressed in the confidentiality agreements was effectively set aside in the effort to raise money during this period. In his declaration in support of the Motion for Determination, Jacobs testified that from January of 2011 through his termination, he "supported Cardio's efforts . . . to disseminate the Merck clinical trial outcomes to the public via Cardio's website, press releases, and investor solicitations in any effort to promote the company and raise funds." Decl. J. Jacobs ¶ 37. Both Jacobs id. ¶¶ 20-23, 25, 26 and Montano Decl. D. Montano ¶¶ 19-27, Ex. C to Mot. For Determination, 4/29/19, describe at length the preparation and dissemination of presentations and written materials describing Cardio's and Merck's trials and findings at a high level of generality. Montano states that he sent packages of these materials to "hundreds" of individuals and entities in 2013 alone in the effort to raise money. He also states, at paragraph 28 of his declaration, that the executives of Cardio, "including Mr. Flaa," were aware of these efforts and were "encouraged to similarly communicate with any potential resources . . . ." When, in turn, Mr. Flaa was asked about the Cardio policy of requiring NDAs, Mr. Flaa testified that it was the company's policy to ask for NDAs when making disclosures, "until it wasn't." Vol I Tr. at 111/11-12.

## II. Struggle for Control

Beginning about the time of the Great Recession, when the flow of risk capital dried up, discontent among some shareholders with Montano's style began to grow. However, a majority of the board remained supportive. After 2009, when the company went into a relatively dormant mode from an operating standpoint, there were no formal board meetings and no annual shareholder meetings. Five of the ten board members resigned during this period, and three persons were elected to replace them, all relatives of Montano. They were elected by written consents from shareholders.

Beginning in late 2011 or early 2012, an effort was made by some of Cardio's board members and an outside investor, Calvin Wallen, to induce Montano to relinquish control of Cardio. Wallen came late to Cardio. He was in the oil and gas industry in Texas. He had first loaned $500,000 to Cardio in November of 2009, having been introduced to the company through Alex Montano, Daniel Montano's son, and Grant Gordon. When Wallen was induced to invest in Cardio, he was not aware of the depth of Cardio's financial troubles. After the

initial $500,000 loan, four months later, in February of 2010, he set up a $3,000,000 line of credit for the company. The first draw was $1,000,000. He and Montano agreed that it would be repaid in 90 days. The money was not repaid. Wallen and some investors made an offer to Cardio to loan it $8.5 million on condition that Montano step aside. The offer was not accepted.

Gordon, who appears to have been Wallen's primary contact with Cardio, had been involved with Cardio from its inception. He had been an acquaintance of Montano's before the founding of Cardio. Gordon had a career in the financial sector and appears to have been an investment advisor, among other things. He helped raise some of the first money for Cardio. Montano testified that Gordon received a significant stock holding and a board position for his efforts. Gordon also later became Montano's son-in-law. He appears to have been one of those who came to believe that Montano should go.

By 2012, Mickael Flaa, the CFO of Cardio, appears also to have become disenchanted with Montano's leadership. Flaa had been a partner in KPMG, been in other business ventures, and joined Cardio in 2003. He became a member of the board in 2005 and continues to serve in that capacity. Flaa testified that by 2012 he was concerned that if something were not done to bring more money and different management into the company, it would be forced into dissolution. Cardio was not paying its bills and had no cash. This created a risk that it would lose an important patent that was in process because it had not paid its patent lawyers. Flaa approached Wallen. He told him of the severity of Cardio's problems, apparently including that Cardio was in danger of losing its lease, that critical documentary materials were in storage and were soon to be auctioned off for nonpayment of rent, and that it was critical it pay patent lawyers to perfect its patent.

Wallen paid the arrearages to the landlord and the storage facility and arranged to keep them current. He also retained patent lawyers to secure the patent. Wallen appears to have paid these debts of Cardio directly through a corporate entity he established for the purpose, rather than loaning the money to Cardio to make the payments. Wallen also began to pay Flaa directly through that same entity, first $10,000 per month, then $15,000, essentially to do his job at Cardio. Flaa testified that he did not see these payments as a conflict of interest because he was trying to protect the shareholders of Cardio. These payments continued from mid-2012 for almost two years, until the removal of Montano and Jacobs. Wallen also paid Flaa's son, who was employed by Cardio, $6,000 per month. Flaa did not disclose these payments to Cardio, or Montano. He justifies that by stating that he was acting for the benefit of the shareholders. Montano came to distrust Flaa because he came to know that he was passing information to Gordon and Wallen and complaining of Montano's management.

In 2013, Wallen, Gordon and Flaa made a move to take control of the board. They circulated written consents to the shareholders to remove Montano, Jacobs, and Montano's family members from the board. The resulting June 2013 vote appeared to carry the motion. A suit was brought in Delaware Chancery Court to gain approval of the vote. Flaa was the named

plaintiff and the defendants were Montano, Jacobs and four aligned directors. Cardio was a nominal defendant. On July 12 of 2013 a stipulated *status quo* order was entered. The new board that appeared to win the vote was to serve as an interim board, with severe limitations on its ability to alter the bylaws or make changes in the corporate organization. It was, however, authorized to incur new debt and to pledge as security Cardio's interests in the Merck license agreement as necessary to obtain the funds needed to pay the $100,000 due to Merck that had been outstanding since 2010. Wallen then funded the payment to Merck. The interim board consisted of Flaa, Gordon, Wallen and two allies. Flaa was to serve as interim president and CEO. Montano and Jacobs and their allies were ordered to refrain from representing themselves as officers and directors of Cardio, from taking any actions purportedly on behalf of Cardio, and were directed to turn over to the new management documents, bank accounts, etc.

The litigation continued in Delaware, apparently see-sawing back and forth. The course of the litigation was not a subject of evidence beyond Montano testifying that the "first round" was won by his side. He then described materials he had Jacobs prepare to send out to possible partners and investors. Evidence was presented of a number of packets of information that were sent out in late 2013 and the spring of 2014. E.g., Resp. Exs. 40-47. Later, the Delaware court apparently entered an order that tipped the balance against Montano. Montano and his wife had divorced at some time during the Cardio venture. His ex-wife received stock in Cardio. Montano testified that in May of 2014 the Delaware court ordered that Montano's ex-wife be able to vote shares of stock that she received. And it ordered that an annual shareholders meeting be held and a new election occur. The meeting occurred in August of 2014, and on September 16, 2014 the Delaware court confirmed the results. Montano's faction lost and he and Jacobs were terminated immediately by the new board under the leadership of Wallen.

Montano testified that after a key ruling had gone against them and it was foreseeable that he and Jacobs would lose the shareholder vote, they had been walked out of the Cardio offices. On June 30, 2014, while still formally employees of Cardio, they formed a corporation, Zhittya Regenerative Medicine, Inc. Their declared aim was to use this entity to continue the effort to create an FGF-1 drug. Montano testified that he saw little prospect for Cardio, given its lack of IP protection and its financial straits. He testified that he was personally committed to the need for an FGF-based drug. He wanted to persevere.

Beginning in September 2014 and continuing through January of 2015, Jacobs prepared several "White Papers" on behalf of Zhittya that dealt with the potential for FGF-1 to treat diabetic foot ulcers, venous ulcers, and various forms of coronary artery disease. In December of 2014, Montano offered to provide copies of materials prepared by Jacobs, as Chief Scientific Officer of Zhittya, through his LinkedIn page. He began announcing through postings that he and Jacobs were working to develop an FGF-1 drug. The evidence is that the content of the materials promoting the value of an FGF-1 drug came both from public sources and from materials that had been written by Jacobs and others for Cardio. In some instances, multiple paragraphs were copied from Cardio materials with Cardio's name deleted.

In November of 2014, Cardio brought suit in federal court against Jacobs. While not naming Montano or Zhittya, the allegations in the federal court complaint closely parallel the allegations of the claims in this arbitration insofar as they assert that Jacobs and Montano, acting individually and in concert, were violating various employment and confidentiality agreements with Cardio, were misusing confidential information of Cardio, violating its copyright to material prepared when Jacobs was with Cardio, and appropriating its trade secrets in violation of Nevada law. Although Montano and Zhittya were not named as defendants in the federal action, the prayer for relief sought damages and to enjoin those "acting in concert" with Jacobs because their conduct threatened to do immediate and irreparable harm to Cardio.

Jacobs responded by asserting that his 2010 consulting agreement with Cardio provided that all remedies for claims arising out of his employment had to be arbitrated. He sought dismissal of the federal court lawsuit and an order that Cardio pursue its claims in arbitration. In February of 2015, the federal court dismissed the complaint and granted Jacob's motion to "compel arbitration." Order of U.S.D.C. D. Nev. dated 2/19/15 at 8.

Cardio did not follow the federal court's direction to take its dispute to arbitration until July of 2018, when it filed this matter against both Jacobs and Montano. The testimony leads to the conclusion that during the interim period, Montano and Jacobs, through Zhittya, continued to make efforts to raise money for their projected FGF-1 drug's development and continued to send to potential investors materials based in significant part on information that Jacobs had compiled for similar solicitations during the waning years of Cardio. Some of this was derived from public sources, some from Cardio's materials sent out, including overviews of the work that Merck had done. They published additional White Papers both during the federal suit and in the year after. They apparently were sufficiently successful in raising money that they are working with the University of Iowa to have it manufacture FGF-1 in quantities that they can use for animal experiments. And they have recently submitted to the FDA a request to be permitted to begin trials, a request that the arbitrator understands has been declined.

In the present arbitration, Cardio asserts essentially the same factual claims raised in the federal suit, updating them to add that the conduct has continued through the present, and adding several federal causes of action based on the original factual allegations, including RICO and the Lanham Act. Cardio again seeks injunctive relief, contending that absent an injunction, the activities of Montano and Jacobs, through Zhittya, will cause it immediate and irreparable harm. It seeks damages, inter alia, for depriving Cardio of investor money it could have raised but for Montano and Jacobs' activities on behalf of Zhittya, measured largely by Cardio's last four years operating overhead and the amounts that Zhittya raised during that period.

## Cardio Claims

### I. Trade Secrets

Cardio claims that the Respondents violated Nevada and federal law by using Cardio trade secrets in their publications and investor presentations on behalf of Zhittya. The arbitrator finds that Cardio did not carry its burden of proof on the first element of that claim—a trade secret.

Under Nevada law, a trade secret is defined as:

[i]nformation including, without limitation, a formula, pattern, compilation, program, device, method, technique, product, system, process design, prototype, procedure, computer programming instruction or code that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any persons who can obtain commercial or economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

NRS § 600A.030.

Cardio claims two separate types of trade secrets. The first is a combination trade secret. The second claim, raised in a post-hearing reply brief, addresses two discrete documents that are alleged to contain discrete trade secrets. This Ruling will address these claims in order.

The first category of claimed trade secrets is "proprietary information about the FGF-1 protein and [Cardio's] manufacturing and clinical trial processes" that have been disclosed by Respondents in their presentations and publications. Cardio contends that the trade secrets are constituted of what may be public information that is combined in a unique way to create an economically valuable trade secret. This line of argument anticipates Respondents' contention that most of the information upon which Cardio bases its trade secret claims may have been disclosed by Cardio itself during Montano and Jacob's tenure. The legal test for this combination category of trade secrets is set forth in cases from the Seventh and Tenth Circuits:

A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.

*3M v. Pribyl,* 259 F.3d 587, 595 (7th Cir. 2001); *accord Harvey Barnett, Inc. v. Shidler,* 338 F.3d 1125, 1129 (10th Cir. 2003).

The problem with this argument is that no such showing has been made. No one testified that there was any "unique combination" of public information in the published materials that "affords a competitive advantage and is a protectable secret." Rather, there was only general testimony that a large quantity of clinical material from various sources that may have been publicly disclosed by Montano, Jacobs and others in the final years of their tenure in an effort to raise money without seeking protection of a non-disclosure agreement. There was no specific explanation of how a "unique combination" of this presumptively public information would qualify it for trade secret status.

It is noteworthy to the arbitrator that Flaa drew a distinction between the sort of public information upon which Cardio bases its claim of a combination trade secret and what he considered "secret sauce," something proprietary to Cardio that if known would have value to a competitor because it would save significant time and money in duplicating Cardio's FGF-1 work. Vol. II, Tr. 217-220. This seemed to be his way of referring to a more traditional trade secret—something kept confidential that is in and of itself commercially valuable to someone seeking a shortcut to producing an FGF-1 drug. He testified that Cardio had such material, but that it was not public and that he was not aware of such information being published by Zhittya. In addition, he testified that he does not know whether Jacobs or Montano currently possess any such information. No one testified to the contrary.

One of Cardio's experts, Dr. Elvia Gustavson, also testified that Cardio does have proprietary and confidential information that would be useful to a competitor. However, after reviewing a large volume of Cardio materials that were made public by Cardio under Montano's tenure, some of which were used by Jacobs in putting together materials for Zhittya, she concluded those documents contained no proprietary and confidential information that would be uniquely valuable to a competitor seeking to make an FGF-1 drug. She characterized the material as simply describing the promising potential of FGF-1 as shown by existing trials. Her judgement was concurred in by Dr. Laurence Meyerson, who now serves as Executive Vice President for R&D for Cardio.

Based on the absence of a showing of a combination trade secret that meets the definition in Nevada law, Cardio has failed to show a trade secret that was misappropriated or disclosed by Respondents.

In its post-hearing reply brief, Cardio raised an additional trade secret claim. Respondents produced two documents as part of its trial exhibits that Cardio claims it did not know that they possessed, Respondents' Exhibits 38 and 60. It contends that both contain discrete Cardio trade secrets.

Exhibit 38 is a document that sets out a discussion of the workings of the "market exclusivity" provisions of the Affordable Care Act passed by Congress in 2010. This provision gives a developer of a biologic drug that lacks potential patent protection either 10 or 12 years

of exclusive market protection for its drug. This provision was an apparent effort to provide an incentive for pharmaceuticals to be developed that otherwise could not be patented. FGF-1 fits this model because of the expiration of Merck's patent. Cardio contends that the two-page description of how this provision works is a trade secret because it gives the possessor a way to raise investment dollars more easily.

Respondents first state that Exhibit 38 is not a scientific document and is not pertinent to FGF-1. The memo was prepared by non-lawyers at Cardio to describe for potential investors their interpretation of the statute under which they could find some promise of protection if they invested in the development of an FGF-1 drug.

The arbitrator finds nothing in Exhibit 38 that could not be gleaned from a reading of the statute and that would not be within the knowledge of any serious investor in biopharmaceuticals. In addition, Cardio cited no authority that a company's interpretation of the law could be entitled to trade secret protection, even if that interpretation is useful for securing investors.

Flaa did testify that the document or a portion of it was part of a presentation to a potential partner. But that does not make it a trade secret. At most it makes it a confidential document, but even that would only be true if the presentation was covered by an NDA.

To that point, Respondents state that the information contained in Exhibit 38 was contained in numerous other documents distributed by Cardio to interested parties without any confidentiality label, citing *inter alia* Claimant's Exhibit 121 and Respondents' Exhibit 52. The former is a 2011 Cardio piece describing the potential for an FGF-1 drug, trials that have been conducted, and the protections offered by the Affordable Care Act discussed in Exhibit 38. Exhibit 52 is from 2012 and is a similar document with much the same discussion. Neither carries any indication of an NDA, and Cardio offered no evidence that they were covered by an NDA, or otherwise confidential. They appear simply to be investor solicitation materials.

Also, Respondents point out that the possession of this document by Respondents is not news to Cardio. It was produced in the federal court suit in a January 9, 2015 disclosure, and was attached to Jacobs' opposition to Cardio's motion for a preliminary injunction in that case.

The arbitrator finds that this document does not contain trade secrets. Its contents are drawn from public documents and would be known to anyone looking into the possible legal protection for developing drugs that may rely on information in the public sphere. Its substance was an apparently routine part of Cardio's post-2010 investor solicitation materials that were not confidential.

The second document claimed to contain a trade secret is Respondents' Exhibit 60. This is a proposal from Lonza, a pharmaceutical manufacturer, to Cardio offering to manufacture FGF-1. It is a bid solicited in 2011, after Phage was dissolved and Cardio had no source for

FGF-1. The document states that it is confidential, contains proprietary information of Lonza, and is not to be copied or distributed other than in connection with Cardio's evaluation of the proposal. Cardio states in its brief that it did not know that this document was in Respondents' possession until it showed up on their exhibit list. Cardio speculates that Zhittya has used the information in this document in submitting its proposal to the University of Iowa for it to make FGF-1 for Zhittya trials.

Respondents point out that while they have a copy of the document, they have done nothing with the information in it. It has not been relied on in the proposal to the University of Iowa. Because this line of argument was not raised in the hearing, no witness was asked about the issue during the hearing. But Jacobs did testify that he did not share any Cardio documents with the University of Iowa, and Cardio's counsel did not impeach him. Cardio has shown no damage from Respondents' possession of the document. Perhaps most importantly, while the document does state that it contains proprietary information of Lonza that does not give Cardio any grounds for claiming a violation of its trade secrets. Only Lonza can make that claim.

Finally, Respondents point out that Cardio has known that Jacobs had this document since the federal court suit. It was produced as Exhibit B to item 50 of Jacobs' Supplement to Initial Disclosures in that case. The only reason it was in evidence in the present matter, and the only questions asked about it, related to the fact that Cardio solicited this bid in an attempt to gain the ability to manufacture FGF-1 again, and could not afford to move ahead on the bid. There was no testimony by anyone that this constituted a trade secret of Cardio.

The arbitrator concludes that Exhibit 60 is not a trade secret of Cardio, and Cardio lacks any basis for asserting a claim on Lonza's behalf. Because neither of these two exhibits contain trade secrets of Cardio, there has been no proof of a traditional trade secret that meets Nevada's statutory definition.

The broad challenge for Cardio in this arbitration is that Cardio's earlier policy of requiring NDAs before disclosing information to others simply was not adhered to in the final years. Montano, as the President, CEO, and Board Chair, had apparent authority to change the policy. No legal or factual argument has been presented by Cardio that his efforts to raise much needed funds through these non-confidential disclosures were beyond the scope of his authority. That creates a challenge for Cardio on its trade secret claim, in particular. It has proven neither a traditional trade secret nor a combination of public information that constituted a "unique" trade secret. This claim fails.

## II. Lanham Act

Cardio's next claim is that Respondents, on behalf of Zhittya, have made video presentations to investor groups at Money Shows. The video presentations include several statements by Jacobs and one statement by Montano's wife, who had been a board member of Cardio, about past trials with FGF-1. During the clips, there are occasions when Jacobs and

Mrs. Montano use the term "we" or "our" in referring to the trials. The trials described were conducted under the supervision of Jacobs when he was with Cardio, or by other researchers. Zhittya had done no trials. Cardio contends that these references to "we" or "our" make the video presentations false advertising that was intentionally made to mislead potential investors to believe that Zhittya has performed these trials and has a track record with FGF-1, when in fact Zhittya has no such record. Cardio contends that these videos and the statements are intended to confuse in investors' minds the work of Cardio with Zhittya and thereby be induced to invest in Zhittya. Cardio seeks damages for lost investment, and a permanent injunction against Respondents making false or misleading statements that imply that Cardio's past successes and experience with FGF-1 are properly affiliated with Zhittya. It also seeks the expenses of this litigation, which is a permitted remedy under the Lanham Act. Cardio expressly does not seek to prevent Dr. Jacobs from representing his own extensive experience with FGF-1.

The Lanham Act, read as it might apply to the video clips, requires that Cardio prove a false or misleading description or representation of fact in an advertisement or promotion regarding the nature of Zhittya's commercial activities. The misleading description or representation must have actually deceived, or had a tendency to deceive a substantial segment of the audience, regarding a material fact about Zhittya that is likely to influence a purchasing decision. And Cardio must show that it has been or is likely to be injured as a result of the false statement either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its product.[1] The challenge to Cardio, then, is to show that those video presentations actually deceived, or had a tendency to deceive a substantial segment of the audience who attended the presentations about an investment decision. Cardio seems to argue

---

[1] The elements of a Lanham Act § 43(a)2 false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.,* 911 F.2d 242, 244 (9th Cir. 1990); *accord ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 964 (D.C. Cir. 1990). To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers. *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 943, 946 (3d Cir. 1993); Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).

that the references "we" or "our" in these brief clips prove that the presentations must have had a tendency to deceive a "substantial segment" of the audience into believing that Zhittya had done the clinical work described and that it likely would influence an investment decision.

No evidence was put on of anyone actually being deceived by the presentations. The clips introduced in evidence are short, some as short as 9 seconds, and the longest approximately a minute. No full video was put into evidence. It is true that the video clips contain instances of Jacobs referring to "we" and "our" when displaying slides and pictures documenting the positive effects of FGF-1, and that the screen bore a Zhittya logo in the bottom corner, apparently throughout the video. It is possible that a viewer could have believed that the work had been done by Zhittya.

At the hearing, one clip was shown in which Jacobs made a reference to "we" as having done some clinical trial, and Jacobs testified that in the opening of the presentation he gave his academic and work background and made it clear that he had worked with FGF-1 while at Cardio and elsewhere. He testified that his reference to "we" was not a representation that this work had been done by Zhittya. He stated that the audience was told that Zhittya was only a start-up. He also stated more generally that when he was introduced at presentations where the videos were shown, his academic and career work with FGF-1 would be described, including his work at Cardio, making the use of "we" generic, and not a representation of his work at Zhittya. No evidence was put on to refute this testimony.

Absent such disclaimers, the videos do have the potential to misrepresent Zhittya's corporate experience with FGF-1, and to do so by using activities of Cardio and others. However, the short clips do not constitute a sufficient representation of the entire presentation at the Money Shows for the arbitrator to conclude that they satisfy the Lanham Act standard, even without Jacobs' testimony about disclaimers. And on the record, the arbitrator has no basis for finding that Dr. Jacobs' testimony on that score is untrue. It is at least as likely as not that if he was being presented as a credible expert, all of his credentials would have been on display, not just that he worked for Zhittya. In addition, based on the existing evidence, the arbitrator cannot conclude that the presentations, taken as a whole, had a tendency to deceive a "substantial segment" of the audience and likely would influence an investment decision.

Based on the foregoing, the arbitrator finds that Cardio has failed to prove the first element of a Lanham Act claim with respect to the presentations that included the video clips. No other specification of Lanham Act violations is made in the lengthy post-hearing brief of Cardio.

While no violation of the Lanham Act is found, the arbitrator notes that Jacobs' practice of copying materials from Cardio publications and pasting of them into presentations on behalf of Zhittya without carefully attributing the source of the information as being other than Zhittya does raise the potential for Lanham Act violations going forward.

### III. Copyright Infringement

Cardio asserts that Respondents infringed Cardio's copyright when they distributed a Zhittya White Paper entitled "Human Fibroblast Growth Factor-1 (FGF-1): A New Treatment to Heal Diabetic Foot Ulcers" on September 12, 2014. This White Paper allegedly copied portions of a Cardio paper entitled "Human Fibroblast Growth Factor-1 (FGF-1) for the Treatment of Diabetic Foot Ulcers." This paper was prepared by Jacobs for Cardio and first published by it in March 2013. Cardio formally registered the paper's copyright effective November 14, 2014. Cardio seeks actual damages and attorney fees. It seeks injunctive relief against further infringement. And it asserts in its brief that Cardio suffered $3.5 million in damages on grounds that the copyrighted material was used to promote Zhittya's prospects and that promotion led three investors to pay this sum for marketing rights for to-be-developed drugs.

On the face of it, there is no question that multiple paragraphs of the Cardio paper written by Jacobs were copied with only minor emendations in putting together the Zhittya paper. Because Jacobs had agreed in his employment contract that the copyright on materials written for Cardio would be owned by the company, the work is a "work made for hire" and copyright protection was vested in Cardio. The effect of Cardio's post-publication registration of the copyright is that it can only recover actual and not statutory damages. *Olin Mills, Inc. v. Linn Photo Co.,* 23 F.3d 1345, 1349 (8th Cir. 1994).

Respondents first assert that Jacobs considered the paper to simply be a marketing piece that was widely distributed to potential investors by Cardio. That may be true. But that does not obviate the fact that the copyright is held by Cardio. And Zhittya used it for that same commercial purpose, to educate potential investors, as Jacobs knew.

Respondents next argue that because the copyright was registered after the infringing paper was published, Respondents had no reason to believe that the publication constituted an infringement. This is a basis for a tribunal awarding only nominal damages. 17 U.S.C. § 504(c)(2). Given Dr. Jacobs' contractual agreement that Cardio owned the copyright on everything Jacobs wrote for Cardio, this point does not carry much weight. He could not be unmindful of that fact, no matter how dormant the corporation seemed at the time.

Respondents' third point is that because the registration was after the date of publication, only actual damages are awardable. And they assert that no such damages have been proven. The arbitrator concurs. Cardio asserts that this white paper, among others written by Jacobs for Zhittya, along with other promotional materials and presentations, gave Zhittya sufficient public awareness that it was able to raise $3.5 million. There is evidence that Zhittya did enter into agreements with other entities, that were essentially paper creations, under which those entities would receive very large percentages of future distribution rights for yet-to-be

developed Zhittya FGF-1 drugs in exchange for relatively small amounts of money. This is the $3.5 million.

However, there is no evidence that this particular paper, which is essentially a compilation of information on FGF-1 trials run by Cardio and others, including Merck, that tout the potential of FGF-1, was of particular value in building Zhittya's public perception. It seems more likely that the individuals associated with the entities in question knew of Montano's long run with an FGF-1 company, Jacobs' experience with FGF-1 and with Cardio, and that they were both capable and motivated to continue working on the drug that the Great Recession had short circuited. In the absence of any solid evidence that this paper actually caused any real economic damage to Cardio, the arbitrator finds no basis for awarding $3.5 million, or any other sum, to Cardio as actual damages. The money that Zhittya raised in no way appears to have been a diversion of funds that Cardio was seeking from investors. In fact, there was no evidence whatsoever that Cardio was going to the public with fundraising efforts, much less that it was targeting the audience at Money Shows.

Finally, Respondents assert that because there is a three-year statute of limitations for a copyright violation, and it has been more than three years between the September 2014 publication of which Cardio was aware and the filing of this arbitration, recovery is barred. Cardio responds that the paper in question is still available for distribution by request on Zhittya's website, indicating that it is still being made available. While there is no evidence that it has been disseminated since September 2014, the continued offering of the paper should be enough to prevent the running of the statute of limitations.

On the question of remedy, the statute gives the tribunal the discretion to award attorney fees incurred in proving the copyright violation, and to grant injunctive relief. The tribunal awards $10,000 to Cardio as a reasonable attorney fee for the simple proof that Cardio had a copyright and Jacobs infringed it. Given the absence of hard proof that it is being currently disseminated, its relatively common content, and the lack of damage proof, nothing more seems warranted. As for injunctive relief, Respondents are ordered to refrain from any further distribution of that White Paper and from any further copying of the copyrighted source document.

## IV. Breach of Contract

Cardio's next claim is that Jacobs and Montano breached their contractual obligations to Cardio. These fall into several categories. First, that they breached a two-year non-competition covenant. Second, that they breached a covenant to keep certain materials confidential "in perpetuity." Finally, it is contended that they did not return Cardio materials in their possession.

A. Non-Competition Covenant

Montano's contract with Cardio contained a non-compete clause. It provides that Montano, for two years from the date of his termination, will not "engage in the business of developing, producing, marketing or selling products or services which would compete with the products or services of the kind or type developed or being developed, produced, marketed or sold by the Company, or planned to be produced, marketed or sold as described in any business plan of the Company or as set forth in any notes or minutes of internal Company meetings, while Employee's contractual relationship with the Company was in effect." Employment Agreement 1/1/2007, para. 6.6. Jacobs' employment agreement has an identical clause. Cardio asserts that Montano's association with Zhittya is in plain breach of this provision. Cardio seeks compensatory and punitive damages, and an injunction.

It is clear that this provision was violated by Montano and Jacobs from September 2014 on.[2] The question is whether they have any defense. Respondents assert several defenses. However, only one need be analyzed—laches. Cardio knew shortly after the time that Respondents were terminated that they had formed Zhittya and were making efforts to raise funds to support the development of an FGF-1 drug. Yet it never made any effort to proceed against them on the breach of the non-competition covenant, despite the fact that it ran only until September of 2016.

To prove laches, the Respondents "must prove 'both an unreasonable delay by the plaintiff and prejudice to itself.'" *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000) (*quoting Coone v. Mech. Specialities Co.,* 609 F2d. 956, 958 (9th Cir. 1979)). The Nevada Supreme Court has stated that "a court must determine: (1) whether there was an inexcusable delay in seeking [the relief], (2) whether an implied waiver arose from the petitioner's knowing acquiescence in existing conditions, and (3) whether there were circumstances causing prejudice to the respondent." The parties both agree on these elements.

The first element seems met. The non-competition covenant was for two years from September of 2014. Cardio waited almost four years to assert its violation, when it was well aware of the breach in 2014. Flaa and Wallen claim that the reason they did not proceed with arbitration against Montano and Jacobs earlier is because Montano was in bankruptcy until sometime in 2018. But Cardio did not even attempt to have the bankruptcy court stay lifted, a relatively routine procedure. No one has explained why Cardio did not take all reasonable measures to bar Montano and Jacobs from working with Zhittya if, in fact, Cardio was faced with competition from what it alleged in the November 2014 federal suit was a company whose

---

[2] It is worth noting that Jacobs argues his 2010 Consulting Agreement supersedes his 2007 Employee Agreement that contains a more restrictive confidentiality provision. That contention is rejected. The presence of a routine integration clause in the Consulting Agreement does not operate to relieve him of the perpetual confidentiality obligations undertaken in the Employee Agreement.

very existence and activity threatened to deprive Cardio of funding and shortcut the long route it had traveled to where it had come. The arbitrator finds that Cardio's delay is not excusable.

The second element is whether an "implied waiver" arose from the "knowing acquiescence in existing conditions." Cardio's only response on this element is that it did not *intend* to waive. But that is not the question. Rather, can Cardio's actions be the basis for implying a waiver? Certainly Cardio's seeking to bar Respondents from Zhittya was the surest way to end its threat. Cardio kept track of Respondents' and Zhittya's activities and knew that they were continuing to work to raise funds for an FGF-1 drug. Flaa's declaration in support of the motion for an injunction recited a list of severe harms Cardio would suffer if the offenders were not enjoined.[3] Yet when the federal court dismissed the case and remanded Cardio to arbitration, it did nothing despite the continuing activity of Zhittya. The failure to seriously attempt to block their continuing violation of the covenant would be viewed by a reasonable observer as an implied waiver.

The final element is whether circumstances caused prejudice to the other party. Here, Respondents have continued to persevere in Montano's 20-year effort to develop an FGF-1 drug. They have spent considerable time in raising money and moving forward through Zhittya to find a manufacturer of FGF-1 and to seek permission from the FDA for tests. Cardio's late action in bringing this arbitration may well be in response to intelligence about Zhittya's showing some prospects for Respondents' efforts. In the face of the failure of Cardio to timely follow up on the federal court's direction to proceed in arbitration, and its knowing of their persistence, Respondents could reasonably believe and come to rely on the fact that the threat of an action from Cardio had receded and that Cardio was acquiescing in their activities, whether or not they were in breach of their contractual obligations.

The Respondents' momentum coming out of Cardio into Zhittya would have been broken had Cardio made a concerted effort to enforce the non-compete provision. It is conceivable that Montano and Jacobs would have given up the effort to make Zhittya viable. But they were allowed to continue. It would create severe prejudice to Respondents to permit Cardio to proceed on these claims. They appear to have relied on its failure to act, and as a result, Cardio is in a position to claim more damages as a result of the continued activity of Respondents than had it acted promptly. In addition, it would gain what amounts to an extension of the two-year non-compete into the present.

The arbitrator concludes that laches bars Cardio's claim for breach of the non-competition covenants.

---

[3]Interestingly, in the current matter Flaa testified that the harms to Cardio predicted by him in 2014 that would result if the activities of Jacobs, Montano, and Zhittya were not enjoined in 2014 still have not eventuated.

<u>B. Confidentiality Covenant</u>

Cardio asserts against both Respondents a claim for breach of the confidentiality provisions of their employment agreements on grounds that they used information that falls within the definition of "confidential" that they had by virtue of their employment with Cardio in their Zhittya venture. This included not only information about what FGF-1 is capable of, which was derived from the Cardio work and the Merck materials, but knowledge of the strategies for raising money and materials that Cardio bad used to solicit the interest of investors. Cardio claims all this resulted in a variety of damages. It seeks actual and punitive damages, and injunctive relief.

While there are several confidentiality provisions, the one that is common to both Montano and Jacobs and appears to be the broadest is from their employment agreements executed on January 1, 2007. It defines "Confidential Information" as:

> all information of any kind, type or nature (written, stored on magnetic or other media or oral) which at any time during the employment of Employee by the Company is, has been or will be compiled, prepared, devised, developed, designed, discovered or otherwise learned of by Employee to the extent that such information related to the Company or any of its affiliated entities including, without limitation, all of the Company's price lists, pricing information, customer lists, customer information, financial information, trade secrets, know how, formulas, patterns, plans, compilations, research, devices, methods, techniques, processes, confidential trade knowledge and computer programs and information; provided, however that any such information which is generally known to the public or which may be obtained by a reasonably diligent person without material cost or effort from trade publications or other readily available and public sources of information shall not be deemed to be Confidential Information, unless such information was first published in breach of or in violation of a confidentiality or similar agreement, including this Agreement.

Para. 6.1(a), Employment Agreement, 1/1/2007.

Under the Agreement, Employee is barred "throughout perpetuity" from revealing or permitting access to any such information without the Company's consent. Employee also may not "directly or indirectly, use or exploit" such information and will hold "any gain or profit" obtained or derived from the use of it in trust for the Company. In addition, Employee acknowledges that such information, including all tangible expressions of it, are the property of the Company and shall be returned to the Company upon termination.

Factually, it is apparent that the definition of "confidential information" under the employment agreement is so broad as to include virtually anything discussed or communicated in writing during the entire course of the Respondents' employment with Cardio. And the term of

the ban on disclosure is "in perpetuity." The provision is a triumph of the lawyer's art. For that reason, it is apparent that Respondents have violated the terms of that covenant.

Respondents contend that in the long phase of Cardio's history when all drug-development efforts had atrophied and its only real business was trying to raise money, Montano as the President, CEO, and Board Chair, disclosed to all comers much information that falls within the definition of "confidential" and that the company no longer adhered to anything like this hermetic confidentiality policy. Therefore, the information that Cardio alleges that they have used all falls within the last portion of the covenant: "any such information which is generally known to the public or which may be obtained by a reasonably diligent person without material cost or effort from trade publications or other readily available and public sources of information shall not be deemed to be Confidential Information . . . ."

As noted, there is ample evidence that Montano distributed much material to outsiders that falls within the agreement's definition, and a good deal of it without NDAs. Other Cardio personnel also made presentations before various audiences that would qualify as disclosures of otherwise "confidential" information. Jacobs testified that beginning in 2011 the use of NDAs had largely ceased, unless the other party routinely expected to sign one. Flaa, who is the only person from Cardio's present management to testify on the issue, stated that Cardio under Montano did have a policy that "confidential" information would be disclosed only with an NDA. But he also testified that this was Cardio's policy, "until it wasn't."

Respondents made an extensive motion several months before the hearing seeking a declaration that they did not have any confidential information of Cardio. The arbitrator has reviewed these papers and the declarations of Montano and Jacobs that were filed in support, and the arguments of Cardio to the contrary. The parties apparently agreed not to have the motion decided because they had fixed a firm hearing date that did not permit its resolution. But it is apparent that Montano, and Jacobs in support, disseminated many, many copies of materials without confidentiality protection to potential investors that mirror much of what Zhittya has distributed.

Based on the foregoing, Cardio's claims for enforcement of the employment agreement's confidentiality provision against Respondents are weak. The case is strong for finding that the materials used and kept by Respondents fall within the exception. But in the absence of a definitive determination on the Respondents' motion that was never submitted for decision, the arbitrator does not feel comfortable concluding that no confidential information has been taken or used.

### V. Failure to Return Tangible Expressions of Confidential Materials

The remaining claim that Cardio asserts under the employment agreements is the obligation to deliver to the company "all tangible expressions of Confidential Information" upon the employee's termination or on request. Para. 6.4(c), Employment Agreement, 1/1/2007.

From the foregoing discussion, it is clear that Jacobs, and perhaps Montano, kept copies of materials that Cardio contends were "confidential." However, it is also clear that Cardio's claims that all, or even most of them remained confidential by the time of their termination is not proven. Cardio has not undertaken to show systematically which documents disseminated by Montano and Jacobs after their termination were protected in all their earlier disseminations by Cardio. If they are not still confidential, the employment agreement does not require their return. Therefore, no relief can be granted.

At the hearing, however, at least one specific instance of a document that remained confidential and was in Jacobs possession came up. The 2011 bid from Lonza to Cardio. Respondents should return that document and all copies to Cardio within fifteen business days of the date this Interim Memorandum of Award. Beyond that, Cardio has not undertaken to target specific documents.

It is worth noting that Cardio has, through the disclosures made by Jacobs in the federal court suit, and the extensive discovery made by Respondents in this arbitration, obtained what Respondents represent are copies of all Cardio documents that Jacobs and Montano have. That is the most that Cardio is entitled to at this date.

The failure of Cardio to prove the taking of confidential documents, but yet the proof of wholesale use of Cardio documents as source materials by Jacobs for Zhittya, brings the laches argument into focus with respect to the second and third of the breach of contract claims.

In its 2014 federal court suit against Jacobs, Cardio asserted essentially the same claims it asserts here respecting the appropriation, use, and disclosure of information that is confidential. It asserted a breach of this same employment agreement, including its provisions forbidding the taking of confidential information, its exploitation for gain, and its provision requiring that all materials reflecting the confidential information be returned. It did not name Montano in the federal suit, but the allegations of the complaint named him as a coordinate actor with Jacobs in establishing a competitor, and it sought damages and injunctive relief against Jacobs and all those acting with him.

The arbitrator concludes that there is no material difference between the claims in this matter and those in the federal suit. The harms which Cardio claims to have suffered, and those it will suffer in the future if Respondents are not held liable and enjoined, are the same harms alleged in the federal suit. "Cardio is threatened with losing financial partners, its trade secrets and goodwill in amounts which will be impossible to determine, unless Jacobs and those acting in concert with him are permanently enjoined and restrained by order of this Court." Federal Complaint, filed 11/15/14, para. 61. All the remedies that Cardio seeks here were sought in the federal suit.

As is the case with the two-year non-compete, Cardio has given no persuasive reason why it did not proceed with its claims in arbitration promptly after the federal court directed it to

do so. Had it done so, it might have shown violations of the employment agreements and prevented Jacobs and Zhittya from continuing to publish White Papers as they did during the pendency of the federal suit, and continued to do--one in late 2016, two more in 2017 and one in early 2018. It might also have prevented Montano and Jacobs from continuing to seek funding for Zhittya in the period between February of 2015 and the summer of 2018, using materials that Cardio contends are confidential. Cardio appears to have tracked their activity. Yet it did not proceed against them for three and a half years. Cardio, in effect, permitted the harm alleged in 2014 to continue for four more years before acting, and lulled the Respondents into continuing to engage in conduct that Cardio claims was wrongful.

The only reason offered at the hearing by Flaa and Wallen for not proceeding was that Cardio wanted to assert claims against Montano as well as Jacobs, and he was in bankruptcy. But neither witness offered any reason why Cardio did not seek leave of the bankruptcy court to assert claims against Montano. And Respondents assert in their post-hearing brief that under section 362(a)(1) of the Bankruptcy Code, Cardio could have proceeded without court permission against Montano for conduct in 2014 and after because it occurred after his 2013 bankruptcy filing. Under that section, the automatic stay applies only to claims accruing before the bankruptcy. R. Post-Hearing Br. at 22. Cardio did not address the argument in its post-hearing reply brief.

The arbitrator finds for the reasons stated in addressing the non-compete provision, and for the additional reason that the confidentiality policy expressed in the employment contract and the other Cardio policy statements was not followed with any consistency after its financial decline, that Cardio is barred by laches from asserting its claims regarding violations of the confidentiality provisions in both Respondents' employment agreements, in Jacobs' 2010 consulting agreement, in his 2004 Confidential Information and Non-Solicitation Agreement, and in Cardio's Code of Conduct.

## VI. Breach of Fiduciary Duties

Cardio relies on the same conduct that underlies their other claims as a basis for asserting violations of fiduciary duty. Cardio claims that by forming Zhittya before they were terminated from Cardio, by breaching their contractual obligations to keep Cardio information confidential, by competing with Cardio for funding and using its information in that effort, Respondents breached their duties of loyalty to Cardio. It asserts that these duties are ongoing.

Respondents assert that Nevada has a three-year statute of limitations for the breach of a fiduciary duty. NRS 11.190(3)(c), (d). This provision starts the running of the period upon the discovery of the facts constituting the fraud. Here, the facts in question constituting the breach of duty revolve around the same facts alleged in the federal suit. Those facts were known to Cardio more than three years before the commencement of this arbitration. A cause of action based on them is therefore barred.

Cardio asserts that Respondents are, in turn, barred from asserting the statute of limitations by estoppel because their conduct is inequitable. However, the equities of estoppel are offset by the equities of laches referred to above. Cardio consciously failed to pursue its claims within the period of limitations without reasonable justification, to the prejudice of Respondents. Were the limitations period not enough to bar claims of which Cardio was aware in 2014, laches would.

## VII. RICO

To assert a claim under RICO, a party must show a pattern of unlawful activity that causes injury to another. Among the activities that can constitute predicate acts are the federal crimes of theft of "trade secrets" and "wire fraud". The instances of allegedly misleading emailed statements to investors by Montano relied on by Cardio for wire fraud are two communications in 2014, one in 2015, and one in 2018. Cardio alleges that as a result of this activity, it was damaged through a loss of investors.

The first alleged crime, theft of trade secrets, fails. No trade secret had been shown to have been disclosed or taken.

As for the second crime, wire fraud, Cardio asserts that sending Cardio confidential information describing trials of FGF-1 to potential investors by email, and impliedly representing that it was the work of Zhittya and not Cardio by using the term "we" to describe the work, constituted fraud.

Cardio asserts that Montano used the possessive "we" and "our" when referring to an FGF-1 drug, and that he described the promise that an FGF-1 drug represents by referring to results of clinical trials that had been done by Cardio and others. He failed to disclose that the information he was referring to did not come from work done by Zhittya, but was information that had been stolen from Cardio and was Cardio property. In so doing, Montano misrepresented the nature of Zhittya and its capacity to develop an FGF-1 drug.

Cardio presented no evidence that any investor had been misled by these communications. However, it relies on the Supreme Court's decision in *Bridge v. Phoenix Bong & Indemnity Co.*, 553 U.S. 639, 661 (2008), for the proposition that a party injured by misstatements made to its customers who then acted on them could claim to have been injured "by reason of" wire fraud, even if it was not itself directly a recipient of the fraudulent material. Cardio asserts that the Respondents' communications into the market "sowed market confusion and in doing so prevented [Cardio] from raising money."

There are several problems with Cardio's wire fraud claim. First, given the evidence that much of the material that Montano distributed had been sent out by Cardio prior to Montano's ouster without observation of Cardio's earlier declared confidentiality policy, and that other supporting materials had been drawn by Jacobs from public sources, the failure of Cardio to

23

show that any particular information sent in these emails was actually still confidential information undermines one premise of the fraud claim. As for the possessory references, the use of the word "our" to describe an FGF-1 drug does not necessarily appear false. Zhittya is in the process of working toward the development of an FGF-1 drug, as are apparently other entities, including Cardio. All such drugs presumably will enhance vascular profusion, just as did Merck's trial drug and Cardio's. Anyone working on an FGF drug could find support for their work in the trials of others. That they do not yet have the drug does not make the reference to "our" false. There is no evidence that any recipient of these emails was deceived by them. Taken as a whole, Cardio has not shown that these emails were fraudulent.

But even if Cardio has shown that the actions of Respondents were misleading, the conduct of which it is constituted is the same conduct complained of in the federal lawsuit in 2014. That conduct is not actionable because of laches, and laches similarly should bar Cardio's RICO claim. It could have been asserted in 2014. The facts supporting it had largely occurred before then. And what has continued is exactly what the federal complaint described as likely to occur but for an injunction against Respondents, an injunction that could have been sought in arbitration.

For a RICO violation, there needs to be a showing of damages. The only evidence offered of damages supposedly suffered by Cardio from "marketplace confusion" was Flaa's expert report. That report is indeed thin gruel. In Claimant's Exhibit 99, Flaa states his opinion on damages. It is based on his knowledge of the Respondents' activities in breach of their confidentiality obligations and their fiduciary duties. He opines on the basis of "my many years as a financial advisor and consultant" that Respondents "proximately caused" $5 million in damages". Montano is credited with sowing confusion among investors by beginning in 2013 to inform people that he was going to start his own company to develop an FGF-1 drug. That action sowed sufficient confusion in the marketplace that Cardio could not raise funds to proceed with its drug development for four years.[4] Flaa attributes to Montano $1 million a year for four years, representing Cardio's overhead during that time which it could not discharge with new investor money. As for Jacobs, Flaa attributes $1 million in damages to him for his support of Montano and Zhittya in producing White Papers, making presentations before potential investors, and joining Montano in forming Zhittya.

No evidence was provided as to any frustrated attempts by Cardio to raise money from the "market" or anyone else by any means from 2014 through 2018. Yet it has funds to hire apparently highly qualified staff and is moving ahead with drug development. The only evidence of "confusion" in any marketplace was testimony by Wallen that some existing investors had contacted Cardio about the time of Montano's termination for an explanation of information they had received about Montano's new endeavor. There was no testimony that any of them were deterred from the possibility of investing in Cardio by Montano's actions. This is no evidence of

---

[4] Montano testified that he raised no money for Zhittya from Cardio investors.

proximate cause, certainly not of the damages cited by Flaa. The numbers assigned to the harm appear to be arbitrary. And the activity to which Flaa attributed the damages—breach of confidentiality obligations and fiduciary duties, have been held barred from action by laches.

The RICO claim fails.

## VIII. Civil Conspiracy

Cardio alleges civil conspiracy on the grounds Respondents conspired to start Zhittya to compete with Cardio in violation of their contractual agreements. The facts alleged are the same facts upon which the violation of the non-competition covenant claim is based.

For the reasons stated in connection with the non-competition covenant, the civil conspiracy claim is barred by laches.

## IX. Other Claims Against Respondents

During the hearing, evidence was adduced concerning a proposed stock offering in London that did not happen, allegedly because of comments Montano made to a reporter during the "quiet" period. There was also testimony that Montano was responsible for irritating note holders on a telephonic meeting call, which was responsible for the failure to refinance debt owed by Phage and the consequent bankruptcy filing against Phage.

There also was testimony by Flaa that suggested that Jacobs was responsible for the destruction of the Phage FGF-1 materials for non-payment of storage fees. Jacobs offered persuasive rebuttal testimony and documentary evidence.

Neither issue was the subject of post-hearing briefing by Cardio. The arbitrator finds that any claims based on this testimony are unproven.

## X. Counterclaims

Montano and Jacobs assert claims for unpaid wages. As noted, in 2009, Cardio adopted a resolution that unpaid employees would accrue a right to be paid an amount that represented their unpaid wages at a wage rate specified in the resolution, plus interest at 12% per annum, and that the amounts due the employees would increase as they worked and were not paid. It also states that the company was to obtain from employees a waiver of their claims for unpaid wages in exchange for payment of the sums specified in the resolution. Flaa reported to the board in 2012 that the amount owed to employees had risen from approximately $4 million in 2009 to more than $10 million in 2012. There was no evidence that anyone had been paid the amounts due to them under this resolution.

Montano asserts a claim for $4,984,399.97 and Jacobs a claim for $2,139,400.52. Cardio asserts various responses to these claims. One is equitable estoppel. It asserts that Respondents were well aware of their confidentiality and non-compete provisions in their employment

agreements, and of their fiduciary duties to Cardio while they were its employees. They intentionally violated both the employment agreement covenants and their fiduciary duties when they formed Zhittya while they were employees of Cardio expressly for the purpose of competing with it, then took with them confidential information they used to assist them in raising funds and putting together their business. Cardio argues that this should estop them from claiming monies promised to employees who worked for reduced or no wages as a matter of loyalty to the company, when they were disloyal to it.

The problem with this defense is that equitable estoppel requires that the party asserting estoppel must have relied upon the estopped parties' conduct to its detriment. *Nevada State Bank v. The Jamison Family Partnership,* 106 Nev. 792, 799, 801 P.2d 1377 (1990). Cardio offered Montano and Jacobs the terms of the 2009 resolution to induce them to continue to work for Cardio without being paid what was promised them. They did so. The conduct that is asserted as a basis for estopping them from claiming the benefits of that bargain occurred as they were under suspension due to the *status quo* order, almost five years after they chose to remain with Cardio, and following their termination. This does not justify estopping them from claiming wages under the resolution.

A second, and more applicable, argument is that the wage claims which the resolution offered future sums for accrued at each pay period, and that under Nevada law, each payment is a separate claim. Therefore, the six-year statute of limitations on a written contract should apply to these claims. NRS 11.190(1)(b). The wage claims were first asserted in this arbitration on January 11, 2019. Six years earlier is January 11, 2013. The stipulated *status quo* order in the Delaware Chancery Court prohibited Respondents from performing any services for Cardio after July 12, 2013. And Jacobs does not claim any amounts after the end of May, 2013 on grounds that he was locked out of Cardio at that point and could not do work after that date. Vol III, Tr. At 51. Therefore, they are entitled at most to their contractual pay from January 11, 2013 through May 31, 2013 for Jacobs, and July 12, 2013 for Montano. Cardio contends that neither of the Respondents have proven that they actually did their jobs during this period. Jacobs testified that there was no real scientific work to do after 2010, and Montano testified that he spent almost no time in the office in the years after 2009 because there were no real operations going on. He and Jacobs both, however, spent some time preparing solicitations to investors. The arbitrator cannot find that Montano and Jacobs were not doing their jobs for Cardio during the periods falling outside the statute of limitations. Both parties testified that a major function of Cardio was to raise funds to feed the drug-development phase from the beginning. The need was constant. The Respondents' time spent attempting to raise money to keep Cardio afloat after the financial collapse in 2007 through 2013 was the same job they did before, at least in part.

26

XI. Final Wage Claim Determinations

Following the issuance of the Interim Order on February 25, 2020, the text of which constitutes subparts I through X of this Final Order, the parties filed additional briefs on the question of wages due Respondents. What the arbitrator anticipated to be a simple question turned out to be rather complex. This Final Order supersedes the February 25 Interim Order on the wage issues to the degree that they are inconsistent. The wage issues pertaining to Jacobs and Montano will be dealt with separately below.

A. Jacobs

In its post-Interim Award briefing, Cardio revisits its argument that Jacobs' wages should be reduced because he did not perform full-time work for Cardio during the years after 2010. The arbitrator addressed this argument in the Interim Award and is not persuaded to reconsider that ruling.

To recap: Jacobs entered into the consulting agreement in 2010 under which he seeks to be paid. The agreement provides for possible adjustment of his pay based on workload. At the time the consulting agreement was entered into, Cardio was in financial trouble and was not conducting any significant drug-development work. It was in survival mode. Jacobs was doing minimal work directed at drug development. His primary task was supporting Montano by preparing materials to be used for fundraising. The company was aware of this when it entered into the consulting agreement and agreed to his wage rate. In the following years, it never made an effort to adjust his compensation. On Cardio's books, his wages remained at the contract rate, and accrued the additional 12% interest provided for by the 2009 board resolution.

Cardio now wants the tribunal to make a post-hoc reduction in Jacob's wages, claiming the employee has the burden to show he earned what Cardio's books credit him with doing. The burden is not on the employee in such a situation, but on the employer. Cardio did not make a showing at the hearing that would warrant a reduction in his wages, much less a finding that Jacob's contractual pay was unearned. Its post-Interim Award briefing adds nothing to its earlier arguments.

Jacobs' award will be determined by the terms of his contract, including the 12% interest accrued on unpaid wages. He filed his wage claim on January 11, 2019. The statute of limitations is six years. His claim runs from January 11, 2013 until May 31, 2013, as stated in the Interim Award. The wages due total $96,222.13 and they accrue interest at the rate of 12% per annum until paid per the 2009 board resolution.

B. Montano

The post-Interim Award briefing on Montano's wage claim presents several issues. The Interim Award found that Montano was entitled to both his unpaid wages from January 11, 2013

to July 12, 2013, as well as the 12% interest provided for in the 2009 board resolution. Cardio challenges the inclusion of the interest on the ground that the bankruptcy court disallowed that portion of his claim. Cardio also asserts that only 75% of Montano's wage claim is his to assert because the remainder was property of the bankruptcy estate. Montano has now conceded that he is entitled only to 75% of his wage claim. However, he disputes Cardio's 12% interest argument as well as the arbitrator's conclusion that the statute of limitations runs from January 11, 2013. He contends he is the beneficiary of a tolling agreement entered in the bankruptcy court. Cardio contests this claim.

### 1. 12% interest

Cardio notes that when Montano filed a Chapter 7 bankruptcy in 2013, he listed as an asset a wage claim against Cardio of $6,645,866.22. The bankruptcy trustee asked the court to disallow 25% of the wage claim and all interest per Nevada's exemption statute. The bankruptcy court granted the motion and ruled non-exempt any "interest" included in the wage claim and 25% of the wage claim. Cardio contends that the disallowance of "interest" included the 12% added to each month's wages under the 2009 board resolution.

Montano asserts that the 12% interest figure was added to the wages earned but unpaid as a "bonus" and is not fairly characterized as "interest," therefore, the "interest" attributable to the exempt 75% of his wage claim is part of the wages due him. Montano argues that the bankruptcy court was not aware of the terms of the board resolution, which only came to Montano's counsel's attention during this arbitration. He claims that this tribunal can determine that the 12% is a bonus and not interest. The arbitrator cannot agree with Montano's characterization of the 12%, or of this tribunal's freedom to disagree with the bankruptcy court.

To recap the 2009 board resolution: In June of 2009, Cardio was in arrears some $3.5 million due to employees for earned wages and, in some instances, reimbursable expenses. Under the terms of the June 17, 2009 Board Resolution (Resp. Ex. 5, pp. 4-5 & Ex. B to Bd. Minutes), Cardio agreed to pay employees their past due wages and other reimbursable expenses, plus interest on the amounts due accruing at 12% per annum until paid. It also agreed to grant them warrants for Cardio stock. Under the terms of the plan that was approved by the Board, the amounts due employees would be paid "as soon as it is available after taking care of current obligations including compensation, rent, trial costs and other ongoing operating expenses vendor liabilities as needed." (Ex. B to Bd. Minutes at 2.) While Mickael Flaa's memorandum proposing the 2009 wage settlement plan, which supported the board's resolution, did say that the company "would pay interest in the form of a bonus equal to 12% per annum based on the monthly outstanding balances," the board resolution never mentioned "bonus" in connection with the 12% and only referred to it as "interest." In addition, the amounts representing the 12% that were shown on entries of the books of the corporation that accompanied Flaa's memorandum were captioned "interest." *Id*. Money paid for the forbearance of a debt is the classic definition of interest. And the wages earned and unpaid were debts of Cardio. Montano's

characterization is not unreasonable, but is certainly debatable. However, it was never presented to the bankruptcy court.

The evidence is that Montano was deposed by the trustee in the bankruptcy case several months before the judge ruled the 12% to be interest. In that deposition, Montano was asked about the constituent elements of his wage claim. In response, he did not suggest that the 12% was anything other than what the books of Cardio characterized it as being—interest. In fact, he deferred to Cardio's accounting when asked about the issue.

The bankruptcy court disallowed "interest." There was evidence that the 12% was interest. Montano, like this tribunal, is bound by the bankruptcy court determination. Montano's wage award against Cardio will not include any portion of the 12% interest carried on Cardio's books.

### 2. Tolling Agreements and Abatement Order

Next, Montano contends that his recent review of the bankruptcy court proceedings reveals that he is entitled to a larger wage claim than suggested by the Interim Order because the statute of limitations pertaining to that claim was tolled in the bankruptcy court proceedings for two years, a fact of which his counsel was not fully aware until looking into the calculation of the wage award. He asserts that this tolling pushes the start of his wage claim back from January 11, 2013 to January 11, 2011.

In the bankruptcy, Cardio asserted breach of fiduciary duty and fraud claims against Montano as offsets to his wage claims, both the exempt and non-exempt portions, which were assets of the estate. To allow the parties time to negotiate a possible settlement agreement addressing these and other claims, all parties, including Cardio, Montano's ex-wife, the trustee, and Montano individually, entered into an agreement that tolled the running of applicable statutes of limitations that had not expired as of April 25, 2016. The agreement recites that the parties "do not believe it is in the best interest of the Estate, the Trustee, the Debtor or any party authorized by the Bankruptcy Court *to commence litigation against CVBT*, Victoria or the CVBT Parties *based on the [claims]*." (Tolling Agreement dated April 25, 2016, at 3.) (Emphasis added.) Under the terms of the agreement, it would expire upon the abandonment by the trustee of the non-barred claims, or January 15, 2017. In the event of its expiration, the tolling period would be extended an additional 60 days for Montano to allow him to assert the non-barred claims without the statutes recommencing to run.

The parties entered into seven extensions of this agreement, the last of which did not give Montano the 60-day extension. Ultimately, there was no settlement agreement and the trustee abandoned the exempt wage claims to Montano. The seventh extension expired on April 23, 2018. Montano did not file an action on his non-barred claims until January 11, 2019, when he asserted them in this arbitration as a counter-claim. Montano contends that he is entitled to an extension of the statute of limitations for the two years during which the agreement was in effect.

He asserts that the six-year Nevada statute of limitations and the tolling agreement, together, allow him to recover wages from January 11, 2011 through July 12, 2013.

Cardio responds that the tolling agreement has no continuing effect. By waiting to assert his wage claim until after the expiration of the tolling agreement, Montano lost any benefit it might have provided him. In effect, the tolling agreement ceased to have ever existed upon its expiration. Montano gained nothing by entering the tolling agreement and it cost him two years of his wage claim.

Cardio's approach to the tolling agreement is not consistent with the arbitrator's understanding of tolling agreements in general, and the language of this agreement fairly read does not support Cardio's conclusion. By its terms, the tolling agreement says that by executing it, all parties called "pause" to efforts to prosecute their claims while they attempted to reach a settlement. Should they fail, the tolled statute of limitations would begin to run again. Nothing in the agreement suggests that its termination would penalize Montano for the failure to reach an agreement by giving up two years of accrued claims. When Montano asserted his exempt claim for unpaid wages in this arbitration, his claim was limited by Nevada's six-year statute of limitations, but that statute had not operated for two years, allowing him to assert a claim for wages unpaid during the prior eight years, to January 11, 2011.

Relying only on the tolling agreement, the arbitrator concludes that Montano is entitled to assert wage claims from January 11, 2011 through July 12, 2013, when he was effectively barred from working. This makes it unnecessary to address Montano's alternative argument that somehow the fact that the competing claims of Montano and Cardio had become the subject of a "contested matter" scheduled to be heard before the bankruptcy court in September of 2018, attested to Montano's having begun a prosecution of his wage claims for purposes of the statute of limitations.

As an alternative argument seeking to avoid the arbitrator's construction of the tolling agreement, Cardio asserts that Montano waived the argument by not raising before this point. The arbitrator acknowledges that it does not appear to have been asserted earlier. However, it is also true that relatively little time was spent by either party in this arbitration on what occurred in the bankruptcy proceedings. Given that Cardio and Montano were parties to the tolling agreement, the assertion of the tolling agreement when it came time to determine the precise wage award cannot have come as a surprise to Cardio.

## XII. Respondent Cardio's Motion to Amend Interim Final Award and Objection to Award of Attorney's Fees and Costs

Following the issuance of the Partial Final Memorandum of Award on May 22, 2020, Respondents' counsel submitted a detailed request for costs and attorney's fees in response to the tribunal's award of costs and attorney's fees to Respondents. Cardio objected to a portion of the attorney's fees request.

Cardo also moved to amend the Partial Final Memorandum of Award on grounds that Montano is not entitled to a judgment for the full $900,000.00 in unpaid wages because, under Nevada law, a debtor is entitled to an exemption from execution only for earnings remaining "after the deduction from those earnings of any amounts required by law to be withheld." NRS § 21.090(1)(g)(1). Therefore, Cardio contends it owes Montano only $457,886.28 because Cardio owes the federal government on behalf of Montano $329,998.88 for federal withholding taxes, $8,537.40 for social security taxes, and $19,350.00 for Medicare taxes. In addition, Cardio asserts for the first time that it is entitled to a $50,000 credit against any award to Montano of unpaid wages per the bankruptcy court's Bankruptcy Settlement Approval. This credit should further reduce the award to Montano to $407,886.28.

Montano responds that he will be personally responsible for paying any taxes due to the federal government should he ever collect on his judgment. He notes that Cardio cites no precedent for the proposition that a judgment debtor must deduct withholding from a judgment for unpaid wages. Cardio simply relies on the Nevada exemption statute as the basis for this assertion. Montano also suggests that Cardio might not actually pay whatever might be due to the federal government as withholding, leaving him holding the bag. Alternatively, Montano asserts that his claim is not for wages, but for sums due under a contract, making no withholding due. In response to this last argument, Cardio asserts that if the sums sought by Montano are not a payment for "personal services" performed in the ordinary course of business but a simple debt, they are not exempt under NRS § 21.090(1)(g)(1). The consequence, Cardio argues, is that Montano is entitled to nothing on his counterclaim.

The arbitrator denies Cardio's motion to amend the award. It has been determined that the amount due Montano is unpaid wages earned for work done in the ordinary course of Cardio's business during its long downward spiral. That decision will not be revisited. As for the federal withholding issue, it has never been raised before this late moment. Cardio cites no precedent suggesting that the judgment for an unpaid wages claim should be reduced for unpaid withholding taxes. It simply cites the Nevada exemption statute and ties it into the fact that Montano had been in bankruptcy and is asserting an exempt claim. The arbitrator declines to venture into this new issue at this late moment on what he sees as inadequate briefing.

As for the $50,000 credit Cardio asserts it is entitled to from the bankruptcy court's settlement order, it can raise that claim at such time that Montano seeks to collect his judgment. This issue, too, was never raised before.

Moving to Respondents' bill for costs and attorney's fees: On the issue of costs, Cardio does not object to Respondents' cost bill of $20,997.17. On the issue of attorney's fees, Respondents accede to Cardio's objections to five discrete items totaling $2,464.00, leaving a balance of $171,375.17.

Cardio also objects to six additional attorney's fee items. A charge for preparing a retainer agreement and four instances in which Mr. Foley, Respondents' counsel, reviewed materials-- including depositions of Cardio witnesses who later testified in this arbitration-- that were generated in the 2018 involuntary bankruptcy proceeding against Cardio brought by former

31

employees. And all time spent preparing a Motion for Determination filed by Respondents but never ruled upon. Respondents' counsel contests each of these objections.

With respect to the retainer agreement, Mr. Foley states that preparing a complex retainer agreement that requires addressing conflicts among clients is something for which he routinely charges. Cardio makes no rejoinder. The arbitrator concludes that this is a matter upon which, different counsel may take differing views. Absent a more detailed objection, it will be allowed. As for the four instances of reviewing information and deposition transcripts from the Cardio bankruptcy, again Mr. Foley's explanation that it was reasonable trial preparation to familiarize himself with the testimony of Cardio witnesses in another related proceeding is persuasive. No rebuttal is offered. The amounts are relatively small. The requests are approved.

Finally, Cardio objects to awarding Respondents' attorney's fees for work done in connection with Respondents' Motion for Determination. In that motion Respondents had sought a ruling that, as a matter of law, Cardio could not prevail on its claim that Respondents possessed and used for the benefit of Zhyttia documents that were protected from such usage by the confidentiality provisions in Montano's and Jacobs' employment agreements. Respondents' ground for this assertion was that, as a matter of fact, the documents Cardio claimed to be protected as "confidential" actually had been widely distributed outside of Cardio without non-disclosure agreements, and that such distribution had been done as a matter of company policy. The motion papers were voluminous and included several detailed declarations describing this broad distribution. After the motion was filed, Cardio asked for an extension of time to respond to the motion. According to Respondents, Cardio never filed a response and the motion was never brought before the arbitrator for decision because the parties had not allowed sufficient time in their schedule to complete all the discovery and motion practice that had been contemplated before the hard date fixed for the hearing.

Cardio grounds its objection to the request for fees related to this Motion for Determination on a comment in the Interim Final Award where it states:

> Based upon the foregoing, Cardio's claims for enforcement of the employment agreement's confidentiality provision against Respondents are weak. The case is strong for a finding that the materials used and kept by Respondents fall within the [public disclosure] exception. But in the absence of a definitive determination on the Respondents' motion that was never submitted for decision, the arbitrator does not feel comfortable concluding that no confidential information has been taken or used.

Interim Final Award at 20.

Apparently, Cardio considers this support for the conclusion that the motion was not helpful in persuading the arbitrator on the question of whether the confidentiality provision of the employment agreement was breached and whether Cardio was entitled to relief for any such breach. The arbitrator does not agree.

The paragraph before the above-quoted section reads in part:

The arbitrator has reviewed [the Motion for Determination] papers and the declarations of Montano and Jacobs that were filed in support, and the arguments of Cardio to the contrary. The parties apparently agreed not to have the motion decided because they had fixed a firm hearing date that did not permit its resolution. But it is apparent that Montano, and Jacobs in support, disseminated many, many copies of materials without confidentiality protection to potential investors that mirror much of what Zhittya has distributed.

*Id.*

It was "based on" the Motion for Determination material reviewed by the arbitrator that in the next paragraph he concluded that "Cardio's claims for enforcement of the employment agreement's confidentiality provision against Respondents are weak." *Id.* And on page 21 of the award, in the next succeeding paragraph, it states that "Cardio's claims that all, or even most of [the materials in question] remained confidential by the time of their termination is not proven. Cardio has not undertaken to show systematically which documents disseminated by Montano and Jacobs after their termination were protected in all their earlier disseminations by Cardio. . . . Therefore, no relief can be granted."

In sum, despite the fact that the motion was not formally decided in favor of Respondents, it did provide substantial support for Respondents' contention that Cardio was unable to prove its claim of a violation of the confidentiality provision of the Employment Agreement. And the force of Respondents' showing in the motion papers may explain Cardio's desultory effort to shore up its claim to the contrary during the arbitration hearing.

The fees associated with the Motion for Determination are awarded. Respondents are not awarded fees in connection with Cardio's final Motion to Amend or its opposition to costs and fees.

BASED ON THE FOREGOING, IT IS ORDERED THAT:

1. Respondents, jointly and severally, pay to Cardio $10,000 as attorney fees as a consequence of their violation of Cardio's copyright in the September 2014 White Paper prepared for Zhittya. Respondents are enjoined from further distributing that White Paper;

2. Cardio pay to Montano $900,000, representing 75% of his unpaid wages of $1,200,000 for the period from January 11, 2011 through July 12, 2013, which amount is due and owing upon the entry of this order and is not subject to the contingency fixed by the 2009 board resolution measured by Cardio's ability to pay since Montano has been stripped of that resolution's 12% interest in exchange for forbearance provision;

3. Cardio pay to Jacobs $96,222.13, representing his unpaid wages for the period from January 11, 2013 through May 31, 2013, plus the 12% per annum interest that has

accrued on those wages since they were first due, per the 2009 board resolution. The unpaid wages continue to accrue interest at the rate of 12% per annum until paid, but need not be paid until Cardio has the necessary funds after "taking care of current obligations including compensation, rent, trial costs and other ongoing operating expenses vendor liabilities as needed;"

4. Cardio is otherwise denied relief on its remaining claims for the reasons set forth in this Final Award;

5. As prevailing parties, Mr. Montano and Dr. Jacobs are entitled to costs and reasonable attorney's fees. Therefore, Cardio is ordered to pay Respondents $171,375.17 as attorney fees, and $20,997.17 as costs; and

6. The administrative fees of the AAA totaling $2,950, the compensation of the Arbitrator totaling $88,934, and the expenses of the arbitrator totaling $851.94 shall be borne as incurred by Cardio.

This Final Memorandum of Award is in full settlement of all claims submitted to this arbitration. All claims not expressly granted are hereby, denied.


Dated: July 20, 2020


Signed: _____

Michael D. Zimmerman, Arbitrator


.

# EXHIBIT "J"

# EXHIBIT "J"

Matthew L. Johnson (6004)
JOHNSON & GUBLER, P.C.
8831 West Sahara Avenue
Las Vegas, NV 89117
Telephone (702) 388-1996
Facsimile (702) 471-0075
mjohnson@mjohnsonlaw.com
*Attorneys for Plaintiff*
*Cardiovascular BioTherapeutics, Inc.*

## SECOND AMENDED ARBITRATION DEMAND

| | |
|---|---|
| CARDIOVASCULAR BIOTHERAPEUTICS, INC., <br><br> Claimant, <br><br> vs. <br><br> DANIEL C. MONTANO, an individual, and JOHN W. JACOBS, an individual, <br><br> Respondents. | American Arbitration Case No. 01-18-0002-7794 <br><br> **COMPLAINT FOR BREACH OF CONTRACT, COPYRIGHT INFRINGEMENT, THEFT OF TRADE SECRETS, CIVIL RICO VIOLATIONS, VIOLATION OF LANHAM ACT, CIVIL CONSPIRACY, BREACH OF FIDUCIARY DUTIES, INJUNCTIVE AND OTHER RELIEF** |

Claimant CARDIOVASCULAR BIOTHERAPEUTICS, INC. ("***Cardio***"), for its Complaint for Breach of Contract, Copyright Infringement, Theft of Trade Secrets, Civil RICO Violations, Violation of Lanham Act, Civil Conspiracy, Breach of Fiduciary Duties, Injunctive and Other Relief against Respondents DANIEL C. MONTANO (***"Montano"***), and JOHN W. JACOBS ("***Jacobs***") (together, ***"Respondents"***), states as follows:

## INTRODUCTION

Cardio requests this Arbitration Panel's (the "Panel") intervention to prevent Respondents from continuing to execute their plan calculated to cause severe irreparable damage to Cardio through the breach of express contractual provisions agreed to by Montano and Jacobs relating to their post-employment activities and the actual, threatened and inevitable theft and dissemination of highly

108592001                                    1

1  confidential intellectual property rights, trade secrets, patents and copyright protected information

2  owned by Cardio (**"*Cardio Proprietary Information*"**).

3     Cardio is a biopharmaceutical company focused on developing recombinant human fibroblast

4  growth factors in various drug candidates for cardiovascular diseases, treatment of chronic wounds

5  and diabetic conditions.  Montano was employed by Cardio as its President and Chief Executive

6  Officer until his employment was terminated September 16, 2014 after a lengthy shareholder fight.

7  Jacobs was employed by Cardio as its Chief Scientific Officer until his employment was terminated on

8  September 16, 2014 after the same a lengthy shareholder fight.  In anticipation of their inevitable

9  termination of employment with Cardio, Montano and Jacobs formed Zhittya Regenerative Medicine,

10  Inc. ("*Zhittya*") as a Delaware corporation in June, 2014.  Zhittya was formed by Montano and Jacobs

11  for the express purpose of stealing and utilizing Cardio Proprietary Information to compete with

12  Cardio following Montano's and Jacob's inevitable termination of employment with Cardio.  At the

13  time of termination of their employment with Cardio, Montano and Jacobs were in possession of a

14  significant amount of Cardio Proprietary Information which they were required to return to Cardio

15  under their Employee Agreements (as defined below).  Further, under Montano's and Jacobs'

16  Employee Agreements, Montano and Jacobs were required to preserve the confidentiality of any

17  Cardio Proprietary Information in their possession following the termination of his employment.

18  Montano and Jacobs were also prohibited under their Employee Agreements from using Cardio

19  Proprietary Information for personal gain or in competition with Cardio.  Despite lawful demands

20  from Cardio for the return by Montano and Jacobs of the Cardio Proprietary Information in their

21  possessions.  Montano and Jacobs have failed and refused to return such Confidential Proprietary

22  Information to Cardio.

23     Montano and Jacobs have, accordingly, breached their contractual obligations under the

24  Employee Agreements which required Montano and Jacobs upon termination of their employment to

25  (i) return all Cardio property and Cardio Proprietary Information to Cardio, (ii) preserve the

26  confidentiality of the Cardio Proprietary Information and (iii) refrain from using Cardio Proprietary

1  Information to compete with Cardio or for personal gain (collectively, the *"Post-Employment*
2  *Obligations"*). To the contrary, instead of returning all such Cardio Proprietary Information to Cardio
3  as required by their Employee Agreements, Montano and Jacobs are now engaging in a course of
4  conduct, in concert with others, in breach of their Employee Agreements, to misappropriate (steal)
5  Cardio Proprietary Information so that such proprietary information can be used in their newly created
6  company, Zhittya, to compete with Cardio for Montano's and Jacobs' personal benefit.

7          As noted above, as part of Montano's and Jacobs' unlawful scheme to misappropriate, steal and
8  disseminate Cardio Proprietary Information, Montano and Jacobs formed Zhittya in Delaware on June
9  30, 2014 and registered Zhittya to do business in Nevada on July 15, 2014.  Zhittya was formed by
10  Montano and Jacobs for the sole purpose of unlawfully stealing Cardio Proprietary Information so that
11  such Cardio Proprietary Information could be used by Zhittya to unlawfully compete with Cardio.
12  Following its registration to do business in Nevada, Zhittya commenced publishing "white papers"
13  authored by Jacobs on the internet to promote Zhittya's "new business" in direct competition with
14  Cardio relating to the treatment of diabetic foot ulcers, venous ulcers, coronary heart disease and other
15  angiogenesis treatments which included copyright protected material exclusively owned by Cardio
16  (the *"Infringed Materials"*), as well as additional Cardio Proprietary Information which had been
17  taken, converted and/or misappropriated by Montano and Jacobs from Cardio.

18          In addition, Montano and Jacobs have engaged in a course of action in which they are
19  publishing false and misleading misrepresentations of fact that are intended to cause confusion and
20  mistakes in order to deceive and misrepresent the nature, characteristics, quality and origin of the
21  alleged commercial development of FGF-1 to be applied in the treatment of various diseases and
22  medical conditions (collectively, the "FGF-1 R&D and Commercialization") as having been financed,
23  developed and progressed through clinical, animal and human trials which they personally financed
24  and developed over a decade and over which they now have the individual ownership rights to
25  commercialize.  This is an outright deception and misrepresentation by Montano and Jacobs of the
26  nature and origin of the FGF-1 R&D and Commercialization, which, in fact, was undertaken and

conducted by Cardio and financed by Cardio's shareholders and its investors and, Cardio and its shareholders are the exclusive owners of the proprietary and confidential intellectual property rights related to the FGF-1 R&D and Commercialization developed by Cardio and financed by its shareholders and investors.

This arbitration proceeding has additionally been instituted by Cardio for the purpose of, *inter alia*, seeking a preliminary and permanent injunction against Montano and Jacobs requiring Montano and Jacobs, and all others acting in concert with them to immediately cease using and publishing Cardio Proprietary Information for any purpose and to immediately return to Cardio all Cardio Proprietary Information and property in Respondents' possession, custody or control and for a permanent injunction requiring Montano and Jacobs, and all others acting in concert with them to permanently cease using Cardio Proprietary Information for any purpose. Cardio additionally seeks monetary damages against Montano and Jacobs for breach of contract, theft of trade secrets, civil RICO violations, violation of the Lanham Act, civil conspiracy, copyright infringement, and breach of fiduciary duties.

## NATURE OF THE ACTION

1.     This is an action for breach of contract, copyright infringement, the theft of trade secrets, civil RICO violations, violation of Lanham Act, civil conspiracy, and breach of fiduciary duties.  Cardio seeks temporary, preliminary, and permanent injunctive relief in addition to monetary damages.

2.     Until September 2014, Montano and Jacobs were employed as Directors and Officers of Cardio.  In their respective positions, Montano and Jacobs gained access to all Cardio Proprietary Information, including access to information relating to patent applications, drug development processes, clinical trials, animal trials, human trials, marketing strategies and potential marketing and financial partners.  This highly sensitive and proprietary information was made available to Montano and Jacobs as a result of the investment of in excess of $100,000,000 Cardio shareholders and investors who mistakenly placed their trust in Montano and Jacobs to honor their contract obligations

108592601

4

1   and fiduciary duties to Cardio's shareholders and investors to protect and develop Cardio's invaluable
2   intellectual property rights for the benefit of Cardio's shareholders.

3       3.   During Montano's and Jacobs' employment with Cardio, they acquired copies of
4   substantially all of Cardio's Proprietary Information and, following their termination of employment
5   with Cardio, Montano and Jacobs, in breach of their Employee Agreements and in breach of their
6   fiduciary duties to the shareholders of Cardio have retained, and still possess, copies of all, or
7   substantially all, of such Cardio Proprietary Information, including a copy of the Merck Data (as
8   defined below), all of which Montano and Jacobs are now falsely claiming was developed and is
9   owned by Montano and Jacobs through their newly formed company Zhittya.

10      4.   Based upon website postings by Montano, Zhittya and others, and the dissemination of
11  plagiarized "white papers" under Zhittya's name, it has become clear that Montano and Jacobs, in
12  violation of their Post-Employment Obligations, are actively utilizing Cardio Proprietary Information
13  for his own personal gain through their newly formed company, Zhittya, to develop and market
14  FGF-1 human protein applications paid for and developed by Cardio in direct competition with
15  Cardio.

16      5.   Upon information and belief, Montano and Jacobs are acting in concert with others
17  who are knowingly aiding and abetting Montano and Jacobs in violating their Post-Employment
18  Obligations and their theft of trade secrets from Cardio.

19      6.   Accordingly, Cardio seeks to temporarily, preliminarily, and permanently enjoin
20  Montano and Jacobs and all parties acting in concert with them from using or threatening to use
21  Cardio's confidential and/or trade secret information in any business or undertaking in competition
22  with Cardio. In addition, Cardio seeks to obtain an temporary, preliminary, and permanent mandatory
23  injunction ordering Montano and Jacobs and all parties acting in concert with them to immediately
24  return to Cardio all tangible expressions of Cardio Proprietary Information in their possession, custody
25  or control.

26

108592601

5

7.      Absent such injunctive relief, Cardio faces irreparable injury, including the loss of markets for its biopharmaceutical business, its exclusive competitive advantage and its trade secrets and goodwill in amounts which likely will be impossible to determine unless Montano and Jacobs and all others acting in concert with them are enjoined and restrained by order of this Panel at once.

**PARTIES**

8.      CardioVascular BioTherapeutics, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dallas, Texas.

9.      Respondent Daniel C. Montano is an individual who is domiciled and a resident of Las Vegas, Nevada who regularly conducts business in Las Vegas, Nevada.

10.     Respondent John W. Jacobs is an individual who is domiciled in and a resident of Las Vegas, Nevada who has regularly conducted business in Las Vegas, Nevada.

**JURISDICTION AND VENUE**

11.     This Panel has jurisdiction and authority to administer and enforce the arbitration of the claims asserted by Cardio against Respondent Montano in Clark County, Nevada under the provisions of Paragraph 9 of the January 1, 2007 Employment Agreement between Cardio and Montano and the Cardio Arbitration Policy acknowledged by Montano on May 23, 2007.

12.     This Panel has jurisdiction and authority to administer and enforce the arbitration of the claims asserted by Cardio against Respondent Jacobs in Clark County, Nevada (i) under the provisions of Paragraph 9 of the January 1, 2007 Employment Agreement between Cardio and Jacobs, (ii)  under the provisions of Paragraph 21 of the March 1, 2010 Consulting Agreement between Cardio and Jacobs and (iii) a February 19, 2015 Order from the United States District Court for the District of Nevada compelling arbitration of Cardio's claims against Respondent Jacobs.

**FACTUAL ALLEGATIONS**

13.     Cardio is a biopharmaceutical company developing protein drug candidates to address diseases that result from lack of blood flow to a tissue or organ.  Cardio's drug candidates address such diseases by growing blood vessels for the treatment, *inter alia*, of heart disease, lumbar

ischemia, bed sores, stroke, spinal cord injury, neuropathy, Parkinson's Disease, ALS, multiple sclerosis, kidney ischemia, pancreatitis, bone repair, cartilage repair, hair growth induction, diabetic foot ulcers, severe coronary microvascular disease, erectile dysfunction and peripheral artery diseases (***"Cardio's Biopharmaceutical Business"***). The active pharmaceutical ingredient in Cardio's drug candidates is FGF-1, a human protein that stimulates the growth of new blood vessels, thereby increasing the blood supply to ischemic organs and tissues.

14.     Montano was Chairman of the Board, President and Chief Executive Officer of Cardio until September 16, 2014 when Cardio terminated Montano's role with Cardio as President and Chief Executive Officer. Prior to his termination on September 16, 2014, Montano had entered into an Employment Agreement with Cardio dated January 1, 2007 (the ***"Montano Employment Agreement"***), a true and correct copy of which is attached hereto as Exhibit "A". Montano's Employment Agreement imposed obligations upon Montano to maintain the confidentiality of all Cardio Proprietary Information and to refrain from utilizing any Cardio Proprietary Information to directly or indirectly compete with Cardio during or following his employment with Cardio. Additionally, Montano agreed under the provisions of Section 6.2(b) of his Employment Agreement, that if Montano used any Cardio Proprietary Information other than in connection with his employment with Cardio, any gain or profit derived by Montano as a result of Montano's use of such Cardio Proprietary Information would be held in trust for the benefit of Cardio and would be remitted by Montano to Cardio upon demand.   Further, during Montano's employment with Cardio, Montano was subject to an Employee (Contract) Confidential Information and Non-Solicitation Agreement dated March 11, 1998 (the ***"Montano Confidential Information Agreement"***), a true and correct copy of which is attached hereto as Exhibit "B". Montano was additionally subject to a Code of Business Conduct (the ***"Code of Conduct"***), a true and correct copy of which is attached hereto as Exhibit "C", and an Arbitration Policy, to which he agreed on May 23, 2007, a true and correct copy of which is attached hereto as Exhibit "D". The Montano Confidential Information Agreement and the Code of Conduct imposed additional obligations upon Montano to maintain the confidentiality of

7

1   all Cardio Proprietary Information and to refrain from utilizing any Cardio Proprietary Information to

2   directly or indirectly compete with Cardio during or following Montano's employment with Cardio.

3   The Montano Employment Agreement, the Montano Confidential Information Agreement, the Code

4   of Conduct and the Arbitration Policy are collectively referred to herein as the "*Montano Employee*

5   *Agreements*."

6        15.    Jacobs was a Director and Chief Scientific Officer and Chief Operating Officer of

7   Cardio until September 18, 2014 when Cardio terminated Jacobs' role with Cardio as a Director,

8   Chief Scientific Officer and Chief Operating Officer.  Prior to his termination on September 18,

9   2014, Jacobs had entered into an Employment Agreement with Cardio dated January 1, 2007 (the

10  "*Jacobs' Employment Agreement*"), a true and correct copy of which is attached hereto as

11  Exhibit "E".  Jacobs' Employment Agreement imposed obligations upon Jacobs to maintain the

12  confidentiality of all Cardio Proprietary Information and to refrain from utilizing any Cardio

13  Proprietary Information to directly or indirectly compete with Cardio during or following his

14  employment with Cardio.  Additionally, Jacobs agreed under the provisions of Section 6.2(b) of the

15  Jacobs Employment Agreement that if Jacobs use any Cardio Proprietary Information other than in

16  connection with his employment with Cardio, any gain or profit derived by Jacobs as a result of

17  Jacobs' use of such Cardio Proprietary Information would be held in trust for the benefit of Cardio

18  and would be remitted by Jacobs to Cardio or demand.  Although Jacobs' Employment Agreement

19  was replaced by a Consulting Agreement between Jacobs and Cardio dated March 1, 2010 (the

20  "*Consulting Agreement*"), a true and correct copy of which is attached hereto as Exhibit "F", Jacobs

21  continued to remain subject to the confidentiality and non-compete obligations under his

22  Employment Agreement.  Jacobs was further subject to September 22, 2004 Employee (Contract)

23  Confidential Information and Non-Solicitation Agreement (the "*Jacobs' Confidential Information*

24  *Agreement*") which prohibited Jacobs from using any Cardio Proprietary Information to compete in

25  any way with Cardio during or following his employment with Cardio, a true and correct copy of

26  which is attached hereto as Exhibit G.  Further, during Jacobs' employment with Cardio, Jacobs was

108592601

8

1   subject to the same Code of Business Conduct which was applicable to Montano, a copy of which is

2   attached hereto as Exhibit "C".  The Jacobs' Employment Agreement, the Consulting Agreement,

3   Jacobs' Confidential Information Agreement and the Code of Conduct are collectively referred to

4   herein as the *"Jacobs' Employee Agreements*.")

5          16.     Montano's Employee Agreements and Jacobs' Employee Agreements (collectively,

6   the *"Employee Agreements"*), which were in effect when Montano and Jacobs were terminated on

7   September 18, 2014, contained reasonable post-employment obligations relating to (1) the

8   confidentiality of Cardio Proprietary Information, (2) the return of all tangible expressions of Cardio

9   Proprietary Information and all other Cardio property and (3) Montano's and Jacobs' obligations to

10  refrain from using Cardio Proprietary Information for personal financial gain or to compete with

11  Cardio's Biopharmaceutical Business (collectively, the *"Post-Employment Obligations"*).

12         17.     During the periods of time Montano and Jacobs were employed by Cardio and were

13  subject to the terms of their Employee Agreements, Montano and Jacobs had access to and came into

14  possession of valuable Cardio Proprietary Information, including confidential and proprietary

15  information relating to Cardio's intellectual property rights, trade secrets, clinical drug trials, animal

16  trials, human trials, and other important strategic information about Cardio's business and marketing

17  plans and strategies and copyright protected original works of authorship published in writing by

18  Cardio.   Montano's and Jacobs' access to Cardio Proprietary Information included access to

19  confidential FDA clinical trials exclusively licensed to Cardio by Merck Sharp and Dome dated

20  November 22, 2010 (the *"Merck Data"*).  A true and correct copy of Cardio's License Agreement

21  with Merck Sharp & Dome Corp. (the *"Merck License"*) is attached hereto as Exhibit "H".

22         18.     Following a lengthy shareholder fight for control of Cardio, Montano and Jacobs were

23  terminated from all positions they held as employees, officers and directors of Cardio on September

24  18, 2014. Immediately following their termination, demands were made upon Montano and Jacobs to

25  comply with their Post-Employment Obligations to immediately (1) return to Cardio all tangible

26  expressions of Cardio Proprietary Information and all other Cardio property and (2) refrain from

1  disclosing or utilizing any Cardio Proprietary Information, either individually or in conjunction with

2  others, to directly or indirectly compete with Cardio.  True and correct copies of Cardio's demands to

3  Montano and Jacobs are attached hereto as Exhibit "I" and Exhibit "J".

4      19.    Despite Cardio's demands to Montano and Jacobs for a return of all tangible

5  expressions of Cardio Proprietary Information following their termination of employment with

6  Cardio, Montano and Jacobs have failed and refused to return any Cardio Proprietary Information to

7  Cardio.

8      20.    Instead, pursuant to a scheme devised by Montano and Jacobs while still employed by

9  Cardio, before and after Montano and Jacobs' termination of employment, Montano and Jacobs

10  began to actively pursue a course of action in which they utilized Cardio Proprietary Information, in

11  violation of their Post-Employment Obligations under the Employee Agreements, to form and

12  participate in Zhittya for the purpose of competing with Cardio utilizing (stealing) Cardio Proprietary

13  Information.

14      21.    Following Montano and Jacobs' formation of Zhittya, Zhittya published a number of

15  "white papers" on the internet authored by Jacobs promoting Zhittya's activities in direct competition

16  with Cardio (the *"White Papers"*).  A true and correct listing of these White Papers is attached hereto

17  as Exhibit K.

18      22.    Further, Daniel M. Montano, a co-founder of Zhittya along with Jacobs, has published

19  statements on the internet that Zhittya will disseminate the White Papers to anyone who requests a

20  copy.  See Exhibit "K" attached hereto.

21      23.    Zhittya's White Papers includes wholesale reproductions of the original works of

22  authorship by Cardio subject to protection under U.S. copyright laws.

23      24.    Provisions of Cardio's original works of authorship, subject to protection under U.S.

24  copyright laws, have been reproduced by Montano and Jacobs in violation of copyright laws and

25  reprinted in the White Papers.

26

108592601

10

25.     Since their termination of employment with Cardio, Montano and Jacob, through their newly formed company Zhittya have engaged in a continuous course of activity of fraudulently representing that they, individually, have expended over $130 Million Dollars over thirty (30) years of biological research and clinical trials to advance the treatments described in Zhittya's White Papers claiming that Zhittya has the right to develop and market the treatment processes described the White Papers, when, in fact, the intellectual property rights that are the basis of those treatments were developed by and are owned by Cardio.  Montano and Jacobs are falsely claiming that Zhittya is the owner of all of Cardio's Proprietary Information and is using such false claims to commit securities fraud, mail fraud, wire fraud, theft of trade secrets, violations of the Lanham Act and infringement of copyright laws to attempt to raise money from unsuspecting investors in a fraudulent scheme in which Montano and Jacobs falsely represent ownership rights to potential treatment procedures which they are contractually and legally prohibited from marketing in competition with Cardio.

26.     If Montano and Jacobs and all others acting in concert with them are not immediately enjoined from violating their Post-Employment Obligations, the knowledge and information that these parties possess and are disclosing to third parties will enable investors in the newly formed Zhittya to save millions of dollars in start-up costs and erode Cardio's trade secrets, confidential and proprietary business information, and prospective investor relationships and goodwill.

27.     Absent immediate intervention by this Panel, Cardio expects Montano's and Jacobs' activities in violation of their Post-Employment Obligations to result in an irreparable damage to Cardio as a result of Montano's and Jacobs' misappropriation of Cardio's years of extensive research, clinical trials and invaluable FDA trial data exclusively licensed to Cardio.

28.     Cardio's confidential and proprietary information is not generally available to the public, is of great value to Cardio and would give any of its competitors who acquired such information, including Montano, Jacobs and those acting in concert with him, an unfair competitive advantage.

29.     Cardio had and has processes and procedures in place to rigorously maintain the confidentiality of the Cardio Proprietary Information because such information provides Cardio a competitive advantage in the marketplace from which Cardio derives substantial economic value.

30.     Montano's and Jacobs's post-employment breaches of contract, misappropriation of trade secrets and improper use of Cardio Proprietary Information in competition with Cardio is irreparably harming Cardio and poses an immediate and ongoing threat to Cardio's Biopharmaceutical Business, its intellectual property rights and trade secrets that must be enjoined because Cardio has no adequate remedy at law.

31.     Cardio's trade secrets and confidential and proprietary information are of great value to Cardio and would give any competitor of Cardio—including Montano and Jacobs and those acting in concert with them—an unfair competitive advantage.  Specifically, Cardio's trade secrets and other proprietary information are of great value to Cardio and such information would give any competitor, who improperly acquired such information, an unfair competitive advantage by:  not expending the time and resources to develop the trade secret and confidential and proprietary information as Cardio has done; quickly developing products and technologies to unfairly compete with Cardio in order to diminish Cardio's head start; alerting a competitor as to initiatives that should and should not be pursued; and other improper advantages.

32.     All told, Montano and Jacobs and those acting in concert with them are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Cardio, including the loss of value of confidential and/or proprietary information, the loss of long-standing prospective investor relationships, loss of goodwill, as well as damage to Cardio's reputation as an industry leader and its ability to successfully market its drug applications.  Money alone cannot make Cardio whole.

## COUNT I

## BREACH OF CONTRACT AND INJUNCTIVE RELIEF

33.     Cardio hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 32.

34. The Employee Agreements that Montano and Jacobs entered into with Cardio constitute valid and enforceable contracts.

35. Cardio performed all of the duties and obligations it legally owes to Montano and Jacobs under the Employee Agreements.

36. The Post Employment Obligations and activity restrictions contained in the Employee Agreements are reasonable in both scope and duration, and are necessary to protect Cardio's legitimate protectable interests in its confidential business information, as well as its business relationships, goodwill and other legitimate business interests.

37. Montano and Jacobs breached, and continue to breach, then Post Employment Obligations to Cardio by failing and refusing to return all tangible expressions of Cardio Proprietary Information in their possession following their termination of employment and by using, in concert with others, such Cardio Proprietary Information to form and utilize Zhittya and possibly other companies to compete with Cardio.

38. As a result of Montano's and Jacobs's breaches of their Employee Agreements, Cardio has been irreparably injured, and it continues to face irreparable injury. Cardio is threatened with losing the value of its confidential and proprietary information and valuable business opportunities, along with income and goodwill, for which a remedy at law is inadequate.

39. Accordingly, Montano, Jacobs and Zhittya and others acting in concert with them, must be enjoined and restrained by Order of this Panel. To the extent a remedy at equity is inadequate, Cardio seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

40. Cardio is also entitled to recover from Montano and Jacobs' and any profits attributable to their use of Cardio Confidential Proprietary Information in competition with Cardio in violation of their Employee Agreements.

108592601

13

## COUNT II

## VIOLATION OF COPYRIGHT LAWS AND INJUNCTIVE RELIEF

41. Cardio hereby repeats, realleging and incorporates by reference the allegations which are contained in paragraphs 1 through 40.

42. Through their conduct as set forth herein, Montano and Jacobs have infringed upon Cardio's copyrights in the Infringed Materials in violation of Sections 106 and 501 of the Copyright, 17 U.S.C. §§ 106 and 501.

43. Montano's and Jacobs' acts of infringement are willful, purposeful, in reckless disregard and with knowledge of Cardio's rights.

44. As a direct and proximate result of said infringement by Montano and Jacobs, Cardio is entitled to damages in an amount to be proven at trial.

45. Cardio is also entitled to Montano's and Jacobs' profits attributable to the infringement, pursuant to 17 U.S.C. § 504(b), including an accounting of and a constructive trust with respect to any profits attributable to Zhittya's unlawful use of Cardio Proprietary Information.

46. Cardio further is entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and otherwise according to law.

47. As a direct and proximate result of the foregoing acts and conduct, Cardio has sustained and will continue to sustain substantial, immediate and irreparable injury, for which there is no adequate remedy at law. Cardio is informed and believes and on that basis avers that unless enjoined and restrained by this Panel, Montano, Jacobs and Zhittya will continue to infringe Cardio's rights in the Infringed Material. Cardio is entitled to preliminary and permanent injunctive relief to restrain and enjoin Jacobs' continuing infringing conduct.

108592601

14

## COUNT III

### ACTUAL MISAPPROPRIATION OF TRADE SECRETS AND INJUNCTIVE RELIEF

### (NEVADA UNIFORM TRADE SECRET ACT, NRS §600A.010, ET SEQ.)

48.     Cardio hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 47.

49.     Cardio's Proprietary Information includes, *inter alia,* information relating to Cardio's to patent applications, drug development processes, clinical trials, marketing strategies, Cardio's investors, potential marketing and financial partners and access to the Merck Data.

50.     This information constitutes trade secrets, pursuant to the Nevada Uniform Trade Secret Act, NRS 600A.10, *et seq.,* because Cardio derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

51.     Montano and Jacobs have misappropriated Cardio's trade secrets without Cardio's consent, in violation of Nevada law. Montano and Jacobs cannot participate in the formation of companies in competition with Cardio utilizing and disclosing Cardio's confidential information.

52.     Montano and Jacobs and those acting in concert with them will be or are being unjustly enriched by the misappropriation of Cardio's trade secrets and/or confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Cardio's trade secrets and confidential information.

53.     Upon information and belief, Montano and Jacobs' actual and/or threatened misappropriation has been willful and malicious.

54.     As a result of the threatened and/or actual misappropriation of Cardio's trade secrets, Cardio has been injured and faces irreparable injury. Cardio is threatened with losing financial partners, its trade secrets and goodwill in amounts which will be impossible to determine, unless

108592601

15

Montano and Jacobs and those acting in concert with him are permanently enjoined and restrained by order of this Panel.

## COUNT IV

### VIOLATION OF FEDERAL RICO STATUTES

55.    Cardio hereby incorporates and re-allege the above paragraphs as if set forth fully herein.

56.    Cardio brings a claim for violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") pursuant to 18 U.S.C. § 1962(c) against Respondents Montano and Jacobs and others acting in concert with them who have engaged in a pattern of thefts of trade secrets and the publishing fraudulent and false statements and plagiarized materials other misrepresentations through wire and mail fraud with the intent to defraud Cardio of its ability to generate business profits and prevent Cardio's potential customers from purchasing and using Cardio's products which are in the process of being brought to market.    Cardio has suffered and continues to suffer monetary damages as a result of Montano's and Jacobs' racketeering activity.    As a result of Montano's and Jacobs' violation of RICO, Cardio is entitled to recover treble damages caused by Montano and Jacobs to Cardio's business plus costs of suit and attorneys' fees.

## COUNT V

### VIOLATION OF THE LANHAM ACT (41 U.S.C. §1125(a))

57.    Cardio hereby incorporates and re-alleges the above paragraphs as if set forth fully herein.

58.    Cardio brings a claim for violation of the Lanham Act, 41 U.S.C. §1125(a), based upon the course of conduct engaged in by Montano and Jacobs in which they are publishing false and misleading misrepresentations of fact that are intended to cause confusion and mistakes in order to deceive and misrepresent the nature, characteristics, quality and origin of the alleged commercial development of FGF-1 to be applied in the treatment of various diseases and medical conditions as having been financed, developed and progressed through clinical, animal and human trials which they

1 | personally financed and developed over a decade and over which they now have the individual
2 | ownership rights to commercialize, when, in fact, this FGF-1 R&D and Commercialization was
3 | undertaken and conducted and owned by Cardio and financed by Cardio's shareholders and investors.
4 | Cardio has suffered and continues to suffer monetary damages as a result of Montano's activities in
5 | violation of the Lanham Act, 41 U.S.C. §1125(a), entitling Cardio to recover monetary damages and
6 | attorneys' fees as a result of such violations.

7 | **COUNT VI**
8 | **MISAPPROPRIATION OF TRADE SECRETS**

9 | 59.    Cardio hereby incorporates and re-alleges the above paragraphs as if set forth fully
10 | herein.

11 | 60.    Cardio brings a claim for misappropriation of trade secrets under 18 U.S. Code
12 | § 1836.  Montano and Jacobs have maliciously engaged in the misappropriation of trade secrets
13 | lawfully owned by Cardio during the period of time from May 11, 2016 to the present.

14 | 61.    As a result of Montano's and Jacob's malicious actions in the misappropriation of
15 | Cardio's trade secrets, Cardio is entitled to recover from Montano and Jacobs actual damages,
16 | punitive damages and recovery of any unjust enrichment realized by Montano and Jacobs as a result
17 | of Montano's and Jacobs' misappropriation of Cardio's trade secrets along with a recovery of Cardio's
18 | reasonable attorney's fees incurred in pursuing its claims against Montano and Jacobs.

19 |
20 | **COUNT VII**
21 | **CIVIL CONSPIRACY**

22 | 62.    Cardio hereby incorporates and re-allege the above paragraphs as if set forth fully
23 | herein.

24 | 63.    Cardio brings a claim for civil conspiracy against Montano and Jacobs.   Montano and
25 | Jacobs conspired to accomplish unlawful objectives against Cardio, specifically thefts of trade secrets
26 | and breaches of contractual obligations to protect and preserve proprietary confidential information

1  relating to Cardio, its intellectual property rights and trade secrets.  Montano and Jacobs acted in

2  concert to deliberately deprive Cardio of its valuable property rights as more particularly described

3  above and Cardio is entitled to recover from Montano and Jacobs the damages it has suffered as a

4  result thereof.

5                               **COUNT VIII**

6                        **BREACH OF FIDUCIARY DUTIES**

7        64.    Cardio hereby incorporates and re-alleges the above paragraphs as if set forth fully

8  herein.

9        65.    Cardio brings a claim of breach of fiduciary duties against Montano and Jacobs.

10 Montano and Jacobs were officers and directors of Cardio until they were removed from such

11 positions in June, 2014.  As officers and directors of Cardio, Monsanto and Jacobs owed Cardio and

12 its shareholders a fiduciary obligation of honesty, loyalty, good faith and fairness.  *Singer v.*

13 *Magnavox Company*, 380 A.2d 969 (Del.1977).  Montano's and Jacobs' thefts of trade secrets and

14 their willful failure to protect and preserve proprietary confidential information relating to Cardio,

15 and their use of Cardio's trade secrets and proprietary confidential information relating to Cardio, and

16 their use of Cardio's trade secrets and proprietary and confidential to compete with Cardio through

17 their newly formed company, Zhittya, constitutes a violation of Montano's and Jacobs' fiduciary

18 duties to Cardio and its shareholders, for which Cardio is entitled to recover the damages Cardio has

19 suffered as a result thereof and additionally entitling Cardio to recover from Respondents any profits

20 realized by Respondents as a result of Montano's and Jacob's breaches of fiduciary duties.

21                        **PRAYER FOR RELIEF**

22        WHEREFORE, Cardio seeks judgment in its favor and an Order against Montano and Jacobs

23  that grants the following relief:

24        A.    Temporarily, preliminarily, and permanently enjoining Respondents Montano and

25 Jacobs and all parties in active concert or participation with them, from using or disclosing any of

26 Cardio's confidential, proprietary and/or trade secret information;

108992601                        18

B.    Temporarily, preliminarily, and permanently enjoining Respondents Montano and Jacobs and all parties in active concert or participation with them, from directly or indirectly engaging in any business in competition with Cardio which utilizes any of Cardio's confidential, proprietary and/or trade secret information.

C.    Orders Respondents Montano and Jacobs and all parties in active concert or participation with them to return to Cardio all originals and copies of all files, devices and/or documents that contain or relate to Cardio's confidential and proprietary information, including without limitation, all computers, electronic media, and electronic storage devices;

D.    Awards Cardio actual, incidental, compensatory, treble and consequential damages to be proven at trial;

E.    Awards Cardio exemplary or punitive damages in an amount to be proven at trial due to Montano's and Jacobs' willful and malicious activities;

F.    Awards Cardio its costs and expenses incurred herein, including reasonable attorneys' fees and interest, pursuant to NRS 600A.060;

G.    Awards Cardio damages in the amount of any and all unjust enrichment realized by Montano and Jacobs and Zhittya as a result of then unlawful use of Cardio's confidential, proprietary and/or trade secret information; and

H.    Awards Cardio such further relief as the Panel deems necessary and just.

*[Signature Page Follows]*

1 | DATED:  April 9, 2019

2 | Respectfully submitted.

3 | DENTONS US LLP

4 | By:  /s/ *Barry F. Cannaday*
Barry F. Cannaday
5 | 2000 McKinney Ave
Suite 1900
6 | Dallas, Texas 75201
Telephone: (214) 259-1855
7 | Facsimile: (214) 259-0910
barry.cannaday@dentons.com

8 |

9 | Matthew L. Johnson, Esq.
JOHNSON & GUBLER, P.C.
10 | 8831 West Sahara Avenue
Las Vegas, Nevada 89117
11 | Telephone:  (702) 471-0065
Facsimile:  (702) 471-0075
12 | mjohnson@mjohnsonlaw.com

13 |

14 | *Attorneys for Plaintiff*
*CardioVascular BioTherapeutics, Inc.*

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

108592601

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this Second Amended Demand for Arbitration has been served via e-mail on the 9th day of April, 2019 as follows:  dan@foleyoakes.com.

Barry F. Cannaday

108592601

21